UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

IN RE: HURRICANE SANDY CASES

THIS DOCUMENT APPLIES TO:                    **14 MC 41**

DEBORAH RAIMEY AND LARRY RAISFELD            **2:14-cv-00461 (JFB)(SIL)(GRB)**
V.
WRIGHT FLOOD

Docket No.:
14-cv-00461-JFB-WDW
------------------------------------------------------------X

**PLAINTIFFS' OPPOSITION TO WRIGHT NATIONAL FLOOD INSURANCE
COMPANY'S OBJECTIONS TO MAGISTRATE JUDGE GARY BROWN'S ORDER
DATED NOVEMBER 7, 2014**


DATED: December 1, 2014


THE MOSTYN LAW FIRM

 */s/ J. Steve Mostyn*
J. Steve Mostyn
JM9387
Texas State Bar No. 00798389
René M. Sigman
RS1594
Texas State Bar No. 24037492
3810 West Alabama Street
Houston, Texas 77027
(713) 861-6616 (Office)
(713) 861-8084 (Facsimile)

**ATTORNEYS FOR PLAINTIFFS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION .................................................................................................... 1

ARGUMENT & AUTHORITY ................................................................................ 1

I.     The sanctions imposed by Judge Brown were warranted and are supported by
       testimony and evidence in the record............................................................. 1

       A. Counsel for Wright clearly violated its obligations to comply with the Court's
       discovery orders ............................................................................................. 2

              i. CMOs 1 and 3 clearly require production .............................................. 2

              ii. Wright had and has a right to obtain reports from its experts ............... 3

              iii. Defendant's failure to produce is not the result of Plaintiffs' actions ... 4

       B. Limiting Wright's expert testimony is appropriate under the circumstances .... 4

              i. Defendant obstructed Plainitffs' attempts to obtain information ordered
              by the Court................................................................................................ 6

              ii. Defense counsel attemped to curtail inquiry into the flawed engineering
              practices at the October 16th hearing........................................................ 6

              iii. Defendant continues to obstruct Plaintiffs' attempts to obtain
              information ordered by the Court .............................................................. 7

       C. The Order appropriately condemns U.S. Forensic's Peer Review Process and
       U.S. Forensic's engineering conclusions.......................................................... 8

II.    FEMA's objections to Judge Brown's order are without merit and do not support
       Defendants' position ...................................................................................... 9

       A. The November 7th order does not change disclosure obligations for
       defendants, is not unduly burdensome, and defendants control the third parties
       they hired ...................................................................................................... 9

       B. FEMA's cost arguments are hypocritical....................................................... 12

       C. Flawed engineering practices are widespread and FEMA is in possession of
       evidence shoing this prevalence...................................................................... 14

i

i. Boilerplate language is consistently used to deny claims...................... 15

ii. FEMA is in possession of evidence of widespread use: Appeals to FEMA ......................................................................................................... 18

iii. Evidence of these widespread practices continues to mount............... 22

PRAYER……............................................................................................................ 25

## TABLE OF AUTHORITIES

### Cases

*Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*
      90 Civ 7811 (AGS) 1994, WL 510043 (S.D.N.Y. Sept. 16, 1994) ...................... 3

*Bank of New York v. Beridien BIAO Bank Tanazania Ltd.*
      171 F.R.D. 135 (S.D.N.Y. 1996) ........................................................... 3

*Residential Funding Corp. v, DeGeorge Fin. Corp.*
      306 F.3d 99 (2d Cir. 2002) ................................................................. 1

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*
      490 F.3d 130 (2d Cir. 2007) ............................................................ 3, 4

*Simms v. Ctr. For Corr. Health and Policy Studies*
      272 F.R.D. 36 (D.C.C. 2011) ............................................................ 11

*Thomas E. Hoar, Inc. v. Sara Lee Corp.*
      900 F.2d 522 (2d Cir. 1990) .............................................................. 1

### Rules

Fed. R. Civ. P. 37 ................................................................................... 1

Fed. R. Civ. P. 37(2)(A)(ii) ..................................................................... 5

Fed. R. Civ. P. 26(b)(2)(B) ..................................................................... 11

Fed. R. Civ. P. 26(b)(2)(C)(iii) ............................................................... 11

## INTRODUCTION

After a lengthy, detailed evidentiary hearing, Magistrate Judge Gary Brown issued a well-reasoned 27-page memorandum and order on November 7, 2014, leniently sanctioning Defendant Wright National Flood Insurance Company ("Wright") and its counsel and reiterating the requirements of CMO Nos. 1 and 3. Wright objects to the November 7th order, but asserts no new arguments. Wright adopts arguments raised by FEMA, so Plaintiffs also address those arguments herein. Plaintiffs ask the Court to overrule Wright's objections for the reasons argued herein.

## ARGUMENT AND AUTHORITY

**I.  The sanctions imposed by Judge Brown were warranted and are supported by testimony and evidence in the record.**

Judge Brown's sanctions were made pursuant to Federal Rule 37 and fall within the scope of pretrial matters and therefore, he was well within his authority to impose sanctions. *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990); FED. R. CIV. P. 37. The purpose of the sanctions was to expedite this case and avoid further unneeded complications.[1] *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002). Judge Brown described Wright's and its counsel's violations in detail, providing legal and factual reasons for the sanctions, supported by testimony and evidence in the record. As described below and in Judge Brown's order, the sanctions are warranted and well-supported by the record.

Wright incorrectly argues that Judge Brown's November 7th order prevents Wright from asserting its remedies under federal laws and rules that constitute the National Flood Insurance Program ("NFIP"). Judge Brown's order does not estop Wright from asserting its remedies, but

---

[1] *See* Plaintiffs' Exhibit 1 at 24 – Judge Brown's November 7, 2014 Order.

1

instead, limits the expert witnesses Wright may use to support its assertions. Wright's attempt to use the Appropriations Clause of the Constitution to shield itself from its wrongdoings must fail. Wright offers no authority that its actions as FEMA's fiscal agent guarantee its ability to designate and rely on experts other than those relied on in claims handling. Further, Wright cites no authority for being immune from sanctions regardless of Wright's conduct in litigation. Wright's objection to this limiting sanction is surprising, as Wright so vehemently defends its engineer's (Hernemar) report, the practices used to create it, and its own reliance on the report as the basis to deny the structural damage to the Ramey residence. Judge Brown's limitation is appropriate and Wright's unsupported objection should be overruled.

### A. Counsel for Wright clearly violated its obligations to comply with the Court's discovery orders.

#### i.    i. CMOs 1 and 3 clearly require reproduction.

CMO 1 directs defendants to produce *any* documentation relating to the assessment of a claimed loss and *all expert reports and/or written communication* that contain any description or analysis of the scope of loss or policy defense.[2] CMO 3 reiterated the instruction by requiring any expert report prepared prior to its issuance be produced immediately.[3] The Committee addressed potential claims of privilege regarding expert reports and instructed that privilege may only be invoked when an expert is retained or specially employed because of the prospect of litigation and not in the normal course of business.[4] Judge Brown's order lays out Defendant's disclosure obligations.[5] These CMOs have been in place since February 21, 2014 and April 7, 2014 and were drafted with input from counsel on all sides.

---

[2] *See* Plaintiffs' Exhibit 2 at 9 – Case Management Order No. 1.
[3] *See* Plaintiffs' Exhibit 3 at 9-10 – Case Management Order No. 3.
[4] *Id.* at footnote 5.
[5] *See* Plaintiffs' Exhibit 1 at 15-16.

Despite the Committee's unequivocal direction, Wright and its counsel failed to make the requisite disclosures. Wright's counsel attempted to excuse its failure to comply by (1) asserting the work product privilege, and (2) arguing that U.S. Forensic only provided the two so-called final reports to Wright, which, in turn, disclosed those reports to plaintiffs. This argument fails when one examines the reports at issue in the *Ramey* case. These are not "drafts." Because of the widely divergent conclusions and omissions of factual observations, these reports constitute entirely separate reports written by different authors, not just drafts of one report. Judge Brown correctly rejected Wright's arguments, which are clearly inapplicable to the facts of this case.[6]

### ii. Wright had and has a right to obtain the reports from its expert.

Wright further asserts it is not obligated to produce the documents because they were not in its possession, custody, or control. However, as Wright acknowledges, the Second Circuit has noted that if a party has access and the practical ability to possess documents not available to the party seeking them, production may be required. *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 138 (2d Cir. 2007). Judge Brown also noted the broad interpretation of "control" – the legal right or practical ability to obtain the documents from another source on demand. *Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co of Pittsburgh, Pa*., 90 Civ 7811 (AGS) 1994, WL 510043 at *3 (S.D.N.Y. Sept. 16, 1994); *see also Bank of New York v. Meridien BIAO Bank Tanazania Ltd*., 171 F.R.D. 135, 146 (S.D.N.Y. 1996).[7]

Wright's frivolous control argument particularly fails when one considers the evidence submitted by Defendant for the October 16th hearing. Defendant easily obtained documents from the engineer prior to the evidentiary hearing and turned them over after the Court denied Wright's assertion of work product. Defendant was not only able to secure the numerous and

---

[6] *Id.* at 16-22.
[7] *Id.* at 19.

growing number of engineer reports, it was able to secure the testimony of engineers Hernemar and Garove at the hearing without the need of subpoenas. Any assertion that Defendant lacks control of the experts it hired to investigate these claims is against *all* evidence before this Court. Further, as Judge Brown pointed out, the engineering reports themselves say additional information would be provided to Defendant Wright upon request.[8] Wright has presented no evidence showing that it does not have the practical ability possess and/or demand and obtain the documents. Therefore, production is required. *Schherbakovskiy,* 490 F.3d at 138.

### iii.  Defendant's failure to produce is not the result of Plaintiffs' actions.

Wright continues to assert that Plaintiffs' failure to produce the photographs of the December 9th report is the reason for delay in the *Ramey* case. This is simply a red herring. Plaintiffs voluntarily produced photos of the original report at mediation. This evidence was produced prior to any attempted resolution of this matter and without the need of Court intervention. While the photos should have been produced earlier, failure to produce was not done purposefully or with intent to deceive. Judge Brown properly admonished Plaintiffs' counsel for the delayed production and handled any purported culpability by not awarding a monetary sanction for the period leading up to the mediation.[9] Defendant's attempt to excuse its purposeful withholding of information while simultaneously blaming Plaintiffs is incongruous.

### B.  Limiting Wright's expert testimony is appropriate under the circumstances.

Judge Brown leniently decided to limit the expert testimony Defendant Wright Flood can use to support its defenses or oppose Plaintiffs' claims. Under the facts of this case, Judge Brown acknowledged that more significant sanctions might be warranted – such as striking Wright's answer or even contempt. Plaintiffs' counsel believes that a contempt order is appropriate and

---

[8] *Id.* at 20.
[9] *Id.* at 24.

should be entered as Defendant Wright has yet to express an understanding of the import of its behavior. However, Plaintiffs understand that Judge Brown attempted to expedite this matter and avoid further unnecessary complications and thus imposed a less severe sanction. This sanction is allowed by FED. R. CIV. P. 37(2)(A)(ii) and Defendant's objection should be overruled.

The circumstances of this case – including the uncovering of reprehensible engineering practices and Wright's counsel's failure to disclose the practices – unnecessarily complicated and delayed this action. (Plaintiffs do not dismiss the usefulness of a valid and effective peer review process. However, the "peer review" process employed by U.S. Forensic is a manufactured process wherein conclusions are reversed and first-hand factual observations are deleted or changed to fit a pre-determined conclusion.) Judge Brown clearly and concisely summarizes the reprehensible practices employed in this case and potentially hundreds of others:

> Specifically, the evidence adduced in this matter demonstrates that U.S. Forensic, an engineering firm retained by defendant Wright National Flood Insurance Company ("Wright") to examine a storm-battered house in Long Beach, New York, unfairly thwarted reasoned consideration of plaintiffs' claim through the issuance of a baseless report. The engineer sent by U.S. Forensic opined in a written report that the home at issue had been damaged beyond repair by Hurricane Sandy. A second engineer, who did little more than review the photographs taken by the inspecting engineer, secretly rewrote the report, reversing its conclusion to indicate that the house had not been damaged by the storm, and attributing – without sufficient evidence – defects in the home to long-term deterioration. This process, euphemistically dubbed a "peer review" by U.S. Forensic, was concealed by design from the homeowners, remained uncovered during the Court-assisted discovery process and came to light through near happenstance. In a misguided attempt to defend these flawed practices, defendant has elicited evidence that this "peer review" process may have affected hundreds of Hurricane Sandy flood insurance claims – and possibly more. [10]

---

[10] *See* Plaintiffs' Exhibit 1 at 2-3.

### i. Defendant obstructed Plaintiffs' attempts to obtain information ordered by the Court.

Despite "unequivocal and repeated Court direction" to produce *all expert reports and/or written communication* that contain a description or analysis of the loss, Defendant Wright willfully withheld *at least* the following documents in clear violation of CMO Nos. 1 and 3:

- December 9, 2012 engineering report indicating damage beyond repair;
- Redline document transforming that report;[11]
- January 25, 2013 engineering report;
- Communications surrounding the creation, transmission, or modification of the reports; and
- Responsive documents from Colonial Claims and David Maxime.[12]

### ii. Defense counsel attempted to curtail inquiry into the flawed engineering practices at the October 16th hearing.

At the October 16th evidentiary hearing, defense counsel attempted to shutdown inquiry into the flawed engineering practices:

| | |
|---|---|
| THE COURT: | You brought a witness who is going to talk about the peer review process. Right? |
| MR. MARTINE: | I don't think I need to call him, judge. |
| THE COURT: | I do. |
| MR. MOSTYN: | I do. |
| THE COURT: | I do, too. We will see you at 2 o'clock.[13] |

\*          \*          \*          \*          \*

| | |
|---|---|
| MR. MARTINE: | Judge, my feeling is that, based on the testimony this morning and based on the reason for this hearing, the hearing is resolved. The witness clearly testified that those were his opinions adopted by him following a peer review process; that he wasn't required, he wasn't compelled, he wasn't really told to do anything. He adopted the opinions.[14] |

\*          \*          \*          \*          \*

---

[11] Despite requests by both Plaintiffs and the Court, and the agreement of defense counsel on the record, the Court was required to issue an Order compelling production of the redline document.

[12] Colonial Claims is the adjusting company hired by Wright. David Maxime is the adjuster hired by Colonial Claims. Plaintiffs still do not have Colonial Claims' claim file.

[13] *See* Plaintiffs' Exhibit 4 – October 16, 2014 hearing transcript at 120.

[14] *Id.* at 121.

MR. MARTINE:      Judge, I would represent to the court, and perhaps – and I don't know if actually Mr. Garove, the witness, will testify as to what was turned over; there were two finalized reports by this witness, and that those reports were then submitted to the carrier. But the draft reports are not seen by the carrier, my client. They see the final report and then those –it's work product as –[15]

            *        *        *        *        *

MR. MARTINE:      . . . And I can tell you that Mr. Garove will testify, and this is a representation to the court, is that, yet, he was the peer reviewer for the original report, the rough report of December, that his peer review, basically his peer review, he made suggestions and that the two engineers consult about the suggestions and that Mr. Hernemar could adopt or deny every single suggestion made and then the report was finalized. And that is the extent of the testimony concerning the peer review, judge.[16]

Had Judge Brown believed defense counsel's representations, the Court and Plaintiffs would still be in the dark as to the true practices employed by U.S. Forensic. Fortunately, the Court sought further testimony which proved that the reports are simply rewritten to reach the desired outcome, without regard to contradicting observations of the inspecting engineer.

### iii. Defendant continues to obstruct Plaintiffs' attempts to obtain information ordered by the Court.

Once the unacceptable engineering practices employed by U.S. Forensic brought to Wright's and Judge Brown's attention, Wright denied knowledge of the altered report, discounting its very existence, failed to adequately investigate the matter, sought to select a different expert engineer, threatening Plaintiffs with a substantive denial of their claim should they fail to cooperate. Defendant now *again* attempts to force the homeowners to another inspection by a yet-to-be-designated engineer of Defendant's choosing.[17]

While Defendant asserts this is the least costly alternative, it has been made clear to Defendant repeatedly that there is no house left, only an empty lot - Plaintiffs' home was

---

[15] *Id.* at 122.
[16] *Id.* at 123-124.
[17] DE [59] at 13; *see also* Plaintiffs' Exhibit 1 at 3, footnote 4.

demolished because of the extensive flood damage. A new engineer would merely be inspecting extremely limited photographs. (Plaintiffs have requested the additional photographs Hernemar testified he took and noted in his report; however, none have been produced to date leaving it unclear if any exist.) This practice is not sound; as the Court correctly notes, if the review of photos is better than an in-person inspection, Wright should send out photographers to inspect the damage and produce purportedly superior reports at lower cost.[18] Even after the hearing, Wright attempted to defend the indefensible practices exposed in this case.[19]

Instead of offering the conciliatory response Judge Brown expected,[20] Wright threatened Plaintiffs' ability to recover on their legitimate claim by demanding compliance with another engineering inspection on a nonexistent home and continue to attack Judge Brown's sanctions and order. Judge Brown's finding that Defendant's response to the allegations was unreasonable is correct and this finding is supported by the record. Defendant's objection should be overruled.

### C. The Order appropriately condemns U.S. Forensic's Peer Review Process and U.S. Forensic's engineering conclusions.

Despite Wright's criticism, at this stage of the litigation, neither Plaintiffs nor the Court were required to retain experts to testify that the ultimate conclusions were wrong or that the engineering processes were unethical. The Court as fact finder during an evidentiary hearing, found the engineering practices employed by U.S. Forensic and accepted by Wright with little investigation are "flawed,"[21] "reprehensible,"[22] "unprincipled,"[23] and "highly-improper."[24] But these findings were related to the Court's role as arbiter of the discovery process and were within

---

[18] *See* Plaintiffs' Exhibit 1 at 10.
[19] *Id.*; *See, e.g.,* Deft.'s Post-Hearing Mem., DE [71] at 5 (incredulously comparing U.S. Forensics practices to documented NASA peer review processes); 7 ("[t]here was nothing nefarious on US Forensic's part in the revision of the report"); 8 (likening the "peer review" process and alteration to a jury trial)
[20] *Id.* at 3, footnote 4.
[21] *Id.* at 3.
[22] *Id.* at 23.
[23] *Id.* at 2.
[24] *Id.* at 3.

the Court's discretion. Defense counsel was not sanctioned for advocating the position that the conclusions were correct and the process was ethical. Defense counsel was sanctioned because of an ongoing failure to comply with the Court's orders, unreasonable response to Plaintiffs' allegations- failing to investigate and threatening denial, and attempts to circumvent Plaintiffs' counsel and the Court's attempts to uncover these violations. Defense counsel continues to circumvent this discovery. Defendant's objection should be overruled.

## II.    FEMA's objections to Judge Brown's order are without merit and do not support Defendants' position.

In an apparently coordinated attempt to undo key portions of Judge Brown's order, FEMA and other WYO insurance companies have also filed separate but complimentary submissions, objecting to the order.[25]

- In its filing, FEMA "...requests that the Court withdraw or rescind Paragraph 3 of the November 7th Order. Alternatively, FEMA requests the Court modify the order to...only inquire into the existence of documents...where there is a prior showing of an earlier conclusion different from the one that was the basis of the whole or partial denial of a claim..."

- On behalf of the WYO insurance companies, attorney Gerald Nielsen falsely claims "there is no evidence that adjusting companies, adjusters, other engineering companies, or other 'agents or contractors' use a similar process..."

Wright has incorporated by reference FEMA's arguments into its objections in the *Ramey* matter, but FEMA's arguments are without merit and do not support Wright's position.

### A.  *The November 7th order does not change disclosure obligations for defendants, is not unduly burdensome, and defendants control the third parties they hired.*

FEMA's primary argument is that Judge Brown's order violates the due process rights of the defendants who "were not parties to the discovery dispute raised by [the] plaintiffs in the *Ramey* case" by requiring additional discovery. These other defendants, the argument goes, are

---

[25] *See* DE [89], [90], [91], and [92]; *see also* Plaintiffs' Exhibit 5 - Newsday article dated November 24, 2014 discussing FEMA's involvement and the "shock[ed]" reactions of Senators Charles Schumer and Kirsten Gillibrand.

being punished for the conduct of the Wright and U.S. Forensic in the *Ramey* case without having had "the opportunity to be heard on this issue." *See* FEMA's Motion, DE [89] at 5.

FEMA's argument misses the mark. Judge Brown did not order new discovery. He issued a specific directive to insurance companies which have failed to abide by prior CMOs. The order is justified in light of the prior CMOs, and the evidence supports the initial finding that this practice is widespread.[26] The Court restated on the record that the conduct violated CMO 3.[27] The Court sanctioned Wright and its counsel, but the sanctions took the form of curtailed expert testimony and reimbursement for attorney's fees and expenses associated with the hearing that produced the November 7th order. (As Plaintiffs noted earlier, Plaintiffs requested a much more robust discovery plan which was rejected by Judge Brown in favor of a more streamlined approach.) This approach by Judge Brown was extremely reasonable and cost efficient.

As the language of CMO 1 makes clear, the production ordered by the Court was simply the compulsion of disclosures that defendants in all Hurricane Sandy cases had previously been ordered to make. All Hurricane Sandy defendants had the opportunity to object to those disclosure requirements, and did. After CMO 1 was entered, defendants objected to it.[28] The Court heard Defendants' objections and declined to implement Defendants' proposed modifications. Defendants also claimed not to understand whether the production of expert reports[29] was required by CMO 1. This led which led Judge Brown to reiterate (in CMO 3) that "*any* expert reports that have been prepared are required to be produced under [CMO 1], regardless of whether a party anticipates, at this time, presenting the testimony of such expert."[30]

---

[26] *See* Plaintiffs' Exhibit 4 at 109; 111-112; 58 (process described as "normal"); 110 (process was "standard"); 129 ("peer review process is actually a very standardized process across the field of engineering"); *see also* DE [71]-1 at ¶¶ 13-16 (describing hundreds of peer reviews of reports by different engineers).
[27] *Id.* at 121-122.
[28] *See* Plaintiffs' Exhibit 3 at 2–8.
[29] *Id*. at pages 9–10.
[30] *Id*. at page 10 (emphasis added).

These expert witnesses are fact witnesses used in the ordinary course of business and ***not*** experts hired for the litigation. FEMA and the other defendants have received the due process to which they are entitled; they are simply using the Court's reiteration of its prior CMOs' disclosure requirements to raise, again, the same objections that were previously rejected.

FEMA argues that what it mischaracterizes as "new" discovery obligations created by Judge Brown's order impose undue burdens on FEMA, WYO carriers, and "the public fisc." This argument cannot withstand scrutiny from any angle. First, there are no "new" discovery obligations—just the same obligations that date back to CMO 1— and there are no "new" litigation costs, just the same costs that would have been incurred had defendants complied with prior orders. Further, as clarified above, the reports at issue are note merely "drafts."

Finally, production of the information required by the CMOs (and reiterated in Judge Brown's order) will make successful mediations more likely and lower litigation costs, not raise them. Conversely, allowing defendants to skirt the Court's disclosure orders will deprive Plaintiffs of the information necessary to evaluate their claims. It is crucial for Plaintiffs' counsel to know whether the engineer who actually inspected the property had different observations and/or reached a different conclusion before "peer review." This information absolutely informs the advice counsel provides to clients at mediation regarding settlement. Without it, mediations are guaranteed to fail, leading to more discovery disputes and trials, not less. This in turn raises litigation costs for all parties.

The cost of complying with the Court's orders pales in comparison to defense counsel's estimate that Hurricane Sandy litigation defense costs will exceed nine-figures.[31] One deposition of one expert witness in one case in preparation for trial, may very well cost more than producing all the documents FEMA and WYO carriers are fighting to withhold. There is no way to tell,

---

[31] *See* Plaintiffs' Exhibit 4 at 176-177.

though, because FEMA has presented no evidence of the costs about which it complains. A party

seeking to restrict discovery on the ground of undue burden must prove *why* it is undue.[32] FEMA

has not shown that procuring the Court-ordered documents presents any burden, let alone an

undue one—FEMA does not advise the Court how many documents it, or any other defendant,

would have to produce.

FEMA next asserts that FEMA lacks "direct access" to engineers' and adjusters' reports

and cannot be compelled to produce them. The use of the term "direct access" is not the

standard. Judge Brown's order included a scholarly refutation of this very argument,[33] as

described in Section I(A)(ii) above, and FEMA has cited no controverting authority. It defies

common sense that FEMA lacks sufficient control over of the engineering companies to obtain

these reports—FEMA has paid them millions of dollars in the past, continues to pay them as

experts in this litigation, works with them on a daily basis, and will continue to pay them

millions of dollars to in the future. At a minimum, FEMA and the WYO insurance companies

should have to present proof that they have attempted to contact their experts, but those experts

refused to cooperate. Then, Plaintiffs may subpoena the documents where necessary. However,

given the relationship between FEMA, the WYO insurance companies and the engineering firms,

one would rightfully expect this to be the exception, not the rule.

### B.   *FEMA's cost arguments are hypocritical.*

FEMA's opposition to the Court's disclosure requirements—especially on the ground of

undue cost—is baffling given FEMA's duty as a fiduciary of taxpayer funds. Transparency can

only benefit this federal agency. Litigation expenses are generally reimbursed by FEMA to

---

[32] FED. R. CIV. P. 26(b)(2)(C)(iii) (general rule); 26(b)(2)(B) (outlining specific rule regarding electronically stored information); *see also, e.g., Simms v. Ctr. for Corr. Health and Policy Studies*, 272 F.R.D. 36, 40 (D.D.C. 2011) (responding party established undue burden under Rule 26 by presenting evidence of costs of copying responsive materials and showing that she lacked the financial means to cover those costs).
[33] *See* DE [82] at pages 18–20.

WYO carriers under the NFIP; but FEMA does not have to reimburse expenses incurred fraudulently or otherwise in violation of the NFIP's WYO program.[34] If the fraud uncovered here is rampant, FEMA can isolate the wrongdoers, cut off their expense reimbursement, and take whatever other necessary measures, such as audits or referral to its Inspector General.

Ironically, the day before FEMA filed its motion for reconsideration, James Sadler, the Director of Claims for NFIP, issued a bulletin to WYO insurance companies and the NFIP.[35] In an about-face from longstanding practice, FEMA now requires policyholders to submit canceled checks *in addition* to the normally required estimates, bills, and/or receipts in order to establish repair costs. This forces homeowners to go through the extra expense and time to obtain canceled checks. In addition to the production of receipts and canceled checks, FEMA has now authorized the insurance companies to hire CPAs or other financial experts to calculate the amount actually spent plus the value of the deductible(s) and applicable depreciation.

Plaintiffs' counsel has represented tens of thousands of insureds against their insurance companies and has never seen an insurer hire a "CPA" or any other "financial experts" to add up receipts, subtract depreciation and deductibles. In the insurance context, depreciation is not remotely related to depreciation in the context of taxes. FEMA's definition of depreciation is a standard definition common in the insurance industry:

> Depreciation – Loss of property value from age, use, physical deterioration, or neglect.[36]

Determining the amount of depreciation on an item is the insurance company and adjuster's job, and is standard practice for which they have already been paid. This determination amounts to

---

[34] *See* 44 C.F.R., Part 62, Appendix A, Article III, Section (D)(3); Article V, Section (D); Article IX; *see also* Plaintiffs' Exhibit 6  - FEMA Guide for Write Your Own Counsel.
[35] *See* Plaintiffs' Exhibit 7 – FEMA Bulletin from James Sadler dated November 20, 2014.
[36] *See* FEMA's substantial improvement/substantial damage determination at page 2, *available at*, http://www.santa-clarita.com/Modules/ShowDocument.aspx?documentid=5488; *see also* FEMA's Increased Cost of Compliance publication at page 7, *available at*, http://www.fema.gov/media-library-data/264f7e03c5b3ad5852808636f55efce7/adjclaimsmanual_part3_508rev_20sep13.pdf.

using a calculator to add up the receipts for items such as a can of paint, a paintbrush and maybe a trim board - an extremely easy task once the documentation is gathered. FEMA's use of its funds in this context is akin to hiring a commercial pilot to throw a child's paper airplane. Finally, FEMA's new directive provides no threshold of the amount and scope of loss required before hiring a CPA.

This directive occurs against the backdrop of FEMA's and WYO carriers' incredulous complaints that "draft" reports that are required to be produced may contain nothing more than typographical errors. The evidence clearly shows the problem at issue to be much more serious than typographical errors, despite defense counsels' repeated assertions. FEMA wants to be excused from production of documents that contain typographical errors when it holds homeowners to a higher standard in the ever-increasing burdens they place on them by authorizing a CPA's review of basic information.

The only reason this new policy would be necessary is if FEMA believed there was a widespread practice of policyholders submitting fraudulent receipts. The opposite is true. Evidence has established "reprehensible" conduct by U.S. Forensic, which Judge Brown found goes beyond misleading into the realm of misrepresentation,[37] in at least the *Ramey* case, with all indications that the conduct was "widespread," as fully described above.[38]

C. ***Flawed engineering practices are widespread and FEMA is in possession of evidence showing this prevalence.***

FEMA incredibly argues that the Court should only permit inquiry into the existence of documents maintained by a nonparty engineer, adjuster or contractor where there has been a prior showing of an earlier conclusion different from the one that was the basis of the denial, such as the photographed report in the *Ramey* case. This absurd position places the burden on

---

[37] *See* Plaintiffs' Exhibit 1 at 11.
[38] *Id*. at 2.

Plaintiffs to prove fraud *before any* discovery. A homeowner would be required to demonstrate to the Court that an "earlier conclusion" was different from the final conclusion without earlier reports or drafts of the reports.

FEMA goes on to argue that Judge Brown's order improperly imputes the conduct of U.S. Forensic and the testimony of one engineer to all engineers and independent adjusters. However, the evidence shows that even if the conduct were limited to U.S. Forensic, the conduct is widespread involving potentially thousands of insureds.[39] But importantly, FEMA and defense counsel ***already*** possess information that these flawed practices *are not* isolated to the *Ramey* case or U.S. Forensic. Indeed, just in the last few weeks, Plaintiffs' counsel has uncovered evidence (without the aid of discovery) that this practice of changing reports is not isolated in information obtained regarding the following claims: Braddish, Gionvinco, Hahn, Parke, and Dweck.

### i. *Boilerplate language is consistently used to deny claims.*

In *Ramey*, Garove admitted that he didn't just peer review Hernemar's report, instead, he actually *wrote* the report by inserting his own boilerplate conclusions and *observations*:[40]

| THE COURT: | You said a number of times that you did not review the report that has a January 7, 2013, date on it. Right? |
| GAROVE: | Yes. |
| THE COURT: | But it's fair to say, based upon what we have seen today, that you wrote that? |
| GAROVE : | Yes.[41] |

---

[39] *See* Plaintiffs' Exhibit 4 at 109; 111-112; 58 (process described as "normal"); 110 (process was "standard"); 129 ("peer review process is actually a very standardized process across the field of engineering"); *see also* DE [71]-1 at ¶¶ 13-16 (describing hundreds of peer reviews of reports by different engineers).
[40] *See* Plaintiffs' Exhibit 8 – Redlined December 9, 2013 Report.
[41] *See* Plaintiffs' Exhibit 4 at 156:1-7.

The same boilerplate conclusions and "observations" that were fraudulently inserted by Garove during the "peer review" process and rewriting of the *Ramey* report are used nearly verbatim in at least 28 other reports discovered to date by Plaintiffs' counsel - even with other insurance companies [42] and in other states. [43] These 28 reports are authored by 12 different engineers. Garove admitted that this "peer review" process was not isolated to the *Ramey* case. [44]

Where structural damage by flooding is denied (which is every report reviewed with very rare exception), each engineering report contains almost identical findings with very slight changes. However, the same *exact* 3 paragraphs appear verbatim in each denial. Two of these paragraphs detail direct observation of the property, the paragraphs which one would expect to be the most divergent report to report. The sentence structure is the same, including the same "observations" and the same wording, no matter which engineer supposedly inspected the property or wrote the report and no matter what damage was actually observed:

- The physical evidence observed and measured at the property indicated that the subject building was not structurally damaged by hydrodynamic forces, hydrostatic forces, scour or erosion of the supporting soils, or buoyancy forces of the floodwaters associated with the subject flood event. [45]

- Flowing floodwaters generally exert greater forces on surfaces and structures than still waters of similar depth. Moving water flowing around a structure imparts lateral and vertical forces to the structure imparts lateral and vertical forces to the structure associated with the weight of the water (hydrostatic and buoyant forces), lateral impact forces associated with the momentum of the moving water (hydrodynamic forces), and frictional forces along the surfaces contacted by the moving water that can scour and erode adjacent soils and remove wall coverings and appurtenances. Hydrostatic and hydrodynamic forces can damage elements of the building structure and erosion and scour caused by the frictional forces can weaken the structure by removing supporting soil and undermining the building foundation. Differential floodwater levels acting against the walls of the building, either from the exterior during the initial flooding of the property or trapped

---

[42] *See* Plaintiffs' Exhibit 9 – Reports from U.S. Forensic used by Travelers, Harleysville, and Allstate.
[43] *See* Plaintiffs' Exhibit 10 – U.S. Forensic report on a New Jersey property.
[44] *See* Plaintiffs' Exhibit 4 at 109; 111-112; 58 (process described as "normal"); 110 (process was "standard"); 129 ("peer review process is actually a very standardized process across the field of engineering"); *see also* DE [71]-1 at ¶¶ 13-16 (describing hundreds of peer reviews of reports by different engineers).
[45] Some reports add October 29, 2012 as the date of the reported flood event.

within the interior of the building when the exterior floodwaters recede, exert hydrostatic pressures upon the building.

- We observed no evidence or indication of recent movement, distortion or shifting of the exterior walls of the building consistent with the application of hydrodynamic or hydrostatic forces from floodwaters. We also observed no scuff marks, abrasions, or other evidence on or around the building to indicate impact or recent shifting or movement of the building framing or foundation. We did not observe any erosion or scour of the soils around the perimeter of the building or in the basement consistent with the detrimental velocity flow. No evidence of recent shifting or movement of the floor framing members or foundation components was observed beneath the subject building. The physical evidence observed at the property indicated that the subject building and foundation system were not structurally damaged by hydrodynamic forces, hydrostatic forces, scour or erosion of the surface soils, or buoyance forces of the floodwaters associated with the reported flood event.[46]

Insured Brian Braddish discovered the same fraud as established through emails between Braddish, the public adjuster he hired, and the U.S. Forensic engineer.   In one email, U.S. Forensic engineer Allan Abbata details that he sent his report to U.S. Forensic for "peer review."[47]   In another email, Braddish's public adjustor details his conversation with Allan Abbata, wherein Abbata confirmed that the engineering report the carrier released was not the same report Abbata wrote.[48] Not coincidentally, the "changed" report issued to Mr. Braddish contained the same boilerplate paragraphs described above.[49]

It would be nearly impossible for 12 different engineers to write verbatim conclusions and observations yet, the reports remain indistinguishable in key regards. The one alarming thing they all have in common is that despite one of the most costly natural disasters to hit the United States and leave thousands of people with no homes not one of these reports finds *any* structural damage.

---

[46] In some reports, there are very slight variations to this paragraph, including the insertion of the October 29, 2012 event date, and in few reports, the sentence structure of the first sentence is reversed to read, "No evidence or indications of recent movement, distortion or shifting of the exterior walls of the building consistent with the application of hydrodynamic forces of hydrostatic forces from floodwaters was observed."
[47] *See* Plaintiffs' Exhibit 11 – Email from Allan Abbata stating that his report was sent for peer review.
[48] *See* Plaintiffs' Exhibit 12 – Email from Public Adjuster Marc Lancaric to Brian Braddish.
[49] *See* Plaintiffs' Exhibit 13 – U.S. Forensic report produced in *Braddish v. Wright*.

Compare these insurance boilerplate denials to the reports from the engineers that many homeowners hired, out-of-pocket.[50] Unlike U.S. Forensic reports, these reports obtained by homeowners vary greatly in descriptions, format, information, and observations.[51] They were obtained by folks who, out of desperation, found local engineers from the phone book, internet and word of mouth. The homeowners' engineers, while varying in degree of damage, found the obvious: a massive wall of water hitting a structure can and did cause extensive damage.

These boilerplate reports have led to boilerplate billing by U.S. Forensic. Plaintiffs' counsel has obtained billing invoices from U.S. Forensic on 19 files. Each file shows that the engineer billed for exactly 14 hours regardless of distance traveled, time spent, or the complexity of the damage observed and investigated.[52] This boilerplate billing is further evidence of the widespread nature of the fraud perpetrated by U.S. Forensic and those associated with it.

### ii. FEMA is in possession of evidence of widespread use: Appeals to FEMA.

Joseph and Patricia Giovinco and Sang Hahn appealed the insurance company's denial based on fraudulent engineering practices to James Sadler, director of Claims and Appeals for FEMA.[53] In both claims, the reports were stamped by Michael Garove, but Garove never inspected the homes. Instead, *unlicensed* engineers solely conducted the inspections. Both families received a response from Sadler rejecting the opinions of local *licensed* New York engineers concluding their homes had structural damage due to flood. In siding with the insurance company and the findings of U.S. Forensics, Sadler wrote to each homeowner that

---

[50] *See* Plaintiffs' Exhibit 14 – Independent Engineering reports obtained by other insureds; *see also* Plaintiffs' Exhibits 20 and 24.
[51] *Id.*
[52] *See* Plaintiffs' Exhibit 15 - U.S. Forensic invoices.
[53] *See* Plaintiffs' Exhibit 16 - James Sadler's curriculum vitae.

FEMA places considerable weight on the recommendations and opinions of *licensed* engineers. **The irony cannot be more striking**.

The Giovincos are Long Beach, New York homeowners whose home was devastated by Hurricane Sandy.[54] The Giovincos' insurance claim was wrongfully denied by Fidelity (now Wright Flood)[55] based on an engineering report authored by U.S. Forensic and Garove.[56] Garove authored the Giovincos' engineering report without ever visiting the site.[57] Instead, the property was inspected by Asher Cohen, who is not a licensed New York engineer. Without observing the damage firsthand, Garove sat in a remote location and inserted the very same boilerplate conclusions and observations used in the Rameys' report into the Giovincos' report.

The Giovincos appealed the wrongful denial of their claim to FEMA.[58] FEMA claimed in its denial of appeal that Michael Garove, the only licensed engineer involved in the project, had actually inspected the property:

> Fidelity retained the services of US Forensic, LLC (USF) to perform an evaluation of the building and determine the cause and extent of the reported damage. The inspection was conducted by Michael P. Garove, P.E., and Asher Cohen, which reported the following site observations.[59]

This incorrect statement was refuted by Ms. Giovinco in numerous letters, stating Garove never came to her house:

> The U.S. Forensics PE, Michael P. Garove, who claims to be engineer of record and signed the report was never even at the site[60]

---

[54] *See* Plaintiffs Exhibit 17 – the Giovincos letters to Governor Cuomo, Senators and New York Department of Financial Services detailing the wrongful denial of their Hurricane Sandy claim.
[55] Just like the Rameys' claim, the Giovincos' claim was inspected by Colonial Claims and David Maxime.
[56] *See* Plaintiffs' Exhibit 17.
[57] *Id.*
[58] *See* Plaintiffs' Exhibit 18 –The Giovinos' appeal to FEMA.
[59] *See* Plaintiffs' Exhibit 19 – FEMA's response to the Giovinco's appeal.
[60] *See* Plaintiffs' Exhibit 17.

U.S. Forensic's own report says who did the inspection:

> 1) Inspection of the building located at 75 Michigan Street in Long Beach, New York performed by Asher Cohen on May 21, 2013. Photographs and measurements were taken throughout portions of the building.[61]

Despite FEMA's awareness that an unlicensed engineer inspected the Giovincos' property, FEMA incredibly responded to the Giovincos' complaint by stating:

> FEMA places considerable weight on the recommendations and opinions of **licensed** engineers. In the absence of any substantive documentation or professional opinion to counter the conclusions of USF, there is no compelling reason to overturn Fidelity's decision.[62]

Garove never visited the home and used an unlicensed person to inspect which can be gleaned from the report because the term P.E. does not even follow Mr. Cohen's name.[63] **Despite FEMA's awareness of these facts, and the opposite conclusions of the Giovincos' own engineers,[64] Sadler, did nothing to investigate this fraud and in fact, stood by it.**[65]

Like the Giovincos, Sang Hahn's property in Brookhaven, New York was substantially damaged[66] by Hurricane Sandy and his claim partially denied by Fidelity based on a U.S. Forensic engineering report. An individual named Felix Rodriguez inspected Mr. Hahn's property, but the report was again sealed by Mr. Garove.[67] Felix Rodriguez's own resume, attached to Hahn's U.S. Forensic report, shows he is not a licensed engineer in New York.[68] Mr. Hahn also appealed Fidelity's decision directly to FEMA. In response, Sadler, using the same misleading language as used in the Giovinco appeal denial, denied Mr. Hahn's appeal, placing

---

[61] *See* Plaintiffs' Exhibit 20 – The Giovincos' U.S. Forensic report.
[62] *See* Plaintiffs Exhibit 19 (emphasis added).
[63] Mr. Garove similarly stamped reports for properties he had never visited in several other instances Plaintiffs' counsel have been able to uncover to date. In the reports available to Plaintiffs' counsel, ach time Mr. Garove's seal is stamped to a report, an unlicensed person has performed the inspection.
[64] *See* Plaintiffs' Exhibit 21 – Engineering reports obtained independently by the Giovincos.
[65] *See* Plaintiffs Exhibit 19.
[66] *See* Plaintiffs' Exhibit 22 – Hahn's Notice from Brookhaven regarding substantial damage.
[67] *See* Plaintiffs' Exhibit 23 – Hahn's U.S. Forensic Report.
[68] *Id.*

"considerable weight on the recommendations and opinions of licensed engineers."[69] Even a cursory investigation by Mr. Sadler would have revealed that Felix Rodriguez is not licensed as an engineer in New York and his recommendations do not deserve considerable weight.

Sadler also denied the appeal of Stephen Parke, an insured whose home in Freeport, New York was destroyed by Sandy. Mr. Parke commented that a 14-foot wall of water hit his home and that Sadler must be "out of his mind."[70]

Despite possessing clear evidence of fraud, Sadler responded for FEMA to the these insured appeals supporting the fraudulent and controverted conclusions in U.S. Forensic's report, stating that in the absence of any "substantive documentation or professional opinion to counter the conclusions of [U.S. Forensic]," FEMA would not overturn Fidelity's decision.[71] The problem is that these insureds obtained professional opinions by New York licensed engineers to counter U.S. Forensic's faulty conclusions. These opinions were consciously avoided by Sadler and FEMA, supporting Fidelity's wrongful denials.[72]

FEMA shockingly moves this Court to require plaintiffs to produce evidence of changed reports in order to obtain discovery when FEMA *itself*, as described in the paragraphs above, is in possession of such information. FEMA should be compelled to explain to this Court how it can argue that the evidence adduced at the October 16th hearing in the *Ramey* case is isolated when FEMA itself is already in possession of numerous appeals showing that the behavior is not isolated. After remaining silent despite direct knowledge of these widespread practices, the Court reasonably allowed Plaintiffs access to prior reports and draft reports so that Plaintiffs may

---

[69] *See* Plaintiffs' Exhibit 24 – FEMA's response to Hahn's appeal.
[70] *See* Plaintiffs' Exhibit 25 – Newsday Article dated July 21, 2013 which details Sadler's outrageous response to insured Stephen Parke's concerns
[71] *See* Plaintiffs' Exhibits 19 and 24.
[72] *See* Plaintiffs' Exhibit 21 and Plaintiffs' Exhibit 26 – Independent engineering report obtained by Mr. Hahn.

evaluate alterations in engineering reports instead of relying on insurance companies and FEMA to voluntarily police themselves.

While FEMA or WYO insurance companies continue argue that there is no incentive for this outrageous conduct, this is untrue and, as noted by Judge Brown, completely irrelevant. There is at least *some* incentive as the practice clearly occurred. Congressional representatives, most notably Senator Robert Menendez,[73] have publicly noted that FEMA audits penalize WYO insurance companies for overpaying claimants, but not for underpaying them. This payment and review structure naturally encourages underpayment and litigation of claims in order to avoid penalties. The issue of what "incentive" there may be to defraud policyholders is precisely the reason discovery is needed. **The Rameys have demonstrated that it has happened** and the additional evidence adduced here demonstrates it is widespread.

### iii.  Evidence of these widespread practices continues to mount.

Just before the filing of this opposition to Defendant's objections, Plaintiffs' counsel learned of yet another family – the Dwecks – who were defrauded by the same scheme which deceived the Rameys.

Sarise and Stephen Dweck own a home in Brooklyn, New York that was devastated by Sandy. Following the storm, the Dwecks made a claim with their flood carrier, Hartford Insurance Company of the Midwest ("Hartford"). The extensive damage to the Dwecks' home necessitated an engineering analysis. Hartford assigned HiRise Engineering ("HiRise") to perform the analysis. HiRise hired a licensed New York engineer, Harold Weinberg, who completed a site inspection on January 11, 2013.  Subsequently, Weinberger wrote a report of his findings dated March 15, 2013 detailing the extensive damage to the Dwecks' home caused by

---

[73] Senator Menendez made his comments at a July 30, 2014 Senate Banking Committee hearing on the flood insurance claims process. *See* Cause No. 1:14-mc-00041, DE [497]-3 at pages 9 and 15.

Sandy's floodwater.[74]  However, like the Rameys, this is not the report the insurance company sent the Dwecks. Instead, the Dweck's received a report dated March 18, 2013, purportedly authored by Weinberg that came to a completely opposite conclusion.[75] Hartford denied the Dwecks' claim based on this report.

In a chance encounter, Weinberg advised the Dwecks that the report they received was not the report he authored. The Dwecks hired an attorney who uncovered evidence that a non-engineer altered Weinberg's report without his approval. Once again, observations were added to justify the predetermined conclusion that the damage was not caused by the flood, in direct contradiction to the observations of the inspecting engineer.[76]

The individual who altered Weinberg's report was Matt Pappalardo, a manager at HiRise Engineering. Mr. Pappalardo holds a Masters of Science in biology and a real estate license, but is not a licensed engineer in any state. Yet, Pappalardo altered Weinberg's report based upon Pappalardo's "experience and dealings with similar claims."[77] Surprisingly, Mr. Pappalardo admits to *inserting Mr. Weinberg's signature on the altered report.*[78] Weinberg's seal was lifted off the March 15th report and inserted on the March 18th report.[79] Weinberg was never even afforded the opportunity to review the new report. Any claims that these practices are isolated are refuted by a cursory internet search. Mr. Pappalardo has overseen over 3000 Hurricane Irene and Sandy claims managing, among other things, "on-site examinations, [and] preparation and

---

[74] *See* Plaintiffs' Exhibit 27 – Dweck Photos of March 15, 2013 Report.
[75] *See* Plaintiffs' Exhibit 28 – Dweck March 18, 2013 HiRise report.
[76] *Id.*
[77] *See* Plaintiffs' Exhibit 29 - July 2, 2013 letter from Dweck's counsel to Hartford describing the fraudulent conduct.
[78] *Id.*
[79] *See* Plaintiffs' Exhibit 30 – comparison of signatures from the March 15th and March 18th reports.

review of technical reports..."[80] Further, Pappalardo "manages a team of 15 engineering professionals" at HiRise Engineering.[81]

The Dwecks appealed Hartford's wrongful denial to FEMA, detailing the changed reports.[82] In an all too familiar fact pattern, James Sadler denied the Dwecks' appeal, as he did with the Ramey, Giovinco, and Hahn appeals.[83] Despite awareness that the report had been changed, Sadler either knowingly disregarded the evidence of fraud in front of him or consciously avoided it.

Hartford hired the same legal counsel as Wright Flood did in *Ramey*, Gerald Nielsen. Instead of putting an end to the fraudulent engineering practices at HiRise, Nielsen used the same strong-arm tactics as in *Ramey*—he and his client demanded cooperation to submit to another engineer[84] and threatened the Dwecks with a substantive denial of their claim should they fail to cooperate with the demand.[85]

Counsel for the Dwecks communicated with Nielsen, illustrating the fraudulent engineering activities at HiRise.[86] Nielsen, aware of this information, asserts in his brief for Hartford and the other WYO carriers that there is no evidence that adjusting companies, adjusters, other engineering companies, or other "agents or contractors" use a similar process or even if so, that the process is tainted in any way.[87] As the Dweck claim shows, Nielsen is in possession of direct evidence to the contrary.

---

[80] http://www.gebhr.com/personnel/matt-pappalardo/
[81] http://www.nycnetworkgroup.com/speaker/matt-pappalardo/
[82] *See* Plaintiffs' Exhibit 31 – Dweck's appeal to FEMA.
[83] *See* Plaintiffs' Exhibit 32 – Sadler's denial of Dweck appeal.
[84] *See* Plaintiffs' Exhibit 33 - August 27, 2013 letter from attorney Bill Treas demanding Dweck's cooperation.
[85] *See* Plaintiffs' Exhibit 34 - September 17, 2013 letter from Bill Treas threatening substantive denial of Dweck's claim; *see also* DE [59] at 13 and Plaintiffs' Exhibit 1 at 3, footnote 4.
[86] *See* Plaintiffs' Exhibit 29, *see also* Plaintiffs' 35 - September 16, 2013 letter to Bill Treas from Dweck's counsel.
[87] *See* Deft.'s Letter DE [92] at 3-4.

The Dwecks' story proves that these fraudulent practices are not limited to any one insured, insurer, adjuster, engineering firm, or engineer. Instead, these indefensible practices appear to be widespread as Judge Brown feared. The evidence against Defendants continues to mount and Plaintiffs can only conclude that FEMA's, Defendants' and Defense counsel's obstructionist tactics are being employed in an effort to prevent the exposure of Defendants' knowing and complicit conduct.

Plaintiffs' counsel appreciates the Court's time and attention to these issues, as Plaintiffs have utilized a lot of space. However, as we know the Court will appreciate, pertinent evidence continues to come to light. As *pro bono* counsel, we have spent hundreds of hours trying to bring this information to the Court and have attempted to condense the increasing mountain of information as best as possible in as timely a manner as possible.

## PRAYER

Plaintiffs pray that this Honorable Court overrule *Defendant Wright National Flood Insurance Company's Objections to Magistrate Judge Gary R. Brown's Order Dated November 7, 2014*.

Respectfully Submitted,

THE MOSTYN LAW FIRM

 */s/ J. Steve Mostyn*
J. Steve Mostyn
JM9387
Texas State Bar No. 00798389
René M. Sigman
RS1594
Texas State Bar No. 24037492
3810 West Alabama Street
Houston, Texas 77027
(713) 861-6616 (Office)
(713) 861-8084 (Facsimile)

**ATTORNEYS FOR PLAINTIFFS**

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument was electronically filed with the Clerk of Court using CM/ECF System, which will automatically send notice to all counsel of record, this 1st day of December, 2014.

*/s/ J. Steve Mostyn*    
J. Steve Mostyn
