1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - X
RAMEY,                              14-CV-461 (GRB)(JFB)
           Plaintiff,

                                    US Courthouse
      -against-             :       Central Islip, NY

WRIGHT NATIONAL FLOOD
INSURANCE COMPANY,                  October 16, 2014
           Defendant. :             10:15 am
- - - - - - - - - - - - - X
      TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE GARY R. BROWN
      UNITED STATES MAGISTRATE JUDGE

APPEARANCES:
For the Plaintiff:    MOSTYN LAW
                      3810 West Alabama Street
                      Houston, Texas 77027
                      BY:  STEVE MOSTYN, ESQ.
                           RENE M. SIGMAN, ESQ.

                      DENIS G. KELLY & ASSOCIATES PC
                      74 West Park Avenue
                      Long Beach, New York 11561
                      BY:  DENIS G. KELLY, ESQ.

For the Defendant:    McMAHON MARTINE & GALLAGHER LLP
                      90 Broad Street
                      New York, New York 10004
                      BY:  ANTHONY MARTINE, ESQ.
                           PATRICK W. BROPHY, ESQ.
                           TIMOTHY D. GALLAGHER, ESQ.

                      THE DEMMONS LAW FIRM
                      3300 West Esplanade Avenue
                      Suite 601
                      Metairie, Louisiana 70002
                      BY:  LARRY DEMMONS, ESQ.

Court Reporter:       Dominick M. Tursi, CM, CSR
                      US District Courthouse
                      1180 Federal Plaza
                      Central Islip, New York 11722
                      (631) 712-6108 Fax:  712-6124
                      DomTursi@email.com

        Proceedings recorded by mechanical stenography.
          Transcript produced by computer.



EXHIBIT
4

2

1    (Call to Order of the Court.  Appearances stated
2    as indicated above.)
3          THE COURT:  So Mr. Neilson's firm is not
4    represented here today.
5          MR. MARTINE:  Well, we are all counsel to the
6    Neilson firm, your Honor.
7          Mr. Nelson is currently on a plane, and will be
8    on one all day heading out West.
9          THE COURT:  I will just note for the record that
10   at 5:30, or whereabouts, last night something was filed, a
11   considerable filing from the plaintiffs which may or may
12   not bear directly on what we are doing here today.  But
13   many of the allegations in those papers, and I hope you
14   have seen them, relate to Mr. Neilson's conduct and
15   statements he has made and so forth.
16         That is why I am just surprised that his firm is
17   not representing him today.
18         MR. MARTINE:  Judge, I would imagine that had
19   those papers not been filed at 6 o'clock last night,
20   Mr. Neilson or a representative from his firm would have
21   been here.
22         I would also say that, your Honor, I do believe
23   that it has nothing to do with the issues at hand, which
24   presumably is an evidentiary hearing as to the efficacy of
25   the report written by an independent adjuster.  So I don't

3

1    think these attacks on what happened in another matter,
2    these allegations really come to bear here at all.
3          THE COURT:  I tend to agree, but would say that
4    a few of the matters set forth in the filing that was made
5    last night relate to the veracity of statements made on
6    this motion to this court.  And to the extent that that
7    may be an issue, that concerns me a little bit.  But it is
8    at best tangential.
9          MR. MARTINE:  Judge, I see your point.
10         George Hernemar is here.  I believe he just
11   walked in.  I just met him the first time this morning.  I
12   think that anything he has to offer to your Honor and to
13   this court will resolve the underlying issue here.
14         THE COURT:  Maybe.  Let's see what other
15   witnesses are here.
16         MR. MOSTYN:  Mr. Kaible, the plaintiff, is here,
17   and I would like to put him on.  We would like to put him
18   on to talk about his relationship with the engineer and
19   what was discussed.
20         THE COURT:  Okay.  Are there any other witnesses
21   concerning the transmission of reports between the
22   engineering firm, the insurance carrier, and all the
23   attorneys?
24         MR. MARTINE:  Judge, they are here.  And I would
25   defer to your Honor as to whether or not your Honor would

4

1    want to hear from them after Mr. Hernemar.
2          But we do have with us a US Forensic engineer
3    who was part of the peer review that made suggested
4    changes to the report that Mr. Hernemar eventually
5    finalized as his engineering report.  It is Mr. Mike
6    Gorove.
7          So if your Honor, after hearing from
8    Mr. Hernemar, feels that Mr. Gorove should offer
9    testimony, he is here to do so.
10         MR. MOSTYN:  Your Honor, we would like to note
11   that Mr. Hernemar, that I asked counsel for his phone
12   number and he refused to give it to me.  They stated that
13   they would not assist me in my efforts to *abuse and
14   intimidate* Mr. Hernemar.
15         THE COURT:  To be clear, there will be no abuse
16   or intimidation here.
17         MR. MOSTYN:  I didn't plan on it.  Maybe I
18   stepped into a hornet's nest, coming in here.  But what we
19   wanted to know is whether or not he has with him the
20   original report in total because there is no way that --
21         THE COURT:  Hold on.  Before we get into the
22   details.
23         It is your motion.  You had a motion, of sorts.
24   I think you were asking for the wrong relief so I ordered
25   this hearing to get to the bottom of it.  But you sort of

5

1    initiated these proceedings so, technically speaking, I
2    think you get to go first.
3          Do you want to call your client first?
4          MR. MOSTYN:  I will call Mr. Kaible.
5          MR. MARTINE:  If I may, your Honor.
6          We also have Jeff Moore here, from Wright Flood,
7    if your Honor deems testimony from the defendant necessary
8    as well.
9          THE COURT:  Excellent.
10         Does anybody move to exclude witnesses?  Hearing
11   no motion, I will ask the court reporter to step over to
12   the witness area as you call your witness.
13
14   **ROBERT KAIBLE**
15         called by the Plaintiff, having been first duly
16         sworn/affirmed, was examined and testified as
17         follows:
18
19   DIRECT EXAMINATION
20   BY MR. MOSTYN:
21   Q.   Mr. Kaible, could you tell the court your wife's name
22   and your relationship on the home.
23   **A.   Deborah Ramey.  She's my wife the last 12 years.  And**
24   **the reason she didn't change her last name, she is a**
25   **school teacher.**

6

1  Q.  You own the home, you-all own the home that is the
2  subject of this litigation together?
3  A.  Yes, I do.  Yes, we do.
4  Q.  Can you inform the court if there is a home left --
5  the engineer -- the defendants wanted to go out and
6  inspect the home.
7        Could you inform the court what is on the lot
8  currently?
9  A.  There is nothing on the lot.
10  Q.  And is that because the City of Long Beach condemned
11  the home?
12  A.  That is correct.
13  Q.  Did you inform the insurance adjusting company of
14  that?
15  A.  Yes, I did.
16        THE COURT:  Hold on one second.
17        When you say the insurance adjusting company,
18  who did you inform of that?
19        THE WITNESS:  Fidelity.  The insurance carrier.
20  BY MR. MOSTYN:
21  Q.  Did you do that to the adjuster from -- were you
22  aware, Mr. Kaible, that the adjuster at the home was an
23  independent adjusting company through Colonial Claims?
24  A.  I don't know if I was aware of that.  I knew that he
25  was just representing Fidelity when he came.

7

1  Q.  And do you recall his name?
2  A.  I do.  David Maxime.
3  Q.  Did you tell Mr. Maxime that the home was going to
4  be, was determined to be torn down by the city?
5  A.  He received the same letter that we received, with
6  the substantial damage.  Yes.
7  Q.  Can I approach, your Honor?
8        THE COURT:  Sure.
9  BY MR. MOSTYN:
10  Q.  Is this the notice of -- the document I've handed
11  you, can you just tell the court what that is, please.
12  A.  That's the letter that we received from the City of
13  Long Beach after the Hurricane Sandy that showed that the
14  house was almost 64 percent damaged.
15  Q.  And, Mr. Kaible, is that report is dated January 3,
16  2013?
17  A.  That's correct.
18  Q.  Is that prior to the engineer's report?
19  A.  I'm not sure.  I think it is, yes, though.
20  Q.  So the court can have some background --
21        THE COURT:  Counsel, are you offering this?
22        MR. MOSTYN:  I am offering it, yes.
23        THE COURT:  Any objection to Plaintiff's 1?
24        MR. MARTINE:  No objection, judge.
25        THE COURT:  All right, we will mark it as

8

1  Plaintiff's Exhibit 1.
2        (Plaintiff Exhibit 1 in evidence.)
3  BY MR. MOSTYN:
4  Q.  Mr. Kaible, can you tell the court where the home
5  that is the subject of the litigation is located.
6  A.  Yes.  The address is 24 Michigan Street, in Long
7  Beach, New York.
8  Q.  I understand it is about five blocks off of the
9  beach?
10  A.  No.  It is exactly five houses off of the beach.
11  It's one block off the beach.
12  Q.  And, Mr. Kaible, do you have another residence there?
13  A.  Yes.  Directly in front of it, on Minnesota.
14  Q.  Can you explain that to the court.  One is a
15  residence and one is a rental.  Would you explain that to
16  the court, please.
17  A.  Yes.  We purchased the house, the Michigan house, the
18  one that got destroyed, approximately 7 years ago, with
19  the hopeful -- we just recently had a child, my wife and
20  I, and we purchased the home in order to expand our home.
21        If you are not familiar with Long Beach,
22  everything is on a 30-by-60 piece of property, so the only
23  way you expand your home is either front or side or back.
24  So we purchased that home.
25  Q.  And so your home, the residence that you live in, is

9

1  on one side or backs up to this home which was a rental
2  property.  Correct?
3  A.  That's correct.
4  Q.  And at the time of the hurricane, did you have
5  tenants in that home?
6  A.  Yes, we did.
7  Q.  And had they complained of the home not being
8  livable?
9  A.  No, they had not.
10  Q.  Can you tell the court the condition you found the
11  memo in after Sandy passed.
12  A.  It was completely devastating.  The floors.
13  Everything on the first floor.  The foundation.  None of
14  the doors would close.  It was just, everything inside
15  that first floor of the house and the foundation was
16  beyond repair.
17  Q.  And am I correct that one the doors would not close
18  and one you had to pry it open?  Is that correct?
19  A.  That's correct.
20  Q.  Meaning, the exterior doors?
21  A.  That's correct.
22  Q.  And you had never had that experience with the tenant
23  there.  Is that correct?
24  A.  No.
25  Q.  And tell the court, would you please, the two

10

1   different discussions you had with -- you had -- let me
2   back up.
3           You had the same adjuster for both homes.
4   Correct?
5   A.   Yes.
6   Q.   And what did the adjuster tell you regarding your
7   residence?
8   A.   We had our house, which is 23 Minnesota, we had the
9   same adjuster for 23 Minnesota and 24 Michigan.  He did
10  the, you know, he did everything for 23 Minnesota, and
11  finalized that, and he went over to 24 Michigan.
12          And he said and he explained to me, because I
13  wasn't too up on what was happening.  We had ServePro come
14  and do everything in the house.
15          And when he went over to 24 Michigan, he says:
16  Listen.  Everything comes out of a pot.  Okay?  It is
17  going to cost $15,000, $20,000 to just dry this house out.
18          He says:  If you spend that money and they
19  condemn this house, like I think they might, I'm not an
20  engineer, he says, but I've been through all the
21  hurricanes, he says, you are just throwing that money
22  away.
23          THE COURT:  This is Mr. Maxime speaking?
24          THE WITNESS:  This is Mr. Maxime.
25          But he did say:  I'm not an engineer.

11

1           MR. MARTINE:  Judge, objection to this hearsay,
2   what Maxime told him.
3           MR. MOSTYN:  This is an agent of the defendant.
4           THE COURT:  I'm not sure of the relevancy but I
5   will hear it, for what it is worth, since there is no
6   jury.
7           THE WITNESS:  So he basically told us not to do
8   anything until an engineer came out and gave us a report.
9           MR. MOSTYN:  Approach the witness, your Honor?
10          THE COURT:  Sure.
11          Are you marking this as Plaintiff's Exhibit 2?
12          MR. MOSTYN:  I am marking this as Plaintiff's
13  Exhibit 2.
14  BY MR. MOSTYN:
15  Q.   Mr. Kaible, this is the engineer request by the
16  adjuster.
17          Have you seen this?
18  A.   Yes.
19  Q.   Would you read for the court the box underneath
20  number 6, please.
21          THE COURT:  Are we offering this, before he
22  reads from it?
23          MR. MOSTYN:  Yes.  We offer this.
24          THE COURT:  Is there an objection?
25          MR. MARTINE:  No objection, judge.

12

1           THE COURT:  All right.
2           (Plaintiff Exhibit 2 in evidence.)
3           THE COURT:  Go ahead, sir.  You may read from
4   the document.
5   A.   "During a recent flood inspection, I noticed the
6   flooring in the dwelling was uneven from the front to the
7   rear.  The floor seemed to have a rolling action as you
8   walked over it."
9           THE COURT:  I hate to interrupt you.  We have a
10  court reporter so read slowly.
11  A.   I'm sorry.
12          "A visual inspection of the flooring at several
13  of the walls appeared to have dropped about an inch or two
14  in some cases.  There was a 5-inch difference between the
15  ceiling height at the corner of the bedroom and the center
16  line of the bedroom.  The exterior of the building had
17  about 3 feet of sand adjacent to the building.
18          "Inspection of the building crawl space showed
19  several framing members out of line.  A visual inspection
20  of the front of the roof showed unevenness along the roof
21  line.  At this current time, the building appears to be
22  unsafe to live in."
23  Q.   And does that coincide with the conversation that you
24  had with the adjuster?
25  A.   Yes.

13

1   Q.   Would you tell the court what happened when the
2   engineer Mr. Hernemar came out, please.
3   A.   Well, when he first came out, we met and we basically
4   walked through the home together.  I assisted him in any
5   way I could with water level lines, holding this, holding
6   that.  And he spent about an hour and a half, two hours to
7   the premises.
8           At that time he left and he said that he would
9   issue a report and that I would be receiving the report in
10  the mail.
11  Q.   Did he give you any indication of what he thought
12  about the damage in the home?
13  A.   Can I say that -- he knew it was in bad shape.
14          MR. MARTINE:  Objection, judge.
15          THE COURT:  Sustained.
16  BY MR. MOSTYN:
17  Q.   Okay.  Then you received a report.  Correct?
18  A.   Received a report.
19          MR. MOSTYN:  Mark this as number 3, your Honor,
20  and we offer this as 3.
21          THE COURT:  Plaintiff's 3 appears to be a US
22  Forensic report which appears to have a date of January 7,
23  2013, and has a report number of 12.22.1304.  Marked for
24  identification.
25          Counsel, you can proceed.

14

1  BY MR. MOSTYN:
2  Q.  Mr. Kaible, is this a copy of the report that you
3  received?
4  A.  Yes, it is.
5  Q.  Would you turn to page --
6       THE COURT:  Are you offering it?
7       MR. MOSTYN:  Yes, I'm offering it.  I'm sorry.
8       THE COURT:  Any objection?
9       MR. MARTINE:  No objection.
10      THE COURT:  Exhibit 3 is admitted.
11      (Plaintiff Exhibit 3 in evidence.)
12  BY MR. MOSTYN:
13  Q.  Would you turn to page 1, sir, paragraph 1.
14  A.  Yes.
15  Q.  In this report it says -- would you read the finding
16  on the first paragraph, please.
17  A.  "The physical evidence observed at the property
18  indicated that the subject building was not structurally
19  damaged by hydrodynamic forces, hydrostatic forces, scour
20  or erosion of the supporting soils or buoyancy forces of
21  the flood waters associated with the subject flood event."
22  Q.  And then would you read the second paragraph, please.
23  A.  "The physical evidence observed at the subject
24  property indicated that the uneven roof slopes, leaning
25  exterior walls, and the uneven floor surfaces within the

15

1  interior of the building were the result of long-term
2  differential movement of the building and foundation that
3  was caused by long-term differential movement of the
4  supporting soil at the site and long term deflexion of the
5  building framing."
6  Q.  Mr. Kaible, did you have any conversations with the
7  adjuster about whether or not there was preexisting damage
8  to the home?
9  A.  With the adjuster?
10  Q.  Yes.
11  A.  No, I did not.
12  Q.  With the engineer?
13  A.  No, I did not.
14  Q.  Did they ask you?
15  A.  No, they did not.
16  Q.  Let me ask you.  Was the damage that you observed the
17  day -- did you observe the damage the day after Sandy?
18  A.  Five days after Sandy.
19  Q.  Was the damage that you observed, the shifting of
20  floors, was that in that home prior to Sandy?
21  A.  Definitely not.
22  Q.  Was the shifting of the doors in the home, prior to
23  Sandy?
24  A.  Definitely not.
25  Q.  Was the fact that you could not get in -- which door

16

1  was it that you could not enter?  The exterior door.
2  A.  I couldn't enter either door.  I had to break down
3  the back door in order to get into the residence.
4  Q.  Let me ask you an absurd question.
5       Was that the way it was when your tenants
6  evacuated that home?
7  A.  No, it was not.
8  Q.  Tell the court, after you received the report what
9  did you and your wife do to follow up?
10  A.  As best we can figure it, it we made about 45 phone
11  calls to Fidelity.  Somehow, some way, my wife was able to
12  get up to the higher echelon of Fidelity.
13      And his name escapes me, I do have it, but we
14  had requested Fidelity to send another engineer out to
15  reinspect the property.
16  Q.  And did they eventually agree to do that?
17  A.  Yes, they did.
18  Q.  And who came back out to the house?
19  A.  George came back to the house.
20  Q.  Would you tell the court what you-all discussion was
21  when he came to the house.
22  A.  When he came back to the house, I was a little bit
23  surprised that they sent the same engineer, since I
24  requested a new engineer.
25      But one of the first things I asked George, I

17

1  said:  George, how can you possibly write this report?
2  And he says:  It's not my report.  It's not the report I
3  wrote.
4       I said:  What do you mean?  He said:  Well, hold
5  on.
6       And he went to the trunk of his car and he took
7  out the report that he wrote, that he submitted.  I assume
8  he submitted it because he had this report with him.
9       And I said:  Well, this is not the report I had.
10  He says:  I don't know.  This is the report I submitted.
11      And at that time he proceeded to look through
12  the house, and with my cell phone I took pictures of the
13  front page and what I consider page one, the page I just
14  described.
15      THE COURT:  If we look at Plaintiff's Exhibit 4,
16  I have a quick question.
17      Approximately when was this; that is, when you
18  had this conversation and these photographs that you
19  described?
20      THE WITNESS:  Approximately, I would say, four
21  weeks after he did the first inspection.
22      THE COURT:  Can you put that in time for me in
23  any other way?  Was it cold outside?  Was it summer?  Can
24  you give me anything?
25      THE WITNESS:  No.  It was very cold.  It was

18

1  very cold. I would say in the house it was in probably
2  the 30s because there wasn't any heat or anything.
3        THE COURT: You can proceed. Plaintiff's
4  Exhibit 4 is a two-page image.
5  BY MR. MOSTYN:
6  Q.   Does January 25 of 2013 seem correct for that second
7  inspection?
8  A.   I'm sorry?
9  Q.   Does January 25 of 2013 seem correct for the second
10 inspection?
11 A.   Yes. Around there, yes.
12 Q.   And did you --
13       MR. MARTINE: We will stipulate that that was
14 the day.
15       THE COURT: Thank you, counsel. It makes it
16 easier.
17 BY MR. MOSTYN:
18 Q.   Are these two, printouts of the photographs that you
19 took with your cell phone?
20 A.   Yes, they are.
21       MR. MOSTYN: We move for admission of 4.
22       THE COURT: Any objection?
23       MR. MARTINE: No objection.
24       THE COURT: Sir, the photographs that you took,
25 the report, what form was the report in? Was it paper?

19

1  Was it on a screen?
2        THE WITNESS: No. It was on a report. Just
3  this. Paper.
4        THE COURT: Paper. Okay.
5        MR. MOSTYN: Your Honor, I think if you look at
6  the first page --
7        THE COURT: Counsel, I'm confused because your
8  letter told me that it was a computer screen, and this is
9  not a picture of a computer screen.
10       MR. MOSTYN: I absolutely agree and understand,
11 your Honor. I saw that in the motion, itself, and that
12 was an error.
13       THE COURT: All right. Plaintiff's Exhibit 4 is
14 admitted without objection.
15       MR. MARTINE: No objection, Judge.
16       THE COURT: Okay.
17       (Plaintiff Exhibit 4 in evidence.)
18       MR. MARTINE: I was going to bring up on
19 cross-examination what you are saying, your Honor.
20       THE COURT: I don't know that this witness can
21 answer it.
22       MR. MARTINE: Understood.
23 BY MR. MOSTYN:
24 Q.   Mr. Kaible, on the first page is the report on a
25 clipboard. Correct?

20

1  A.   That's correct.
2  Q.   And the second page is what you called page 1, the
3  opinions. Correct?
4  A.   That is correct.
5  Q.   And that is, I guess, your thumb in the picture.
6  A.   That is correct.
7  Q.   And then we have another one, on what would be page 3
8  of this exhibit, of the same, with the finger.
9        That is your finger. Is that correct?
10 A.   That's correct.
11 Q.   And then a picture of two paragraphs again. Correct?
12 A.   That is correct.
13 Q.   Why didn't you ask for a copy of the report?
14 A.   It wasn't offered to me.
15 Q.   And why didn't you take pictures of all the pages?
16 A.   I didn't think it was necessary because I skimmed
17 through the report and this was the only pertinent
18 information I thought was on the report.
19 Q.   Would you read what is number one.
20       Let's see if we have a better picture of it.
21       Let's read on page 4, what is No. 1. Could you
22 read that paragraph into the record, please.
23 A.   "The physical evidence observed at the property
24 indicated that the subject building was structurally
25 damaged by hydrodynamic focuses associated with the flood

21

1  event of October 29, 2012. The hydrodynamic forces
2  appeared to have gone caused the foundation walls around
3  the southwest corner of the building to collapse."
4  Q.   And then would you read what is the next paragraph.
5  A.   "The extent of the overall damage to the building,
6  scope of repairs, combined with the age of the building
7  and a simple structure lead us to conclude that the repair
8  of the building is not economically viable."
9  Q.   Mr. Kaible, your home that this report was done, 24
10 Michigan, was built in a different manner than your
11 residence. Correct?
12 A.   That's correct.
13 Q.   Would you explain that to the court.
14 A.   Well, the house that we lived in on Minnesota was
15 built in I think 2001. It was on a slab. It did not have
16 a foundation.
17       The house that was on Michigan was built on a
18 pier system and, you know, that is the foundation.
19 Q.   And can you tell the court what you were paid by the
20 insurance company.
21 A.   The first payment was approximately $60,000. And
22 then we got an additional claim of $11,000.
23 Q.   And was that for cosmetic damages?
24 A.   Yes.
25 Q.   Not for structural.

22

1    A.    The $11,000 I think they said was something about
2    structural.
3    Q.    And that was after the second report?
4    A.    That's correct.
5    Q.    Can you tell the court, please, what has happened
6    with the home since then.
7    A.    Well, approximately eight months after Sandy came, we
8    were forced to sell the house for the cost of the property
9    because we weren't able to carry the mortgage on the house
10   without a rental income.
11   Q.    And was the house sold?
12   A.    Yes, it was.
13   Q.    And when was the house torn down?
14   A.    It was torn down in June of 2013.
15   Q.    Was that after it was sold or before?
16   A.    After it was sold.
17   Q.    And it was sold as a tear-down.
18   A.    Yes.
19   Q.    And the buyer knew that the city had just --
20         MR. MARTINE:  Objection.
21         MR. MOSTYN:  I withdraw it.
22   BY MR. MOSTYN:
23   Q.    How much was the home insured for, Mr. Kaible?
24   A.    $250,000.
25   Q.    Which was the maximum limit?

23

1    A.    That's correct.
2          MR. MOSTYN:  That's all I have.  Pass the
3    witness.
4
5    CROSS-EXAMINATION
6    BY MR. MARTINE:
7    Q.    Mr. Kaible, the 60-and-change or $67,000-and-change
8    plus the 11-and-change that you were paid by the insurance
9    company, it came in installments.  Correct?
10   A.    One check for $60,000.
11         Yes, I guess it was installments.  Yes.
12   Q.    You were given $20,000 early on just for immediate
13   relief.  Is that correct?
14   A.    That is correct.
15   Q.    And then another 40-and-change after that.  Correct?
16   A.    That's correct.
17   Q.    And then another 11 after the review or engineering
18   inspection of the foundation.  Is that correct?
19   A.    The second engineering inspection.
20   Q.    Right.  By the same engineer who did the first
21   inspection?
22   A.    Yes, sir.
23   Q.    And that was the exact amount actually of damage,
24   excluding foundational damage, that the independent
25   adjuster Maxime found.  Is that correct?

24

1    A.    Yes.  The $60,000.  Not the 11.
2    Q.    Okay.  The 60-and-change was the exact amount that
3    the independent adjuster, not the engineer, found was
4    damage to your home.  Is that correct?
5    A.    That's correct.
6    Q.    And your very first exhibit that you looked at that
7    was admitted into evidence with the first page of City of
8    Long Beach, do you still have that before you?
9    A.    Yes, I do.
10         THE COURT:  Plaintiff's Exhibit 1.  Correct?
11         MR. MARTINE:  Yes, your Honor.  Thank you.
12   BY MR. MARTINE:
13   Q.    That indicates that the cost of repairs and
14   improvements was to be $129,000.  Is that correct?
15         On the second page, sir.
16         Far right middle.
17         Do you see that?
18         Cost of reimbursements?  Improvements?
19   A.    Yes, I see that.
20   Q.    Your claim here in this case is for $250,000, the
21   full policy limit.  Is that correct?
22   A.    That's correct.
23   Q.    Now I want to turn briefly to your interaction with
24   George Hernemar, the engineer, the second time he went to
25   your house.

25

1          It took, you said, I think 45 phone calls to get
2    him there.  Correct?
3    A.    Yes.  That is correct.
4    Q.    I know you are estimating.  Right?
5          And your thing was to have a different engineer
6    there.  Is that correct?
7    A.    That is right.
8    Q.    Because you weren't pleased with the first report
9    that found that, the report that you received that found
10   no damage from any of the flood courses.  Is that correct?
11   A.    That's correct.
12   Q.    You eventually prevailed upon Wright Flood to have,
13   or Fidelity to have the engineer come back.  Is that
14   correct?
15   A.    An engineer.
16   Q.    Now, you weren't happy, I assume, when you saw
17   Mr. Hernemar.  Is that correct?
18   A.    I wasn't displeased.  I just wanted to know why.
19   Q.    So I assume, though, you weren't happy with the
20   contents of that report that you received.
21   A.    That's correct.
22   Q.    Now, when the engineer gave you the report back, is
23   it fair to say it reached the exact opposite conclusion as
24   to what you first received?  Is that fair to say?
25   A.    That's correct.

**26**

1  Q.  You are telling me you didn't ask him for a copy of
2  that report because he didn't offer it?
3  A.  He did not offer the report.
4  Q.  Okay.  Did you say:  Hey, I don't care.  Give me a
5  copy of the report that says the exact opposite of what I
6  was told earlier?
7  A.  No.  I had the pictures of it.
8  Q.  Did you -- when did you first share those pictures
9  with anyone from Wright Flood, if you ever have?
10  A.  When I contacted Mr. Kelly, my law firm.
11  Q.  That is your lawyer.  Correct?
12  A.  Yes.
13  Q.  So you had a lawyer at this time.
14  A.  Yes, I did.
15  Q.  Now, you said you were in desperate times at this
16  point in order to get money to possibly fix your house.
17  Is that right?
18  A.  Not desperate times.  I didn't say desperate.
19  Q.  Well, you had to sell the house because you couldn't
20  afford it without a rental.  Is that correct?
21  A.  That's correct.
22  Q.  Is it fair to say the sooner you got money, the
23  sooner you could fix your house and the sooner you could
24  get a rental back in that house?  Is that correct?
25  A.  That's absolutely correct.

**27**

1  Q.  And it wasn't your intention to sell this house, was
2  it?
3  A.  No, it was not.
4  Q.  So rather than using this report to try to contact
5  someone from Wright Flood, who you had been in contact
6  with 45 times before this reinspection, you instead simply
7  give photos to your attorney.
8  A.  No.  I called David Maxime, the adjuster, who was the
9  only person who had ever, besides George, the only people
10  I have ever seen face to face, and he said to me it was
11  out of his jurisdiction.
12  Q.  Okay.  So when you found out it was out of
13  Mr. Maxime's jurisdiction, did you contact anyone from the
14  insurance carrier, whose jurisdiction it is -- excuse
15  me -- to ask them:  Hey:  What's going on here?
16  A.  Fidelity.  I called them another 30 times.  Never got
17  one return phone call.
18  Q.  Who did you talk to?
19  A.  Everyone, all the way up until the vice president of
20  Fidelity.
21  Q.  Give me some of the names of the people you --
22  A.  I don't have the names with me.  My wife was handling
23  most of the phone calls.  But whoever is in charge of the
24  case we called numerous times.
25  Q.  Is your wife here?

**28**

1  A.  No, she is not.
2  Q.  What number did you use to call other people at
3  Fidelity -- please -- numerous times after the second
4  report?
5  A.  I have no idea.
6  Q.  Do you have a diary or journal at home that
7  indicates -- please --
8  A.  My wife probably does.
9  Q.  Mr. Kaible, I've got to ask you to let me finish.  I
10  know you know where I'm going, but this gentleman to your
11  right cannot to take down two people talking at the same
12  time.  So I ask for your indulgence.
13       Your wife has the numbers that were used to call
14  Fidelity numerous times after you found the report in the
15  trunk of George's car?
16  A.  I did not find the report in George's trunk of the
17  car.  George handed me the report.  He took it out of the
18  trunk of his car and handed it to me.
19  Q.  Did you see if there was more than one copy there?
20  A.  No.  He handed me the report from the trunk of the
21  car and brought it in the house.  I did not follow him to
22  the car.
23  Q.  So this engineer was willing to hand you a copy of
24  the report, yet you didn't feel comfortable enough asking
25  him for a copy for you to keep?

**29**

1  A.  Again, I did not ask him.  I took pictures of the
2  report.
3  Q.  The report is, what, about 12, 15 pages?  Correct?
4  A.  I read the entire report.  And from my recollection I
5  didn't have my report in front of me that was sent, but I
6  knew that the pertinent information on that report were
7  the first page and page one where they were completely
8  different about hydroaquatics and hydrodynamic and the
9  soil movement and all that.
10  Q.  I understand, Mr. Kaible.  We have already
11  established that.
12       My question is, the report was longer than the
13  first two pages that you took pictures of.  Is that right?
14  A.  That's correct.
15  Q.  And was George there while you were taking pictures
16  of his report?
17  A.  He was in the house, yes.
18  Q.  Did he say:  Hey, you only get two pictures here?
19  A.  No, he did not.
20  Q.  What else -- were you with the engineer when he went
21  to the trunk of his car to pull out his report?
22  A.  I was not.  I was in the house.
23  Q.  And he walked into the house with the report.
24  A.  That is correct.
25  Q.  At the point you saw this report that had completely

30

1  opposite conclusions as the report you received, did you
2  think that there was something wrong?
3  A.  Absolutely.
4  Q.  Did you have other neighbors in the area that also
5  had damage to their house from Sandy?
6  A.  Absolutely.
7  Q.  Did any of these neighbors of yours have Wright Flood
8  as their insurance carrier?
9  A.  I have absolutely no idea.
10  Q.  Well, did you make a point of talking to your
11  neighbors and saying: *Hey, something might be going on*
12  *here.  Be careful of the report you receive?*
13        MR. MOSTYN:  Objection.
14        THE COURT:  I will overrule the objection.  But
15  it is a little far afield.
16  BY MR. MARTINE:
17  Q.  Okay.  Well, besides taking pictures of what you
18  believe was something wrong going on in the report that is
19  the opposite of what you received and handing them to your
20  lawyer, did you do anything else?
21        Did you contact a friend?
22        Did you contact the District Attorney?
23        Did you contact the Better Business Bureau?  The
24  Insurance Department?  Anybody?
25  A.  Did I contact the District Attorney?  We have

31

1  contacted the Attorney General.
2  Q.  How about you, personally?  Did you contact the
3  Insurance Department or the Better Business Bureau about
4  what you thought about something that was wrong going on?
5  A.  I called Fidelity numerous times, very numerous
6  times, and they refused to even return a phone call.
7  Q.  Can you tell me one person with whom you left a
8  message at Fidelity?
9  A.  Offhand, it is over two years ago, I would not know.
10  My wife does have records of who she spoke to.
11  Q.  Fidelity did return your calls when you were trying
12  to arrange the reinspection, though.  Correct?
13  A.  Yes, they did call us that they would sent another
14  inspector, and they told us the date and time that he was
15  going to be there.
16  Q.  Now, you testified on direct about some of the damage
17  to your house.  Much of it was to the interior.  You
18  talked about floors, the walls, and things of nature.
19  Remember?
20  A.  Yes.
21  Q.  You also mentioned the unevenness across a roof line.
22  Do you remember saying that?
23  A.  Did I say that?
24  Q.  Yes.
25  A.  No, the adjuster said that.

32

1  Q.  Okay.  Did you see an unevenness across the roof
2  line?
3  A.  Yes, I did.
4  Q.  Did that unevenness across the roof line exist prior
5  to Sandy?
6  A.  No, it did not.
7  Q.  Was there any damage to the roof, or where the roof
8  meets the gutter, at any point prior to Sandy?
9  A.  If there was, I didn't realize there was.
10  Q.  Now, what year did you buy the house?
11  A.  Approximately seven years ago, so I'm going to say
12  2006.
13        MR. MARTINE:  If I may, may I approach, your
14  Honor?  I'm going to mark Defendant's Exhibit A.
15        THE COURT:  You may approach.
16        MR. MARTINE:  Thank you, judge.
17        Your Honor, can I give the court my copy?  Can I
18  have the copy back?  I only made two copies, surprisingly,
19  instead of three.  That is my fault.  Just for some brief
20  questioning.
21        That is from David Maxime's report, the
22  independent adjuster's report.  He had a photo of the
23  house prior to Sandy.
24        THE COURT:  For the record, Defendant's Exhibit
25  A is denominated PC 079.

33

1        MR. MARTINE:  Thank you.
2  BY MR. MARTINE:
3  Q.  Mr. Kaible, do you recognize what is depicted in what
4  was just marked as Defendant's Exhibit A?
5  A.  Yes, I do.
6  Q.  Now, is that a picture of what your house looked
7  like?
8  A.  I'm trying to think what year this could possibly be
9  from.
10  Q.  I represent to you that on the right corner there,
11  you can see it says 2/13/010, taken by the appraiser.
12        Do you see that?
13  A.  Yes.
14  Q.  Does that refresh your recollection as to whether or
15  not this is a fair depiction of what your house looked
16  like pre-Sandy?
17  A.  No.
18  Q.  So is this, would you say this is, looking at the
19  picture, a fair and accurate recollection (sic) of what
20  your house looked like pre-Sandy?
21  A.  The overall view, I would say, yes.  The front of the
22  house, absolutely not.
23  Q.  What is different about the front of the house?
24  A.  The front of the house was all fixed up.  It had a
25  new door.  New siding.  New numbers.  New lights.

34

1  Q.  How about, do you see the roof line above the front
2  door there, where it meets the gutter?
3  A.  Yes.
4  Q.  Do you see how it appears to be bowed?
5  A.  Yes.  With the soffit.  What happened with that is,
6  the gutter --
7  Q.  Do you see where it appears to be bowed?
8  A.  I do, yes.
9  Q.  I will ask the question.  Was that like that the day
10 before Sandy?
11 A.  No, it was not.
12 Q.  Did you fix it?
13 A.  Yes, we did.
14 Q.  Do you have those repair records?
15 A.  No, I don't.
16 Q.  When did you fix it?
17 A.  Probably in 2007, after we bought the house.
18 Q.  Did you do it yourself or did you hire a contractor?
19 A.  I think, for the gutter, I did it myself.
20 Q.  What did you do?
21 A.  Just put new gutters along the interior -- the
22 exterior.
23 Q.  Is that the extent of the work that was done after
24 you bought the house, to that area of the house where
25 there is a bowing of the roof above the gutter?

36

1  photos, from a whole bunch of photos he took during his
2  inspection.
3         Do you see that top photo?
4  A.  Yes, I do.
5  Q.  Now, is that a fair and accurate depiction of what
6  the exterior of your home looked like after Sandy?
7  A.  Yes, it is.
8  Q.  And there is -- you testified I believe that the
9  house was completely damaged following Sandy.  Correct?
10 A.  Yes, it was.
11 Q.  Does that picture show the -- does that picture
12 depict that new gutter that you say you put on?
13 A.  Yes, it does.
14 Q.  And where is that new gutter?
15 A.  It is hanging right there.  You can see it from here.
16 Q.  Right across the front?
17 A.  Yes.
18 Q.  Sir, after you bought the house did you remove any of
19 the interior walls within the house?
20 A.  No, I did not.
21 Q.  Is it fair to say that from the original
22 construction, if you know this, that those interior walls
23 at some point before you purchased the house were removed?
24 Correct?
25 A.  I would have no idea.

35

1  A.  Yes.
2  Q.  So you did no work to the shingles of the house.
3  Correct?
4  A.  There was a roof put on after the house.  A new roof
5  was put on after the house.
6  Q.  When?
7  A.  I'm going to say 2009.
8  Q.  What half of the house?
9  A.  Back half.
10 Q.  So not the part we are talking about.
11 A.  No.
12 Q.  Do you see, sir, on the side of the house that is in
13 the foreground of the picture, there appears to be some
14 separation between the shingles and the white siding at
15 the roof line?
16 A.  No, I don't.
17        MR. MARTINE:  Judge, I'm going to mark another
18 photograph.  And again I ask for the court's indulgence a
19 second time about using an exhibit.
20        This will be Defendant's Exhibit B.
21 BY MR. MARTINE:
22 Q.  Mr. Kaible, I'm going to hand you what was just
23 marked as Defendant's Exhibit B.  I represent to you that
24 this is a photograph taken from David Maxime, the
25 independent adjuster's, report concerning a whole bunch

37

1  Q.  You never had an original floor plan of the house
2  when you bought it?
3  A.  No, sir, I did not.
4  Q.  There is one support beam on the main floor.
5  Correct?
6  A.  Yes.  There is.
7  Q.  More commonly known as a lally column.  Are you
8  familiar with that term?
9  A.  Yes.
10 Q.  And that lally column is a wooden 2-by-4.  Is that
11 fair to say?
12 A.  No, it is not.
13 Q.  What is it?
14 A.  It's a 6-by-6.
15 Q.  6-by-6.  I'm sorry.  But it is a vertical column that
16 runs into, toward the roof and the ceiling of the house.
17 Correct?
18 A.  That's correct.
19 Q.  Do you know if there are any other -- strike that.
20        Was that lally column shifted in any way?
21 A.  Not to my knowledge.
22        Are you talking about after Sandy or before
23 Sandy?
24 Q.  After Sandy.
25 A.  Again, I didn't really pay attention to it so I

38

couldn't tell you if it shifted or didn't shift.

Q.   Before Sandy how about the counters in the kitchen? Were they always even?

A.   Yes, they were.

Q.   So there was never a portion of the countertop that was perhaps above an appliance, and another portion of the countertop was perhaps below an appliance?

MR. MOSTYN:  Your Honor, I object to relevance. They didn't do an interview process whatsoever of Mr. Kaible.  The question is why does the report go from saying the house is totalled to no damage, and this is not relevant to that.

MR. MARTINE:  It is my understanding that this hearing goes to whether or not there was structural damage as a result of hydrodynamic or hydrostatic forces, and the allegation by the plaintiffs is some kind of, something untoward going on by virtue of the fact that a report was purportedly changed.

THE COURT:  We are pretty far afield at this point when you are talking about the appliances in the kitchen.  When you get to the blender, I'm going to --

MR. MARTINE:  I'm not going --

THE COURT:  -- stop listening and then we're done.

MR. MARTINE:  All right.

39

THE COURT:  Before we break I have a question for you, sir.

There come a time point in time when they installed two telephone poles in front of the house, or a second telephone pole in front of the house.

THE WITNESS:  A second telephone pole was installed after Sandy.

THE COURT:  Okay.

THE WITNESS:  If we're talking about the same pole.

No.  Okay.  No.  On the corner of my house, which is, if you look at this picture, if you would go towards the back of the house, my house, when I said it butts up against it.

But what the utility companies have done after Sandy, they have put higher poles on the corner.  So when you say two poles on my corner, they installed another pole.

THE COURT:  Okay.

BY MR. MARTINE:

Q.   Mr. Kaible, isn't it -- is it true that the reason you didn't take pictures of all of the engineer's report that you say he took from the trunk of his car is because you didn't have permission to look at that report?  Isn't that true?

40

A.   I didn't have permission?  He handed me the report.

Q.   So you are saying to this court that the engineer handed to you a report that was the report different than the one you received?

A.   That's absolutely correct.

Q.   And upon receiving that report and reading the contents, which was completely inapposite (sic) to what you had briefly, you didn't bother to ask for a copy.

A.   I did not.

MR. MARTINE:  That's all I have, Judge.

THE COURT:  Any followup?

MR. MOSTYN:  Brief followup.


REDIRECT EXAMINATION

BY MR. MOSTYN:

Q.   Mr. Kaible, when you called the insurance company the first 44 times, did they call you back?

A.   We spoke to some people.  Okay?  This is when we first started.  We spoke to some people, you know, answering machines, I don't even know if my wife ever talked to a live person until, they kept passing us off and passing us off.

And then somehow, some way, she, and I'm trying to remember the man's name, I should have wrote it down. He was the vice president of Fidelity and he was the one

41

who got us the second engineer.

Q.   Okay.  And then, just briefly.  The picture that is B, Defendant's Exhibit B, the house after Sandy, on the bottom picture, those cars that are there, Mr. Kaible?

A.   Yes.

Q.   I assume those are washed up there from the flood, not parked that way?

A.   Yes, sir.

MR. MARTINE:  Objection to relevancy, Judge.

MR. MOSTYN:  It goes, your Honor, to the ridiculous nature that these cars can float down the street and this home can be perfect until they move out and then it has no damage, according to the second engineer's report.

THE COURT:  Since I don't have a copy to rule on, I will allow it.  Since I don't have a copy, it is hard for me to rule.  But I will allow it.

Anything further?

MR. MOSTYN:  Nothing further.

THE COURT:  Further cross?

MR. MARTINE:  No, sir.

THE COURT:  Thank you.  You can step down.

(The witness was excused.)

THE COURT:  Please call your next witness.

MR. MOSTYN:  We call Mr. Hernemar, please.

42

**HARRY GEORGE HERNEMAR**

called by the Plaintiff, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MOSTYN:

**Q.**   Mr. Hernemar, you are a licensed engineer in New York.  Correct?

**A.   Yes.  Correct.**

**Q.**   Do you have a copy of the report that Mr. Kaible has a photograph of?

**A.   With me.  I think I have everything in front of me. Yes.**

**Q.**   The report that determines that the house is not repairable --

THE COURT:  Counsel.  Just mark exhibits.  It makes it a lot easier.

MR. MOSTYN:  Thank you, your Honor.

THE COURT:  I show him Plaintiff's Exhibit 4, I think it is, and take it from there.

MR. MOSTYN:  May I approach?

THE COURT:  Yes.

BY MR. MOSTYN:

43

**Q.**   Do you have a copy of Plaintiff's 4, this report with these conclusions?

**A.   Yes.**

**Q.**   You have that with you?

**A.   Yes.**

**Q.**   Is that the one you have in front of you?

**A.   Yes.  Among other papers, yes.**

MR. MOSTYN:  Can I take a few minutes to read over this report?  Can we take a break?

THE COURT:  Why don't we move along.  I'm sure we will break at some point.  Let's get the basic facts established.

THE WITNESS:  I need to keep this here.

MR. MOSTYN:  Let me take 30 seconds.

THE COURT:  Do you have extra copies of the report that we are talking about now?

And when I say that, what I mean would be a complete copy of a report that is somewhat depicted in Plaintiff's 4.

MR. MARTINE:  Judge, I don't.  It is my only extra copy.  And it is not with the color photographs.

MR. MOSTYN:  Fine.

MR. MARTINE:  Judge, let the record reflect that I just handed it to him.

THE COURT:  You know what I'm going to do?

44

Counsel, just hand it up here.  I'm going make copies of that so we all have them, and you can proceed with the questioning.

BY MR. MOSTYN:

**Q.**   How do you pronounce your last name?

**A.   HER-ne-MAR.**

**Q.**   I'm from East Texas.  It is going to be a little difficult.

**A.   Fine.**

**Q.**   How many reports -- Mr. Hernemar, how were you contacted about writing reports for US Forensic?

**A.   I'm sorry.  I couldn't hear.  Could you repeat?**

**Q.**   How were you contacted about writing reports for US Forensic?

**A.   I respond to an ad on Craig's List, a recruiting agency looking for licensed engineer in State of New York.**

THE COURT:  Did I hear correctly:  You responded to an ad on Craig's List?

THE WITNESS:  Correct.

THE COURT:  For a licensed engineer?

THE WITNESS:  Yes.

THE COURT:  Okay.

THE WITNESS:  Doing this kind of; yes.

THE COURT:  Go ahead.

BY MR. MOSTYN:

45

**Q.**   Were there other companies advertising on Craig's List for engineers?

MR. MARTINE:  Objection, judge.

THE COURT:  Yes.  Let's keep it very relevant.

**A.   There's a lot of job ads on Craig's List.**

BY MR. MOSTYN:

**Q.**   Did you write reports for other companies as well, for Sandy damage?

**A.   No.**

**Q.**   Just for US Forensic?

**A.   Yes.  Correct.**

**Q.**   And approximately how many reports did you write for US Forensic?

**A.   I would say about 50.**

**Q.**   And, Mr. Hernemar, are you aware of the requirement that your reports be stamped with a engineer's seal? Correct?

**A.   Yes.**

**Q.**   And are you aware of a requirement under New York law that it be also stamped with a stamp that says it is a violation of New York law to alter this report?

**A.   I don't understand the question.  I don't understand the question.**

MR. MARTINE:  Objection.  There is no foundation.  All his official reports were stamped.

46

I don't understand where they are going.

THE COURT:  Hold on.  Objection overruled.

You can answer the question.

MR. BROPHY:  Your Honor, if I can continue that objection.

THE COURT:  No.  I have overruled the objection. I know what you want to argue, counsel.  We will argue later.

MR. MOSTYN:  Your Honor, an Exhibit -- I apologize.  Is Exhibit 3 the original engineer's report?

THE COURT:  I don't know what *the* engineer's report is.  There *is an* engineer's report.

MS. SIGMAN:  The January 8.  I think January 8.

THE COURT:  2007.

BY MR. MOSTYN:

Q.  I want to approach with number three.  Plaintiff's Exhibit 3.

Mr. Hernemar, is your Plaintiff's Exhibit 3 stamped by you?  The report that was sent to Mr. Kaible.

**A.   The final version, I believe I was asked by US Forensic to physically stamp that one, the final, yes.**

Q.  Do you have a stamped --

**A.   It was the one there we had it wasn't stamped everything but yes.**

Q.  Do you have one with the stamp?

47

**A.   I have a lot of pages there.**

Q.  That is the supplement --

**A.   Okay.**

Q.  That is the supplement.

**A.   Okay.  Which one?  You are talking about the first report that was taken a picture of?**

Q.  No.  I'm talking about the report that was sent to Mr. Kaible, Exhibit 3, that concludes that there was no damage to the home structurally.  It is dated January 7, 2013.

**A.   I'm not familiar with this exhibition.  I cannot recall.  I have copies of my, what I send.  I scanned this stamp so I don't see.**

Q.  I'm sorry.  Could you repeat that?

**A.   I cannot recall the details here if I stamped this or not but...**

Q.  Let's talk about the procedure.

**A.   Yes.**

Q.  What is the procedure on how you would -- you would send your report to US Forensic?  Is that correct?

**A.   Yes.  By email.**

Q.  You emailed it.

**A.   Together with photos.  20 of them is included in the report.  And the purpose of that is for peer view.**

Q.  And would that be in a PDF format or Word format?

48

**A.   The question implies that they could add to my report.  I do not recall if it was PDF.**

THE COURT:  Sir, only reply to the one question. What was the format?, he asked.

THE WITNESS:  I can't recall right now.  It's two years ago.

THE COURT:  Then that is your answer.

THE WITNESS:  I can get back to you to answer that question.

THE COURT:  Don't worry about it.

Next question.

BY MR. MOSTYN:

Q.  Do you have copies of your emails still?

**A.   Yes.  Absolutely.**

Q.  You have them on your server at home or in your email box?

**A.   Yes, sir.**

Q.  Who did you send the Ramey report to?

**A.   The same routine as for every report.  I have the email list that belongs to US Forensic.**

Q.  Do you know who the person was?

**A.   It was a secretary or -- I can't recall it.  I can, you know, I can go back to my file and see who I sent the email to.**

Q.  So you kept all the emails between you and US

49

Forensic?

**A.   Yes.**

Q.  You are going to have to -- normally in conversation you would often finish the question before I finish, but the court reporter can't it get down if we are both talking at the same time.

**A.   Okay.  Sorry.**

Q.  So we have to have some sort of an unusual conversation, where I will stop talking and pause and then you can answer.  Okay?

**A.   Okay.**

THE COURT:  My clerk has been kind enough to make copies of the report and is handing them to counsel.

MR. MARTINE:  Judge, perhaps if Mr. Hernemar backs off from the microphone a bit, it might help, too.

THE COURT:  Do you want to mark this now?

MR. MOSTYN:  Yes.

THE COURT:  As?

MR. MOSTYN:  I believe it is number 5.

THE COURT:  I think so.  All right.

Do you want to offer Plaintiff's 5?

MR. MOSTYN:  I would like to offer Plaintiff's Exhibit 5.

THE COURT:  Any objection?

MR. MARTINE:  Judge, I object only to the extent

50

that it is not an official report.  It was his rough draft report, which he forwarded.  And if he can identify it as exactly that report, I would have no problem with it, but I don't know if that has been stated so far.

THE COURT:  So you are saying there is no foundation.

MR. MARTINE:  Yes.  Correct.

THE COURT:  Counsel, please establish foundation.

MR. MOSTYN:  Yes.

BY MR. MOSTYN:

Q.  Mr. Hernemar, is this Exhibit 5, is that the copy of the report that you sent to US Forensic?

A.  Yes.

Q.  Is that a correct copy of that report?

A.  Yes.

Q.  And was this your report and your opinions at the time that you sent it to US Forensic?

A.  Yes.  But I have to stress also, what is written there, the conditions I gave in this report, is very clearly written based on an assumption we don't have all the facts.  I cannot -- I can quote from this report.

THE COURT:  Stop for a second.  We can do that in a moment.

This is a correct copy of what you sent to US

51

Forensic after your inspection of the house.

A.  I do rather comparison with my copy, to answer the question.

Yes, I don't see any discrepancy.

THE COURT:  Any objection to the admission of Exhibit 5?

MR. MARTINE:  No objection, judge.

THE COURT:  So Plaintiff's 5 is admitted.

(Plaintiff Exhibit 5 in evidence.)

THE COURT:  You may continue.

BY MR. MOSTYN:

Q.  Let's look at Exhibit 4, which are your -- let me see if I can clarify this.

Mr. Hernemar, the Exhibit 4?

A.  I'm not familiar with the labeling here.

Q.  Excuse me?

A.  I don't know what is Exhibit 4 means.

Q.  Exhibit 3, which is the January 7, 2013 report.  Let me approach.

This report, sir, the one I asked you about whether it had an engineers seal on it.  Correct?

A.  As I said, the routine was, we never had to seal what submitted electronically.  Only, you know, in this case I got asked to seal the final version, and I did.

Q.  You got asked to seal the supplemental report?

52

A.  I guess so.  Yes.  I have a copy of that here also.

Q.  You didn't get asked to seal the January 7 report that concludes there is no structural damage to the house?

A.  Yes.  That was the normal routine.

Q.  To not seal it.

A.  Yes.

Q.  Are you aware that New York law would require you to seal it?

MR. MARTINE:  Objection.

THE COURT:  Sustained.  Rephrase your question.

BY MR. MOSTYN:

Q.  Are you familiar with New York law regarding whether a seal has to be on an engineer's report or not?

A.  I cannot answer that question.  I take my ethic oath very seriously, you know.  Being a licensed professional is my livelihood so I wouldn't jeopardize that easily.

Q.  I can't understand you.

A.  Being professional licensed engineer in this state is my livelihood so I don't take that easily.  It's something I don't stand for so.

Q.  Are you familiar with the --

A.  If it stamped or not, I stamped for me, you know.

Q.  Are you familiar with the laws governing engineers in the State of New York?

A.  That --

53

MR. MARTINE:  Objection, judge.  Asked and answered.

THE COURT:  It hasn't been asked and answered yet.

Please answer the question, sir.  Do you know the law or don't you know the law?

That is okay.  Just answer the question.

A.  Maybe not in detail.

THE COURT:  Okay.

BY MR. MOSTYN:

Q.  Are you familiar with the requirement that that your reports are stamped and sealed?

MR. MARTINE:  Asked and answered.

MR. BROPHY:  Objection, your Honor.

THE COURT:  He answered this, counsel.  Sustained.

BY MR. MOSTYN:

Q.  Okay.  Let's look at Exhibit 3, which is your report that you don't believe was sealed, from January 7, 2013.  Correct?

A.  As I said, the same routine we follow for every report.  I have been issuing 50 reports.

Q.  Well, was the routine to stamp or not to stamp?

A.  Not to stamp.

Q.  The routine was not to stamp.

54

**A.** Yes.

**Q.** But they asked you to stamp the final supplement. Correct?

**A.** Yes.

**Q.** Okay. Why was that different from the normal routine?

**A.** I cannot answer that question.

**Q.** Okay. Did you ask them why they wanted you to stamp the final supplement?

**A.** I did not.

**Q.** I want you to pull out --

**A.** But I had no issue with that, you know, since everything I issue I take full responsibility for.

      So, but -- okay. So I'm sorry if I interrupt.

**Q.** Are you done?

**A.** Yes.

**Q.** I want you to look at that final, the report which is January 7, 2013, which is unstamped, with the conclusion that none of the damage was caused, none of the structural damage was caused by flood water. Correct?

**A.** Correct.

**Q.** Do you have that report?

**A.** Yes.

**Q.** Can you get that one out, please.

**A.** If I can get -- oh. I have made remarks to prepare

55

my witnessing here so I don't want to give it out. But I have it there.

**Q.** You don't have that?

**A.** Yes, I do have it. Yes.

      I think so. Yes.

**Q.** Could you get that report out, please. I mean, can you turn to the first page of that report.

**A.** Okay. It is not labeled.

**Q.** I want you to look for the report that is dated January 7, 2013.

      THE COURT: Just so we are clear and so that I understand. There is a page 1 on both.

      MR. MOSTYN: Yes.

      THE COURT: So could you pull out the December 9, 2012.

      THE WITNESS: I don't have that.

      MR. MOSTYN: Let me get him a copy.

      THE COURT: Very good.

BY MR. MOSTYN:

**Q.** Marked as Exhibit 3. Okay?

**A.** Yes.

**Q.** I'm going to put Exhibit 5 up here because I want to compare them. Okay?

**A.** Yes, sir.

**Q.** Exhibit 3, the January 7, 2013, report, which

56

concludes there was no structural damage. Okay? Correct?

**A.** Correct.

**Q.** When was the first time you saw that report?

**A.** I wrote that report.

**Q.** Okay. And so you wrote the report which is Exhibit 5. Correct?

**A.** Yes.

**Q.** Which says the building was structurally damaged.

**A.** Yes. And can I -- may I say something right now?

**Q.** And you wrote the January 7, 2013, report that it was not structurally damaged?

**A.** Correct.

**Q.** Okay. And you wrote, in the January of 2013 report you write that all damage was due to long-term differential movement. Correct?

**A.** Correct.

**Q.** And in the December 9 report -- which has the exact same report number. Correct?

**A.** Yes, I guess so.

**Q.** -- it says, concluded that the repair of the building is not economically viable. Correct?

**A.** That was the first report. No, the -- after I wrote. Yes.

**Q.** Your first draft --

**A.** Yes.

57

**Q.** -- says that the house is totaled by flood water?

**A.** Based on the assumption that turn out not to be correct.

**Q.** Okay.

**A.** And all those conditions are mentioned in the report, in the first report. We talked about Exhibit 5.

**Q.** I just want to establish --

      MR. MARTINE: Judge, I would like him to finish his answer, please.

**A.** Yes. That was based on assumptions, assumptions and theory that turn out to be not vindicated after we got all the facts. And all those conditions are mentioned in Exhibit 5.

BY MR. MOSTYN:

**Q.** I'm just trying to establish some basic facts.

**A.** Yes, so do I.

**Q.** You wrote both of these reports.

**A.** Yes.

**Q.** Did anybody else make any alterations to these reports?

**A.** No.

**Q.** Did anybody make any suggestions for changes in these reports?

**A.** No.

**Q.** Okay. So --

58

**A.   We had a peer review in normal order.  That's the reason why me and my colleague.  We submit 50 photos. Every time we go there, 50 photos.  20 of them are included in the report.  That is to enable a peer review.**

MR. MOSTYN:  I want to object to --

**A.   That explains the difference between Exhibit 3 and the supplement report.  And also the difference between Exhibit 5 and Exhibit 3.**

MR. MOSTYN:  Okay.  I'm going to object as nonresponsive.

THE COURT:  Overruled, counsel.  You may keep asking questions.

BY MR. MOSTYN:

**Q.**   Okay.

**A.   I'm sorry.  I'm sorry if I violate the protocol.**

**Q.**   So five days after you inspected Mr. Kaible's home, you wrote Exhibit 5, dated December 9, 2012.  Correct?

**A.   Yes, sir.**

**Q.**   And then you submitted --

**A.   All those reports you have presented to me, I'm the author of them.**

**Q.**   And you sent those down -- did you send that report to what you-all referred to as a peer review in Metairie, Louisiana?

**A.   No.  They do.  They, US Forensic, select the peer**

59

**reviewer.**

**Q.**   Okay.  Explain to me that peer review.  Does your report go through a peer review?

**A.   Yes.**

**Q.**   And did that peer review result in some recommendations for changes?

**A.   No.  No.  An open discussion.**

**Q.**   They had -- you said they had a discussion?

**A.   Yes.**

**Q.**   With whom?

**A.   I cannot recall the engineer's name.**

**Q.**   Do you remember if it was Gary Bell?

**A.   No.**

**Q.**   Do you know if that engineer was licensed in New York?

**A.   It is the same physical laws here as in other states, you know.**

**Q.**   I just need you to answer my direct questions.

**A.   I did not ask them that question.**

**Q.**   In that discussion I would assume, since your position changed 180 degrees, that --

**A.   I don't agree.**

        **Objection.  I don't agree.**

MR. MARTINE:  I guess I'm dropping the ball, judge.

60

THE COURT:  I will overrule the witness' objection.

MR. MOSTYN:  I appreciate that, your Honor.

BY MR. MOSTYN:

**Q.**   And so the discussion -- I tell you what.  Just tell us what the discussion was about.

THE COURT:  Wait.  Wait.  Wait.  Who did you talk to?

THE WITNESS:  I do not recall the name.

It was an engineer.

THE COURT:  Was that engineer here?

THE WITNESS:  No.  No.

Oh, where physically was located?  I don't know.

But he is working for US Forensic.

THE COURT:  Did you talk to him or her on the phone?

THE WITNESS:  Yes.

THE COURT:  Not in person.

THE WITNESS:  No.  No.

THE COURT:  So the person was someplace else.

THE WITNESS:  Yes.

THE COURT:  And you had a discussion.

THE WITNESS:  Yes.

THE COURT:  And based on that discussion, you then changed your conclusions and issued a second report.

61

THE WITNESS:  It was very simple.  All -- Exhibit 5, that's the first report I issued.  Not issued, that I sent to US Forensic.

There are a lot of conditions in that report -- theories, assumptions -- on what we could see, I could see, on the site.

THE COURT:  I know you want to explain that, sir, so let me ask you.

What additional information did you get about the home between December 9 and January 7 that made you say:  Oh, gosh, those were wrong?

THE WITNESS:  Oh, fundamental and more information.

I went out to the site a second time.  And the problem to make assumptions, the reasons why there are a lot of assumptions and theories in the first report was that the house, the foundation was covered with sand, so there was no way to tell definitely what happened to foundation.

Secondly, there was no access to the crawl space to see if the foundation was still intact.

BY MR. MOSTYN:

**Q.**   But your second inspection, sir --

THE WITNESS:  Can I --

THE COURT:  Let him finish.

62

**A.   And I could only do research based on what I have**
**access to.  And the thing was the neighbor building, down**
**the opposite side of the street, was positioned exactly**
**the same relative to the coastline, that foundation had**
**been, the sand had been removed there and it showed that**
**the foundation had caved in, was too clear collapsed, and**
**based on that I assume --**

THE COURT:  All right.  You've answered.
Counsel wants to ask an important question.

Before he does that, let me ask you, how many
times did you personally visit the home at 24 Michigan?

THE WITNESS:  Two times.

THE COURT:  Counsel, you can proceed.

BY MR. MOSTYN:

**Q.   Your second inspection was after your first report**
**was issued.  Correct?**

**A.   Yes.**

**Q.   So the court's question to you is what changed from**
the time you issued, what new information regarding the
home did you obtain from the time you issued your first
report, on December 9, 2012, to the time you issued your
second report, approximately 28 days later, on January 7,
2013?

What additional information did you obtain?

**A.   It is clearly written in the report.**

63

**Q.   Tell me.**

**A.   The sand along the foundation had been removed that**
**enabled me to inspect the foundation.**

**Q.   The first time --**

**A.   And secondly, there was a hole cut to the floor that**
**enabled me to have access to the crawl space, which I did**
**not have the first time.**

**Q.   The second inspection was in January 25.  Okay, sir?**

Your second inspection was January 25 of 2013.

**A.   Correct.  I guess so.**

**Q.   It was after you issued the January 7 of 2013 report.**
Correct?

**A.   The time line is like this.  Exhibit 5, I wrote that**
**after the first visit.  And there is a lot of condition in**
**this report mentioned.  Assumption.**

**The second report I issued that you imply that**
**contradicts the first report, it does not.  It does not.**
**And that report was written after second visit to the**
**site.**

**I don't understand the question.**

THE COURT:  Hold on.  Before you do that, one
other question.

Did you issue two reports or more than two
reports about this?

THE WITNESS:  I *issue*.  What is the definition?

64

I sent the draft to US Forensic for peer review.  And this
always open for discussion, you know.

So *issued*:  I don't know how many finally issued
to -- at least -- I guess two was formally issued.

THE COURT:  Okay.

BY MR. MOSTYN:

**Q.   Can I approach the witness?**

THE COURT:  Go ahead.

What are you showing him?

MR. MOSTYN:  I'm showing him his supplemental
report.

THE COURT:  I don't know what that is.  I don't
if counsel knows what that is.

MR. MOSTYN:  That is the January 28 report.

THE COURT:  Okay.  Does anybody have a copy of
that for me?

MR. MOSTYN:  I do.  I'm looking for it, your
Honor.

I'm going to ask that be marked as Plaintiff's
Exhibit 6.

THE COURT:  Plaintiff Exhibit 6 is marked for
identification.

Any objection to entering it?

MR. MARTINE:  I would just like to see it.

THE COURT:  For the record --

65

MR. MARTINE:  No objection, Judge.

THE COURT:  Plaintiff 6 appears to be a January
28, 2013, report.

No objection?

MR. MARTINE:  No, judge.  No objection.

THE COURT:  It is in evidence.

(Plaintiff Exhibit 6 in evidence.)

BY MR. MOSTYN:

**Q.   Mr. Hernemar, I'm going to try to establish a time**
line here.

On Exhibit 3, which you have, which is the
January 7 dated report.  Correct?

Can you look at that report please.  Turn to
page 7, please.

**A.   Yes.**

**Q.   It says that your site inspection was done on**
December 4, 2012.  Correct?

**A.   I guess so.**

**Q.   Well, does it say that your site inspection was done**
on December 4, 2012?

**A.   Um-hmm.**

**Q.   Is that yes?**

**A.   Yes.  I have no reason to question it.**

**Q.   *Um-hmm* and *uh-huh* are hard for him to discern, so**
yeses and nos are better.  Okay?

66

**A.**   Okay.

**Q.**   So that inspection was done on December 4, 2012. Correct?

**A.**   Um-hmm.

**Q.**   Is that a yes?

**A.**   Yes.

**Q.**   And then we turn to Exhibit No. 5, which is the report dated December 9 of 2012.  Right?

**A.**   Right.  What page?

**Q.**   Go to page 7.

**A.**   The site inspection was done October 7.

**Q.**   That is not possible because the storm had not hit yet.  Correct?

**A.**   Okay.  Might have slipped an error in this report in this respect.

**Q.**   I understand.  But I'm tying to establish for the judge that you went out twice.

**A.**   Yes.

**Q.**   One time we believe was December 4, 2012.  Correct? About a month after the storm.

**A.**   I cannot definitely say yes or no.  I was there twice.

**Q.**   You would say the first time was about December 4?

**A.**   I cannot definitely answer that question.

**Q.**   And then on the supplemental report, which we have

67

marked as Exhibit 6, it says:  *I went out January 25 of 2013.*  Is that correct?

**A.**   Might be.  Yes.

**Q.**   So we (sic) went out twice?

**A.**   Yes.

**Q.**   And we (sic) issued three reports.  Right?  Or three drafts --

**A.**   Yes, sir.

**Q.**   -- as you call them.

**A.**   Yes.

**Q.**   Draft one was issued December 9 of 2012.

**A.**   Um-hmm.  Correct.

**Q.**   Is that correct?

**A.**   Yes, I -- yes, I think so.

**Q.**   And then there is a draft, unsealed, that is sent to Mr. Kaible that is dated January 7 of 20123.  Correct?

**A.**   Second report.

**Q.**   The January 7, 2013, report which concludes no structural damage --

**A.**   Yes.

**Q.**   -- is a second report.  A draft.  Right?

**A.**   Yes.

            MR. MARTINE:  Objection, judge.
Mischaracterizes his testimony.

            He testified that January 7, 2013, was his final

68

first report; not a draft.

BY MR. MOSTYN:

**Q.**   Fine.  I will change it.

            Do you believe that the January 7, 2013, report, what is marked as Exhibit 3 and dated January 7, 2013, which is in front of you, you believe that is your final report?

**A.**   Yes, that's my report.

**Q.**   And the one that is dated December 9, 2012, is a draft, you said.  Right?

**A.**   Yes.

**Q.**   And then you go back out after these reports are written.  Correct?

            After the report which is marked as Exhibit 3 and dated January 7, 2013, and after the report that is written December 9, 2012, you go back out afterwards.

**A.**   No, the time line cannot be correct here.

**Q.**   Well, why can't it be correct?

**A.**   Take a look at the picture in the second report.  It shows the sand has been removed on the wall.  So obviously it has been written after the second visit on the site. If you compare the picture there, you will see the difference.

            The sand has been removed around the house in the picture on second report.  And also the --

69

**Q.**   The same as this?

**A.**   The second report.

**Q.**   This is the January 7 report.  The sand is around the house.

**A.**   No.  That picture from the inside, the crawl space.

**Q.**   The sand is -- now returning to page 11.  There is sand all around the house.  On the full, entire side of the house, there is sand.

**A.**   No.  No.  No.

**Q.**   This report, the one that is Exhibit 6, dated January 28, in this report the sand has been removed.  This is the supplemental report.  Right?

**A.**   Yes.

**Q.**   And it is marked as a supplemental report.  Correct?

**A.**   Yes.

**Q.**   It is identified as a supplement.

**A.**   Yes.

**Q.**   That was done from an inspection, as it indicates on page one of Exhibit 6, which is your report dated January 28, 2013.  That inspection was done January 25, 2013. Correct?

**A.**   Yes.

**Q.**   Right?

**A.**   When it was done.  I have to see when it was done. Just a second.

Yes.  It was based on the site visit done January 25.

Q.   January 25, 2013.  Correct?

A.   Yes.

Q.   So there was no site inspection done.  You only did two.  Correct?

A.   Yes.

Q.   One in December.  Correct?

A.   Yes.

Q.   One in January 25 of 2013.  Correct?

A.   Yes.

Q.   So there was no additional site inspection done between December, the one you did in December, and the first of January before you issued the January of 7th report which is marked as Exhibit 3.  Correct?

A.   Yes.

Q.   So there is no additional inspection between those two reports.  Correct?

A.   May I say something?

Q.   Is that correct, sir?

      MR. MARTINE:  This is his direct witness here, Judge.

      THE COURT:  I'm not so sure of that.

      Sir, can you answer the question yes or no, sir?

      Did you inspect the property between December 9

and January 7?

      THE WITNESS:  No.  I only made two visits on the site.  Yes.

BY MR. MOSTYN:

Q.   So what information did you have about the property that was new from December 9 to the issuing of your report on January 7?

A.   As I said, my issuing the draft was based on assumptions.  Very far-fledged (sic) assumptions.

Q.   What new information did you have which was observed by you, gathered through research, or from speaking with someone, any information new that you had from the time you issued your report in December to the report issued in January?

      MR. MARTINE:  Judge, asked and answered.

      THE COURT:  I will allow it.

A.   I had a discussion with a peer reviewing engineer.

Q.   Other than the peer review --

A.   Wait.  Wait.  Wait.  Wait.

      And he said based on these picture we cannot definitely assume, he didn't assume that foundation had caved in, was damaged.  We need to remove the sand to get the final answer to that.

Q.   Does that say that anywhere in your January 7 report, that this is not a conclusion and there was no damage?

Does it say I need to come back out?  Does it say I need to remove the sand?

      Does it tell Mr. Kaible that anywhere in that report?

A.   As I said, there is a lot of condition in the first report.

Q.   You testified it was the final, that the January 7 was your final report, as your lawyer clarified for us.

A.   No.  No report is final until -- that's the whole purpose of sending 50 pictures, so if you get a call for a peer reviewer engineer, you can have a discussion.  And that's normal in any profession, give and take, and somebody I miss something and another point it out.  And that make, we come to an agreement.  And that makes me, I don't see anything wrong with that.

Q.   Okay --

A.   That is, the first report is not final in that sense. It is a draft you send.  And if US Forensic has no issue with that report, then I get the confirmation that my report was good.  And if I get the call from US Forensic, their engineer, and want to discuss the report with me, then I know if they have some other points they want me to consider maybe.  We have a discussion.  And that happened in this case.

      And I think a trained eye can see, based on

those 50 pictures that I submitted, that the foundation is not collapsed of the wall that I assumed, that I could not be definitely sure about.  And that is also written in that report.  In the first report.

Q.   I just want to make clear --

A.   So in order for the final until...

Q.   I just want to be clear.

A.   Yes.

Q.   The only additional information or discussion you had between the issuing of the December report, which concluded that house was not economically feasible to be repaired, and the January report, which determined there was no structural damage, was a conversation with somebody at what you called a peer review.

      Is that correct?

A.   I have messed up with time line here.

      MR. MARTINE:  Judge, objection to that: mischaracterizes the second report he sent.

      He didn't say there was no structural damage. He said there was no structural damage by hydrodynamic forces.

BY MR. MOSTYN:

Q.   I will change the question.

      You first stated the home was not economically repairable and then you stated it wasn't damaged by

**74**

hydrodynamic forces.  Correct?

**A.   Correct.**

**Q.**   And the only thing that happened between those two opinions of yours was a conversation with someone from US Forensic engineering?

MR. MARTINE:  Objection again, judge.  It is a peer review.

THE COURT:  Overruled.

**A.   It is two years ago.  As I recall it, I was out there in between and took those pictures.**

**Q.**   Now you are trying to say there are three inspections?

**A.   No.**

**Q.**   Okay.  Two inspections.  Correct?

**A.   Yes.**

**Q.**   So --

**A.   What I'm saying, the date might be not correct.**

**Q.**   Well, I can show you.

Is there a reason why you put an incorrect date in your report?

**A.   No.  No.  No.  I don't do that.**

**Q.**   Okay.  Is there anything that happened, sir, between the December report and the January report, other than that you had to obtain new information about the house, other than the conversation with someone that you referred

**75**

to as a peer review?

**A.   Just a second.  Just a second.**

**The date you said the second report.  What is the date?**

**Q.**   Okay.  Let's talk about this.  You had a draft report which you referred to as a draft.

**A.   Yes.  The first one.**

**Q.**   That was December 9.

**A.   Yes.**

**Q.**   What you referred to as the final report, which was sent to Mr. Kaible and told *no money*, is dated January 7.

MR. MARTINE:  Objection, your Honor.

**A.   January 7, you said.  Yes.**

BY MR. MOSTYN:

**Q.**   Yes.  And then the supplemental report, which is marked as Exhibit 6, is dated January 28 and refers to a January 25 inspection, on page 7 of that report.

**A.   Yes.  I had the discussion with peer reviewer.**

**Q.**   That is the only thing that you did that you -- it is the only thing that you did to obtain any --

**A.   Yes.  Yes.  But it really comported with my assumption in the first --**

**Q.**   So who was the engineer?

**A.   I cannot recall the name.**

**Q.**   Just one engineer?

**76**

**A.   Yes.**

**Q.**   Okay.  And what was his qualifications?

Was it a he or she?

**A.   He.**

**Q.**   What was his qualifications?

**A.   Licensed engineer.**

**Q.**   Where?

**A.   I didn't ask.**

**Q.**   Electrical?  Chemical?

**A.   No.  No.  No.  Civil engineer.**

**Q.**   Structural?

**A.   He appeared to know what he was talking about.**

**Q.**   Did you look at his resume?

**A.   No, I did not.  But --**

**Q.**   I'm just wondering because it is your position you talk to somebody on the phone who you don't know who it is and you change your opinion.  Correct?

**A.   That's his point of view, which I absolutely agree with, that before you state the whole building was damaged by hydrodynamic forces, as I did in my first draft, that before you do that, he told me, that there should be further investigation also to verify that.  If it was based on the photos you have submitted to us, it doesn't vindicate that theory.**

**And he was the opinion that before we**

**77**

**categorically say that this foundation has collapsed and caused all the damage of the building, we need to go out and take a second look there after the sand had been removed, after the hole has been cut in the floor.**

**Q.**   But, sir --

**A.   And I agreed with that, you know.**

BY MR. MOSTYN:

**Q.**   Mr. Hernemar, you did not go back out there, as you say this person suggested, before you issued a report saying it was not damaged.

MR. MARTINE:  Again, objection.

THE COURT:  Overruled.

MR. MARTINE:  Mischaracterizes what the report says, Judge.

He didn't say it wasn't damaged.  He says it wasn't damaged by hydrodynamic forces as a result of Sandy.  Big difference.

THE COURT:  He will amend the question.

MR. MARTINE:  Thank you.

MR. MOSTYN:  I amend the question.

BY MR. MOSTYN:

**Q.**   You did not go back out to the home between the two reports.  Correct?

**A.   It appears so.  Yes.  Okay, yes.**

**Q.**   So you had a conversation with somebody who said, in

78

the best light says that they don't agree with your conclusion because of the fact that you need more investigation.

You don't do more investigation; you just issue a report changing your opinions.  Correct?

**A.   I absolutely agree with his findings there, you know.**

**Q.**  Is that correct, sir?  That is what you did?

**A.   Yes.**

**Q.**  Okay.  And let's look at these reports.  Because not only did you change your conclusion, sir, you even changed your observation and analysis.

**A.   I don't know that.**

THE COURT:  Can you use an example?

MR. MOSTYN:  Sure.

Can I approach, your Honor?  I think would be easier for me.

THE COURT:  I will say, if you want the rest of us to know what you are talking about, if you want the rest of us to hear you, you will have to be clear.

MR. MOSTYN:  Yes.  I will have to describe what I'm looking at.

THE COURT:  Yes.

MR. MOSTYN:  Thank you.

BY MR. MOSTYN:

**Q.**  So let's look at Exhibit No. 3, which is the report

79

that you have, dated January 7, 2013.  Correct?

**A.   Okay.**

THE COURT:  Page, counsel, please?

BY MR. MOSTYN:

**Q.**  We will go to page 3.

MR. MARTINE:  Is this the December one?

MR. MOSTYN:  This is the January one.

MR. MARTINE:  Okay.

BY MR. MOSTYN:

**Q.**  I will go to what has been marked as Exhibit No. 5.  Sir, will you do that, please, and follow along with me.  That will make it easier.

**A.   Yes.  Which page?**

**Q.**  In Exhibit 5, which is January 7 report, we are going to go to page 3.

In Exhibit No. 3.

THE COURT:  Exhibit 3, page 3?

MR. MOSTYN:  Yes.  And Exhibit 5, page 3.

BY MR. MOSTYN:

**Q.**  You removed, for example, the entire paragraph.

The second paragraph, says:  *"The entire south wall was leaning?"*

You removed that as an observation.

**A.   You compare to what?**

MR. MARTINE:  Which report?

80

BY MR. MOSTYN:

**Q.**  The January 7.

THE COURT:  Hold on.

Page 3.  That says:  *"The entire south wall"*.  Is that what we are referring to, counsel?

MR. MOSTYN:  We are.  Thank you, your Honor.

THE COURT:  Go ahead.

BY MR. MOSTYN:

**Q.**  It is not there?

**A.   I was exhibit 3, page 3, here in front of me.**

**You compare that with what?**

**Q.**  Exhibit 5, the December report, page 3.  And there is a paragraph that begins:  *"The entire south wall was leaning."*

You removed that, sir, as an observation from your January 7, 2013, report.

**A.   Yes.  Yes.  But there still is mentioned here that the floor was leaning.**

**Q.**  Yes.  But you removed that observation.

**A.   Yes.  But the bulk of it is still here.**

**Q.**  Sir, the observation that the entire south wall was leaning has been removed.

THE COURT:  Counsel.  Counsel.  Counsel.

**A.   Top of the page on January 7 says:  *"Measurement taken indicates that the entire south wall was leaning***

81

*outward approximately .6 inches."*

MR. MARTINE:  It was just moved, judge.

THE COURT:  To the top of the page.

MR. MARTINE:  Page 3.

MR. MOSTYN:  Okay.

BY MR. MOSTYN:

**Q.**  Then let's go to page 4 of each report, Exhibit 3 and Exhibit 5, your analysis and discussion.

Do you see that?

**A.   Yes.**

**Q.**  You write in the January 7, 2013, report that:  *"We observed no evidence or indication of recent movement,"* which is the second-to-last full paragraph.

**A.   Yes, in the third paragraph.**

**Q.**  Yes.  Why was that taken out of the January 7 report?  I mean, why was that inserted in the January 7 report?

**A.   Because it is a fact.  We observed nothing that would vindicate that.**

**My first draft was based on assumptions, theories, but I actually did not observe anything that vindicated my theory.  So this is absolutely correct, what I write there.**

**Q.**  What theories were you referring to?  What theories changed from your first report to your second report?

**A.   It is clearly written in Exhibit 5 what assumption I**

82

made. I have marked them on my own copy. I can refer to them.

Exhibit 5, page 1: *"The hydrodynamic forces"* -- on point one there -- *"appear to have caused the foundation walls around the southwest corner to collapse."*

Can I continue? And on page 3, the last text before weather information. Exhibit 5, still.

*"The crawl space could not be thoroughly inspected due to congestions of loose floor insulation hanging down, debris, and a stark small of undetermined petroleum products."*

And I specified what I could not see. And then I have something more. There is another quote here.

All observed -- no. *"An approximately 1.5 feet deep layer of sand, that the flood had deposited, surrounded the building."*

And then I go on. Page 4 in the same report, the second chapter, the second section from the low part, from the bottom of that page.

**Q.**   What page?

**A.**   Page 4. I write like this. I quote.

*"We assume that the slope of the floor and the leaning walls appeared"* -- and I have to say that this slope of the leaning of the floor, the slope of the floor was mentioned in the next draft also, so it is not that I

83

was changing anything of substantial. I quote.

*"We assume that the slope of the floor and the leaning of the walls appeared after the recent flood event."* This is assumption. It is not -- okay.

And I go on. The last section on page 4, it states clearly, I quote: *"For the definite determination of the cause of the slope of the floor,"* that I still mention in the next draft from 9th of January, 7th of January, I did not omit anything of substance; *"and the leaning of the walls,"* that you point out I did not include; I'm sorry about that; *"the sand along the west and south perimeter of the building has to be removed and maybe also a part of the southwest floor has to be opened up,"* to definitely determine what happened with this building during the Sandy hurricane.

*"Our theory,"* I go on here, *"is that the foundation walls around the southwest corner of the building have collapsed and that since the recent event, that building around this corner is supported by the deposited sand.*

*"Also supporting this theory"* -- I stress theory -- *"is this circumstance that the next building to the west of the subject building experienced a collapse of its south foundation wall by hydrodynamic forces."*

**Q.**   Would you read to the court the next page.

84

THE COURT: Before we do that. For the court reporter, we will take a 15-minute break while you organize your thoughts and whatever and finish this.

Step down, sir. In 15 minutes we will start again.

(Recess taken from 12 pm until 12:15 pm.)

THE COURT: Mr. Hernemar, I remind you that you are still under oath.

Counsel, you may proceed.

MR. MOSTYN: Your Honor, I would like to mark the file that Mr. Hernemar brought with him and admit it into evidence, please.

THE COURT: Why?

MR. MOSTYN: It is different than the files, the documents that I have.

THE COURT: Okay. The reason I am hesitating is we have to have a record, so mark it and we will come to it.

MR. MOSTYN: I need to have some copies made of it. It is relevant. And I wouldn't waste your time otherwise.

THE COURT: Other than the file, are there specific documents that you are interested in?

MR. MOSTYN: Can I just ask him some questions and then go forward?

85

THE COURT: Yes.

DIRECT EXAMINATION (Continued)
BY MR. MOSTYN:

**Q.**   Mr. Hernemar, is it your testimony that you have only issued three reports in this matter?

**A.**   **Yes.**

MR. MARTINE: Judge, objection only to the use of the term *issued*, which does have a distinct connotation when it comes to final versus drafts, things of that nature.

THE COURT: Sir, are there reports other than the three we have looked at?

THE WITNESS: I cannot say definitely if there are, in terms of drafts.

THE COURT: Issued.

THE WITNESS: Three or four.

THE COURT: Are there any others, other than the three that we have looked at?

I don't care if they are drafts, official, stamped, unstamped, in Swahili. Whatever. Are there any reports other than the three --

THE WITNESS: Yes, I do understand your question.

The supplemental report include to put the block

86

there.

Just a second, judge.  Just a second.

In my report from January 25, there is no mention on the scope of repair that block should be back in place in the foundation.  So it might -- I cannot definitely say that there is a draft after this one I have it in front of me.

It is a very minor, minor addition in the scope of repair.

THE COURT:  Counsel, does that answer your question?

BY MR. MOSTYN:

Q.  Well, Mr. Hernemar, your supplemental report.  Let me hand you what has been marked Exhibit 6.

Your supplemental report that you have in your documents has completely different supplemental conclusions than Exhibit 6, does it not, sir?

A.  **Where?**

Q.  In your file, sir.  What you wrote.

Did you write that?

A.  **Yes.**

Q.  That is not Exhibit 5, sir.

A.  **Oh.**

Q.  No.

THE COURT:  Tell you what, counsel.  If you have

87

what you believe to be a different report, make copies and --

MR. MOSTYN:  We have a report of January 25, that I have my thumb on here, that has the exact same date as the supplemental report we have, the exact same file number, the exact same supplemental claims, but has different results and conclusions.

THE COURT:  Give it to my clerk.  We will make copies and return it to the witness and take it from there.

Do something different while we are doing that.

BY MR. MOSTYN:

Q.  Where are you currently employed?

A.  **2020 Inspections, Incorporated.**

Q.  What do you currently do?

A.  **I'm doing inspections.**

Q.  What type of inspections?

A.  **I'm making sure that the buildings are erected according to plan.**

Q.  What are you doing?  So you are signing off on whether they are built correctly to the plans?

A.  **Yes.  I make sure, for instance, that reinforcement bars are placed where they are supposed to be as well as location.**

Q.  At the time of Sandy, where were you employed?

88

A.  **At the time of?**

Q.  Sandy.  October 30.

A.  **I worked at H&H Building Consultants.**

Q.  Were you a full-time employee?

A.  **I was.  I had -- I'm a cancer survivor, and the same year I had a major operation done in 2012, in February, and there was a long recovery so I could only work half time that autumn.**

**So I worked half time at H&H under one single therapy.**

Q.  Is that during that time you worked part time for US Forensic?

A.  **No.  I -- no.  I got -- no.  I switched to work for US Forensic on a full-time basis, you know.  And I did some freelance for H&H Building Consultants.  Yes.  You know.  But I devoted my time for US Forensic.**

Q.  Did you consider yourself an employee of US Forensic?

A.  **No.  Nothing.  No.**

Q.  Just a consultant?

A.  **As a contractor.**

Q.  Now, you have done this about, you have issued about -- I want to be clear here.

Have you done inspections on 50 homes or have you issued 50 reports?

A.  **Issued 50 reports.**

89

Q.  Was that on 50 different buildings?

A.  **Yes.  Yes.**

Q.  So you may have issued more than 50 reports.

A.  **I cannot definitely say that number.  My estimate is 50 reports.**

Q.  What --

A.  **50 different reports on 50 different addresses.**

Q.  Okay.  And on any of those, did those go through what you referred to as a peer review process?

A.  **This is not the only one that was peer reviewing.**

Q.  How many of those went through a peer review process?

A.  **I don't know.  Maybe every one.  I only got the feedback when there was a disagreement, you know.**

Q.  So you have spoken with someone at US Forensic 50 times and you can't tell us their name?

A.  **No.  No.  That is not what I said.**

**I said every report I sent to US Forensic might have been peer reviewed, but I only heard from them if there was a disagreement, and that was maybe four or five, you know, four or five times.**

Q.  When did you start working for US Forensic?

A.  **October 2012.**

Q.  Well, the storm didn't hit until October 31.

A.  **Okay.  It must have been November.**

Q.  Was Mr. Kaible's house one of the first reports you

90

had issued to them?

**A.  Yes.**

Q.   And you would agree with me, would you not, sir, that the first four or five were the ones that they had issues with you about?

**A.  No.  No.**

Q.   And when they had issues, you would rewrite these reports.  Correct?

**A.  I didn't take order.**

Q.   But you would rewrite them.  Correct?  Meaning, they did not rewrite them; you --

**A.  No.  I don't lend -- my professional assessment is not for sale.**

Q.   My question is, you would do the changes to the report.  Correct?

**A.  Yes.  If I was in agreement with the peer reviewer, then I rewrote my report.**

Q.   Did you ever -- give the court your definition of the peer review process, please.

**A.  Yes.  I was speaking with engineer over the phone, and my impression of him was that he knew what he was talking about.**

Q.   That is the peer review process?

**A.  As I said earlier, we submit, every report is accompanied with 50 photos.**

91

Q.   I'm just asking you about what this process is.  Did you-all go over scholarly articles or studies?

**A.  Sorry?**

Q.   Did you-all review any studies or scholarly articles?

      THE COURT:  You can't use *you-all* here.

      MR. MOSTYN:  I'm sorry.  Is that *you guys*?

      Thank you.

BY MR. MOSTYN:

Q.   Did you guys do any studies?

**A.  Studies?  Yes.  We got book recommendations to read from US Forensic.**

Q.   You had some books from US Forensic?

**A.  Yes.**

Q.   What books were those?

**A.  One book was *When Buildings Fall*.  And a second one was some technical book.**

Q.   About soils?

**A.  Yes.  I cannot recall the title, you know.  I could have.  Yes.**

Q.   You don't cite them in your report.

**A.  I have both books home and I both read them.**

Q.   Have you ever done forensic engineering prior to working on the Sandy storm?

**A.  Yes.**

Q.   When was that?

92

**A.  In Louisiana.**

Q.   Was that after Katrina?

**A.  Yes.**

Q.   Did you work for Rimkus?

**A.  No.  I worked for a local engineer company in New Orleans.**

Q.   Who was that?

**A.  I would say second biggest engineering company in Louisiana.  And I stayed there for --**

Q.   Was it Rimkus?

**A.  No.**

Q.   Haigh Engineering?

**A.  Oh.  If I had a phone, I would call my wife.**

      **Oh, I don't have my resume.**

Q.   Do you have emails between you and US Forensic?

**A.  Yes.**

      **With me?**

Q.   No, but --

**A.  Every interaction I had over email, I still have them.**

Q.   Would you-all discuss changes or suggestion of changes of reports in these emails?

**A.  I'm sorry.  My thoughts drifted away.**

Q.   Did you have discussions of the need to change a report, in emails?

93

**A.  Oh.  No, I don't think so.**

Q.   How many emails do you think you have between you and US Forensic during the time that you wrote these 50 reports?

**A.  Maybe 40.**

Q.   Have you had conversations with the attorneys for the insurance carrier?

**A.  No.**

Q.   Have you had -- somehow these folks had your report.  How did that happen?  Your December report.

**A.  Don't ask me.  I don't know.**

Q.   You don't know how they got copies of your December 2012 report?

**A.  No.  I don't know that.**

Q.   You did not give that to them?

**A.  No.  No.**

Q.   Okay.  Have you spoken with any attorneys about your testimony here today?

**A.  I was called by Larry Demmons to appear here.**

      **And also one attorney from Philadelphia -- Fidelity, Patrick, also wanted to ask me if I would come or not.  And there was limited to that.**

      **And when I said yes to Larry Demmons, I said of course I come.  And I assumed it was in the downtown Manhattan and in midtown.  And then I realize how far away**

94

this court was. So when Patrick called me and wanted to check that I really will appear here, after I send him an email and asked for compensation to appear.

Q. Did you have other emails with these attorneys?

A. No.

Q. Did you produce any documents to them?

A. Yes.

Q. Which documents?

A. I had similar hearing with Attorney General two weeks ago or something. And I was subpoenaed to submit everything relative to this, even how I got this job in the first place.

Q. I'm talking about the lawyers for the insurance company or the engineering company.

Did you or any of those lawyers, not the Attorney General, have you produced any documents to them?

A. Yes, I have.

Q. To whom?

A. To Patrick from Fidelity. And Larry Demmons.

Q. What documents were those?

A. Everything I submitted to Mr. Goldberg, Assistant Attorney General. Everything I submitted to him I submitted to the attorney.

Q. Thank you.

You testified previously that you did not give

95

them the December report.

A. Actually, I asked my wife to do this. And she submitted everything we could find in my email and also on the hard disk on the folder Michigan 24.

So I really don't know. I just wanted, I have nothing to hide. I sent everything I had. Yes.

Q. You sent everything you had to whom?

A. Yes. Yes. Except for my correspondence with the recruiter that put the ad in Craig's List.

And when I went to that Attorney General assistant, he asked me how did you get that job? I said yes, I answered on an ad in Craig's List.

And can I see that interaction you had with the recruiter? Yes, of course. And I even submitted that to him.

Q. You turned over all the documents you have with you today?

A. I hope so. I hope so. Yes.

Q. Let me finish the question, please.

A. Yes.

Q. You turned over all the documents you have today to the Attorney General's office?

A. After my best knowledge.

Q. Did you gather those documents or did your wife?

A. Sorry?

96

Q. Did you gather those documents or did your wife?

A. My wife did.

Q. So did you review them before they were turned over to the Attorney General's office?

A. No. No. No.

Q. You received a subpoena from the Attorney General's office?

A. Yes.

Q. And you don't know if you complied with the subpoena. Is that correct?

A. Oh, here we go.

MR. MARTINE: Objection, judge.

THE COURT: Sustained. Sustained. You don't have to answer.

THE WITNESS: Okay.

BY MR. MOSTYN:

Q. Sir, have you turned over all the documents you have to these attorneys, or is that something your wife has gathered as well?

A. Physically, my wife did that. But what she did was just for that, exactly what we had sent to Mr. Goldberg. Every email was sent to Goldberg we forwarded to Larry Demmons and Patrick at Fidelity.

Q. When did you do that?

A. Yes. I promised to do it last week. I did it the

97

day before yesterday. I let my wife did.

Q. What about the reports that you have in front of you, the ones that are being copies right now? Did you give them copies of those?

A. I assume that, yes. Yes.

Q. When you say you assume that?

A. Yes. I instructed my wife to send whatever I have in this matter.

Q. There is a report that is being copied right now that is engineer stamped December 28 of 2012. There is only a signature page on the documents that are being copied. It is stamped.

Do you have a full copy of that report?

A. Oh. The stamp is on one page in the report, so I only submitted one page.

Q. Well, the report has a different date, of December 28, 2012, than any other report we have.

Do you have a full copy of that report?

I'm not talking about in front of you, sir. I'm talking about, do you have one somewhere in your possession?

A. Can you repeat the date?

Q. Yes. In the documents that are being copied, there is a –

A. -- copy I submitted --

98

**Q.** -- that are being copied.

**A.** **Okay.**

**Q.** There is an engineer-stamped final report with the date December 28, but the only page in those documents is the signature page and the cover page.

Do you have a full copy of that report?

**A.** **Yes.  I must have it.  Yes.  I should have it.**

**Q.** Did you give it to these attorneys?

**A.** **I hope so.  You know?**

**You know, I was asked to come here and I do what I can.  I have work to do, you know?  I work seven, more than 40 hours a week, so I do my best.**

THE COURT:  That's okay.

BY MR. MOSTYN:

**Q.** Then, sir, there is a supplemental report in your papers with the exact same date as the supplemental report that we have, but it has different conclusions.

Do you have a copy of that report?

**A.** **Yes.**

**Q.** So that is five separate reports we have now.

**A.** **That's what I said.  It might be more than three, you know?  Because it is, I mean, it sounds like a major issue for you but it is really not.**

**Q.** Well, I have had engineers --

**A.** **I know you try to make a chicken out of a feather.  I**

---

99

**know.  But --**

**Q.** Okay.

**A.** **You know?  Can I -- can I say something?**

THE COURT:  Just wait.

BY MR. MOSTYN:

**Q.** Could there be more than five reports?

**A.** **No.  I don't think so.**

**Q.** Do you generally --

**A.** **But --**

**Q.** Sir, an engineer's seal on a report that is not final.

**A.** **That is not.**

**Q.** Do you usually stamp and sign a report that is not final?

**A.** **I can do it because as long as I believe, I stand for what I write and I stamp it and it doesn't exclude a peer review after I stamp it.**

**Q.** Do you know whether those reports, those five now, were sent to US Forensic?

**A.** **Yes.**

**Q.** They were all sent to US Forensic?

**A.** **Yes.**

**Q.** And how would you have sent all of those reports to US Forensic?

**A.** **How?  Electronics.  With email attachment.**

---

100

THE COURT:  I know you are waiting for the copies to come back.  Are you otherwise pretty much complete?

MR. MOSTYN:  I have a few wrap-ups to do.

THE COURT:  Why don't you do that.  But before you do that, I have a few questions.

I want to ask you, where do you live?

THE WITNESS:  I live in New Jersey.  West New York.

THE COURT:  Okay.  And where did you go to school?

THE WITNESS:  In Sweden.  Stockholm.

THE COURT:  And the other question I want to ask you, sir, and I'm not trying to trick you or confuse you, but do you know someone named Joseph Griffith?

THE WITNESS:  Joseph Griffith?

THE COURT:  Yes.

THE WITNESS:  That sounds familiar.

THE COURT:  I ask that because, if you look at what we have been calling the December report, it says: *Prepared for Joseph Griffith, Fidelity National Property and Casualty Insurance Company.*

Do you know who that is?

THE WITNESS:  No.

THE COURT:  Do you have any more wrap-up

---

101

questions?

MR. MOSTYN:  I do.

BY MR. MOSTYN:

**Q.** When these reports that you have come back, you said it was a process.

Would you send the reports, the final version of the report, to Mr. Griffith at the insurance company, or would that come from US Forensic?

**A.** **No.  Every report I see as final.  Everything I submit to US Forensic is a final report.  That's how I prepare.**

**Q.** Would you sign those --

**A.** **And that doesn't exclude the peer review.  And it doesn't exclude that I might change, have overlooked something, you know.  So everything I submit is a final report, you know.  And everything I submit, I submit to US Forensic.**

**Q.** You sent it to US Forensic and not to the insurance company.

**A.** **Correct.**

**Q.** And then they would send it to the insurance company?

**A.** **I guess so.**

**Q.** Do you know if there were any changes ever made to those reports?

**A.** **I have no -- I have no clue about what the internal**

102

affairs are --

MR. MARTINE:  Objection.

**A.   -- in US Forensic.**

THE COURT:  Overruled.  He answered.

BY MR. MOSTYN:

**Q.**  Can I approach?  I want to go back to where we left off.

We were looking at Exhibit 5 and Exhibit 3. Exhibit 3 is the January 7 report.  Exhibit 5 is December 9.

Will you turn to page 5 of Exhibit 5.  Right here.  That is called Scope of Repairs.  Is that correct?

**A.   Yes.**

**Q.**  This was your opinion on December 9 of 2012.

**A.   Yes.**

**Q.**  Tell me if I read it correctly.

"The extent of the overall damages to the building, its needed extent of repair combined with the age of the building and its simple structures, lead us to conclude that a repair of the building is not economically viable."

Did I read that correctly?

**A.   I said it is based on --**

**Q.**  Did I read it correctly?

THE COURT:  He is just asking did he read it

103

correctly?

THE WITNESS:  Yes.

BY MR. MOSTYN:

**Q.**  "Additionally to the collapsed foundation that causes the entire building to lean, also the circumstance that moist sand reaches above the foundation and is in direct contact with the wood structure above the foundation, it is likely that the adjacent wood structure is not salvageable."

Did I read that correctly?

**A.   Yes.**

**Q.**  To continue reading.

"The building should be demolished and rebuilt in its entirety."  Correct?

**A.   Yes.**

**Q.**  And then we go, sir, to after you have your phone call with somebody at US Forensic, on page 1 of Exhibit No. 3, a determination that the uneven roof slope, leaning exterior walls and uneven floor surfaces were results of long-term differential movement of the building.  Correct?

**A.   Yes.**

**Q.**  Please explain to the court all the information you have that this movement happened prior to Sandy.

MR. MARTINE:  Judge, objection.  This has been asked and answered several times.

104

THE COURT:  You know what?  I tend to agree so I'm going to sustain the objection.

MR. MOSTYN:  Your Honor, I can pass and wait until I get those documents, to go over the few things I have.

THE COURT:  Okay.  Your witness.

MR. MARTINE:  Thank you, judge.

CROSS-EXAMINATION

BY MR. MARTINE:

**Q.**  Good afternoon, sir.  We met for the first time this morning.  Is that correct?

**A.   Correct.**

**Q.**  We spoke for the first time this morning?

**A.   Yes.**

**Q.**  Spent about two minutes talking.  Is that right?

**A.   Correct.**

**Q.**  I want to try to clarify the order of the process from inspection to the finalization of an engineering report.  Okay?

**A.   Okay.**

**Q.**  For this case you went for the first time to the Ramey house on December 4.  Is that correct?

**A.   Correct.  Yes.**

**Q.**  Following that visit you issued a draft report or

105

wrote a draft report dated December 9.  Is that correct?

**A.   Correct.**

**Q.**  That report was then submitted via email to US Forensic.  Correct?

**A.   Correct.**

**Q.**  Their procedure at the time, as you knew it, was, they conduct a peer review.

**A.   Correct.**

**Q.**  Meaning, they have --

MR. MOSTYN:  I am going to object to leading. And this is his witness.  They are paying him to be here. And he is their -- and clearly he is agreeing with everything.

MR. MARTINE:  A, we not paying him.  B, he is not my witness.  C, we have no control over this witness.

And while he has asked to be paid, we didn't want that to be any issue here, as clearly plaintiff's counsel is making acts of impropriety the center of their case, the substance of the case.

MR. MOSTYN:  This witness is clearly not hostile to their case.

MR. MARTINE:  It is cross-examination, judge, and in light of the language, I thought it would be the best way to handle this situation.

THE COURT:  Are you two done?

106

MR. MOSTYN:  Yes.

THE COURT:  Good.  Here is the thing.

I disagree.  I think he is, technically speaking, your witness.  On the other hand, because this is not a jury situation I will allow you to do this so we can get through some of this before the end of my appointed term.

MR. MARTINE:  I will be quick.

BY MR. MARTINE:

**Q.**  Now, sir, Mr. Hernemar, that peer review process, as you understand it, occurs back in Louisiana with other engineer or engineers at US Forensic.  Correct?

**A.  Yes.**

**Q.**  Following that peer review, a discussion is had about the draft report you wrote.  Correct?

**A.  Correct.**

**Q.**  You then made changes to that draft report and submitted it as your final report, and that is the one dated January 7, 2013.  Correct?

**A.  Correct.**

**Q.**  Did you agree with the changes that were made to your draft report?

**A.  Absolutely.  Yes.**

**Q.**  As reflected in your January 7 report.

**A.  Absolutely.  Yes.**

107

**Q.**  Did anyone coerce you to make those changes or sign off on them?

**A.  Absolutely not.**

**Q.**  Did anyone offer you anything in exchange for you making those changes?

**A.  Absolutely not.**

**Q.**  As you sit here today, do you agree from an engineering perspective, as an expert, with the conclusions you reached in your January 7, 2013, report?

Did I get the date wrong?

**A.  Yes.**

**Q.**  At some point you returned to the site.  Correct?

**A.  Yes.**

**Q.**  What was the focus of your inspection on the return visit to the site?  What portion of the structure?

**A.  Foundation.**

**Q.**  Why -- were you able to examine the foundation the first time you were at the house?

**A.  No.**

**Q.**  Why not?

**A.  It was covered in sand.  The whole foundation.  Plus, there was no access to the crawl space.**

**Q.**  Was that situation resolved when you went back out to the site?

**A.  Yes.**

108

**Q.**  Did that allow you access to the foundation?

**A.  Yes.**

**Q.**  Was there other access to the foundation in addition to the perimeter from the removal of sand?

**A.  Yes.**

**Q.**  What was that other access?

**A.  They had cut a hole in the floor.**

**Q.**  Was that hole in the floor present when you went there for the first time?

**A.  No.**

**Q.**  Now, sir, why did you go back the second time to the site?

**A.  To see -- the first report, it was convoluted.  It was like a black box.**

THE COURT:  Whose idea was it?

THE WITNESS:  I was asked by US Forensic to go back.

THE COURT:  Okay.  You were here, sir, and I saw you here, while the plaintiff testified this morning.  The home owner testified when you were here this morning.  Right?

THE WITNESS:  Yes.

THE COURT:  He said he called and said you've got to send the engineer back.  Or send an engineer back.  You heard him.  Right?

109

THE WITNESS:  Yes.

THE COURT:  You don't dispute that, do you?

THE WITNESS:  I don't know of the internal affairs conducted within US Forensic.  You know, I only report to US Forensic.  I don't know anything beyond that.

THE COURT:  Okay.

BY MR. MARTINE:

**Q.**  Did you have any role in scheduling the reinspection, or was that done through the US Forensic office and plaintiff?

**A.  Done through US Forensic.**

**Q.**  Now, when you went back this second time, is it fair to say that that was the first time you were able to give a full investigation or inspection of the foundation?

**A.  Absolutely correct.**

**Q.**  And based on what you observed and the 50 or more photos that you took, did you reach conclusions that part of the foundation was damaged from Sandy?

**A.  No, I did not.  I said that the foundation was not damaged by hydrodynamic forces.**

**Q.**  On the reinspection what did you observe about the foundation?

**A.  That was in fact it had not been damaged by the hurricane.**

**Q.**  I refer you to your report, sir, of January 28.

110

By the way, let me ask it that way.

Did you write a second report after the reinspection?

**A.   Two were after the reinspection, you asked?  Yes.**

**Q.**   You had to write a supplemental report.  Correct?

**A.   Yes.**

**Q.**   And did that supplemental report go through the same peer review process?

**A.   Yes.**

**Q.**   Because that was the standard at the time.  Correct?

**A.   Yes.**

**Q.**   And based on and following that peer review process, was there a second finalized report?

**A.   Yes.**

**Q.**   And that is one of the exhibits that is Plaintiff's 6 here today?

**A.   Yes.**

**Q.**   And did you stamp that report?

**A.   Yes.**

**Q.**   Do you stand by the conclusions that you reached in that supplemental report based on your reinspection?

**A.   Yes.  Absolutely.**

**Q.**   And are those your conclusions or someone else's conclusions?

**A.   My conclusions.**

111

**Q.**   Did anyone compel you to reach the conclusions as stated in your supplemental report of January 28, 2013?

**A.   No.  I had the discussion with the peer reviewer and he pointed out based on one single photograph that shows -- just a second.**

**Q.**   What did they point out, sir?

**A.   In this Exhibit 6, picture 4.**

MR. MARTINE:  May I approach, judge, so I can see which picture he is referring to?

THE COURT:  Sure.

(Both counsel approach the witness.)

**A.   Picture 4, Exhibit 6.**

BY MR. MARTINE:

**Q.**   On page 7.  Okay?

**A.   There is a gap -- on this picture -- every other picture confirms that the foundation was in tact.  And it was only this photograph 4 that is a gap between the pier and the beam.**

**And US Forensic, the peer reviewer pointed this out and said we cannot categorically rule out that this block that is missing here on picture 4 was moved by water.**

**Q.**   So US Forensic found damage to the foundation that you didn't find, based on the peer review?

**A.   Yes.  In this regard.  In this little regard.  It is**

112

only one pier of all the piers there was a missing leveling block.

And my assumption still to this day is questionable if the water moved that but it cannot be ruled out.  And I agree with that peer reviewer, you know.

**Q.**   So following the peer review that preceded your final supplemental report, you amended your report to show that there was some damage to the foundation.  Correct?

**A.   As when it comes to hydrodynamic damage, it was only one leveling block out of 20 that had been, that was missing.  And as I said, it cannot be ruled out that it was caused by hydrodynamic forces.**

**And he pointed it out for me.  Yes, you are right, it cannot be ruled out.  So I changed my draft.**

**Q.**   Just quickly, sir, my question is, and that determination was made following the peer review.

**A.   Yes.**

**Q.**   At US Forensic.

**A.   Yes.**

**Q.**   Do you remember, do you have actually a specific memory of going to the Ramey house the second time?

**A.   Yes, I do.**

**Q.**   Do you remember if Mr. Kaible was there?

Do you remember the gentleman who testified earlier?

113

**A.   Yes.  He is big guy.  I remember.**

**Q.**   Okay.  Did you have any interaction with him?

**A.   He was there and he had opened the door.**

**Q.**   Did you show Mr. Kaible your rough draft report dated December 2012?

**A.   No.  No.**

**Q.**   Did you ever go to your trunk of your car and remove your December 2012 rough draft report and walk into the house with it?

**A.   No.**

**Q.**   Did you hear him -- were you in the room when he testified about that?

**A.   Yes.  I was surprised to hear that.**

**Q.**   Did you even mention to Mr. Kaible your rough draft report?

**A.   No.**

**And I can just say I heard his testimony, and according to him I presented a peer previous draft.  And why wouldn't I give him a copy of that if that was the case?**

**Q.**   Do you have any idea -- let me ask you this.

Did you have the report with you when you went -- strike that.

**A.   Yes.  Yes.  What I had before I brought with me of course.**

114

**Q.** In order to inspect the foundation, do you actually have to crawl under the house?

**A. Yes. That was possible the second time.**

**Q.** Mr. Kaible didn't go there with you under the house, did he?

**A. No. He was on the first floor.**

**Q.** Did you have your report with you, on your person, at any point prior to going under that foundation? In a bag. In a briefcase. Anything at all.

**A. Everything I had done on this address I had with me, you know? Yes.**

**Q.** Did you leave that in the house when you went under the foundation?

**A. Yes.**

**Q.** Now, did you give anyone permission to take photographs of any of your work product?

**A. No. Absolutely no.**

MR. MARTINE: One second, judge?

THE COURT: Sure.

(There was a pause in the proceedings.)

MR. MARTINE: That's all I have, Judge.

THE COURT: Okay, counsel. Why don't you finish up. Briefly, please.

MR. MOSTYN: Yes.

115

REDIRECT EXAMINATION

BY MR. MOSTYN:

**Q.** You brought with you what has been marked as Exhibit 4. You brought with you this report stapled on a clipboard. Correct?

**A. Yes. I brought everything with me in this regard.**

**Q.** Why would you bring the draft report when you had already issued a different report that is 180 degrees, that found different opinions?

Why would you bring the draft report stapled on a clipboard?

**A. I had, everything in this matter I had with me to refresh my memory, you know.**

**Q.** Did you have your other report from January?

**A. Yes. Sure.**

**Q.** I want to look at something real quick.

We are just going to move to mark --

THE COURT: Why don't you move the package of documents as one exhibit.

MR. MOSTYN: That is what I'm going to do. One exhibit as 7, your Honor. The packet of documents he brought with him.

MR. MARTINE: I haven't seen them.

THE COURT: Didn't my clerk give you a copy?

MR. MARTINE: Oh. I apologize. (Referring.)

116

I have no objection, judge.

THE COURT: Okay.

MR. MOSTYN: I move for admission of 7.

THE COURT: So admitted.

(Plaintiff Exhibit 7 in evidence.)

BY MR. MOSTYN:

**Q.** Do you have your documents in front of you?

Just real quick.

On the supplemental report that you have with you here. There was two supplemental reports.

**A. It turned out there are two supplemental reports.**

**Q.** It turns out there are two supplemental reports.

**A. Yes. Yes. I was the one to point it out.**

**Q.** Well, okay. And it turns out that they have different conclusions. Correct? Results or conclusions.

**A. As I said, in this regard, about this seeing a block.**

**Q.** And you gave all of these reports to US Forensic. Correct?

**A. Yes.**

**Q.** Isn't it actually true, Mr. Hernemar, that the only report you had with you that day at Mr. Kaible's house is the one that is on this clipboard, Exhibit 4? That is the only report that you had with you?

**A. I think I brought everything I had on this address; what I had done on this address. Yes.**

117

**Q.** Did you not say to Mr. Kaible that this was your report that you had written on this house?

**A. Which one are you pointing at?**

**Q.** What is marked in Exhibit No. 4, the December report.

**A. Exhibit 4. Which one is that? I don't have that. Exhibit 4.**

THE COURT: The photographs.

THE WITNESS: That's it. Okay. If it is my clipboard, you mean?

BY MR. MOSTYN:

**Q.** Yes.

**A. Yes.**

**Q.** Didn't you tell him that was the report you wrote?

**A. No.**

**Q.** And that you had submitted to US Forensic?

**A. No.**

**Q.** The other thing interesting to me is, on the copy of these reports on your January -- you say you made all these changes yourself or did they make the changes for you?

**A. No, I did the changes.**

**Q.** You did the changes.

**A. Yes.**

**Q.** On Exhibit 3 you will note, real quick, that there are different offices located on the cover page. Exhibit

118

3 lists offices, sir, in different cities.

**A.   Yes.**

**Q.**   It adds Dallas and Austin.  And there is a different phone number.

So you had a different template as well for the cover for these reports?

**A.   I cannot recall.  Maybe we were sent a new template.**

**Q.**   Really what was happening was --

MR. MARTINE:  Objection, judge.  He didn't let him finish.

BY MR. MOSTYN:

**Q.**   Really what was happening was, you say you would forward it to US Forensic and they would change it and send it on to the insurance company.  Correct?

**A.   Yes.**

MR. MOSTYN:  Thank you, that's all I have.

THE COURT:  Counsel, anything further.

MR. MARTINE:  No.

THE COURT:  Okay, sir.

MR. MARTINE:  Your Honor, I was distracted.  Can I have the last answer read back?

THE COURT:  Yes.

(The record was read.)

THE WITNESS:  No.  No.  No.

119

RECROSS-EXAMINATION

BY MR. MARTINE:

**Q.**   Who made the changes?

**A.   I did the changes.**

**Q.**   And the opinions in the reports are your opinions.  Correct?

**A.   Absolutely.**

MR. MOSTYN:  I don't have anything further.  I need some discovery.

THE COURT:  Sir, you can step down.

(The witness was excused.)

THE COURT:  It is now 1 o'clock.  We will take a break for lunch and continue at 2 o'clock.

Please be here on time.

MR. MARTINE:  Can we approach for just two minutes?

THE COURT:  Sure.

(Discussion at sidebar ensued as follows.)

MR. MARTINE:  Judge, I think the purpose of this hearing was to determine whether we should have some discovery; in essence, whether or not something untoward was going on between US Forensic and perhaps Mr. Hernemar.

THE COURT:  Are you under the impression that the result of the hearing so far gives us a clear answer to that?

120

MR. MARTINE:  Yes, Judge.  And I believe counsel is also agreeable that we should do discovery and --

THE COURT:  You think we are done?

MR. MOSTYN:  No.  I need discovery.

THE COURT:  You brought a witness who is going to talk about the peer review process.  Right?

MR. MARTINE:  I don't think I need to call him, judge.

THE COURT:  I do.

MR. MOSTYN:  I do.

THE COURT:  I do, too.

We will see you at 2 o'clock.

(Discussion at sidebar was concluded.)

(Lunch recess taken at 1 pm.)

121

AFTERNOON SESSION

2 pm

THE COURT:  Call your next witness, please.

MR. MOSTYN:  Your Honor, do you want us to call their peer review expert?

THE COURT:  I gave this some thought over lunch.  If you don't want to, you don't have to.

MR. MOSTYN:  I would like to cross-examine him, but I would like to hear the direct first.

THE COURT:  It doesn't matter.

You have no direct:  Is that what you are saying?

MR. MARTINE:  Judge, my feeling is that, based on the testimony this morning and based on the reason for this hearing, the hearing is resolved.

The witness clearly testified that those were his opinions adopted by him following a peer review process; that he wasn't required, he wasn't compelled, he wasn't really told to do anything.  He adopted the opinions.

THE COURT:  Let me slide that then into what has to be then issue two.

I refer to you CMO-3, page 9.  It says, *Production of Expert Reports*.  And we went around and

122

around on this, and the court ruled repeatedly that if it was in existence, it was to be turned over.

In other words, don't create any extra reports, we don't want to put you to any extra expense, but if you have reports, they should be turned over.

Now, what the record is not complete on, at least as an evidentiary matter, is exactly what was turned over, because I saw, this morning I believe it was, five different variations of reports about this property.

My suspicion based on the representations of counsel -- though, as we learned from the computer screen versus the clipboard, I can't always rely on those 100 percent -- there were two turned over.

MR. MOSTYN:  Two is right, Judge.

MR. MARTINE:  Judge, I would represent to the court, and perhaps -- and I don't know if actually Mr. Garove, the witness, will testify as to what was turned over; there were two finalized reports by this witness, and that those reports were then submitted to the carrier.

But the rough draft reports are not seen by the carrier, by my client.  They see the final report and then those -- it's work product as --

THE COURT:  What date is the final report?

MR. MARTINE:  The final stamp and signature --

123

and, Judge, I will represent to the court the January 7 report is stamped.  We don't have the stamped one with us but there is a stamped copy that was present.

THE COURT:  And I know that I saw a stamp on something that was dated December 28.  So what is that about?

MR. MARTINE:  Judge, the December 28 report is the exact -- the signature stamp on the December 28 report is the exact report for the January 7 report.  It was stamped, signed, finalized on December 28 but then reprinted on the 7th and stamped and signed.  It is the exact same report, from what I understand.

And so, as far as the final reports, there was two.  There was a January 7 following the initial inspection, and then there was the January -- no.  Excuse me.  Yes, the January 7, following the inspection in December.  Then the January 27, I believe, or 28th, following the reinspection once the sand was removed from the foundation.

And that is consistent with what Mr. Hernemar testified to, that he had two final reports following each inspection, following two peer reviews.

And I can tell you what Mr. Garove will testify, and this is a representation to the court, is that, yes, he was the peer reviewer for the original report, the

124

rough report of December, that his peer review, basically his peer review, he made suggestions and that the two engineers consult about the suggestions and that Mr. Hernemar could adopt or deny every single suggestion made and then the report is finalized.

And that is the extent of the testimony concerning the peer review, judge.

MR. MOSTYN:  Your Honor, we would like to put him on and talk to him about it.

Mr. Hernemar's testimony was -- well, his lack of credibility, would be an understatement.  He changed his testimony repeatedly.  In fact he even answered one time that they changed the report.

So what is interesting to me is, I have looked at probably 20 or 25 of these reports that have identical conclusions.  They are by different engineers.

So what the defendant expects the court to believe along discovery lines is that there are 25 different engineering reports or 10 different engineering reports and some of them come up with identical conclusions and that is not given to them by US Forensic.

So I think it's clear from the testimony if the engineer who was here was present and had given uncontradicted testimony, which Mr. Kaible contradicted, himself, then we wouldn't need this person.

125

But he has come up here, from I guess Louisiana, and we are all here, so let's put him on.

MR. MARTINE:  Judge, A, I would disagree with the characterization about the credibility of the witness.  And he could also say that then Mr. Kaible gave contradictory testimony about what the engineer said concerning the inspection of the report (sic).  So that goes to weight.

THE COURT:  That would be your copyright claim.

MR. MARTINE:  Right.  Thank you, judge.

But I still think, this hearing was based on a conclusion that plaintiffs made that USF changed a report that was originally written by this engineer.

He testified clearly and unequivocally that those changes were part of the peer review process, that he agreed to those changes, and those changes were his, and his opinion alone.

So we are now getting far afield of what the reason for this hearing was, in my humble opinion, Judge, if we are putting on a witness to testify about the peer review process that this witness already testified happened.

THE COURT:  Let me add --

MR. MARTINE:  Sure.

THE COURT:  -- that when I referred to CMO-3, it

126

says the following.

CMO No. 1 expressly provides that defendants are to provide, *"all expert reports and/or written communications that can contain any description or analysis of the scope of the loss or any defenses under the policy.  To be clear, any expert reports that have been prepared are required to be produced, under this provision, regardless of whether a party anticipates at this time presenting the testimony of such expert.*

*"At the same time, CMO-1 should not be read as imposing an affirmative duty to create such a report, but if it exists, it should be produced."*

MR. MARTINE:  Judge, it says that the parties must produce that.

The only two reports Fidelity had, and they are the party in this case, were the two final reports sent to them by USF, and those are the two reports exchanged.

THE COURT:  All right.  Let me ask counsel for plaintiff:  Would you like to question the witness about that those issues?

MR. MOSTYN:  We would.

THE COURT:  Okay.  Call the witness.

MR. MOSTYN:  Yes.

MR. MARTINE:  Which witness are you talking about now, judge?  The USF witness?

127

MR. MOSTYN:  Peer review.

MR. MARTINE:  Michael Garove.

THE COURT:  Is Mr. Garove here?

MR. MARTINE:  Yes.

THE COURT:  Come up.

**MICHAEL GAROVE**

called by the Plaintiff, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SIGMAN:

Q.  Good afternoon.  Were you in the courtroom earlier when Mr. Kaible and Mr. Hernemar took the stand today?

**A.  I think I came in after Mr. Kaible took the stand initially, but I was in here for the entirety of Mr. Hernemar's testimony.**

Q.  And prior to testifying today, did you have time to prepare for your testimony today with counsel from defense?

**A.  No.**

Q.  Where are you currently employed?

**A.  Where am I employed?**

Q.  Yes.

128

**A.  At US Forensic.**

Q.  How long have you been employed by them?

**A.  Roughly, four and a half years.**

Q.  So at the time of Hurricane Sandy, in October of 2012, you were employed by US Forensic?

**A.  Yes.**

Q.  And at that time that would have been about two years?

**A.  Approximately.  Yes.  I believe it was March 2010, I believe is when I was first with them.**

Q.  And are you licensed engineer in Louisiana?

**A.  Yes.**

Q.  Are you a licensed engineer in New York?

**A.  Yes.**

Q.  When did you obtain your license in New York?

**A.  I believe it was in 2011.**

Q.  That is prior to Hurricane Sandy?

**A.  Yes.**

Q.  Did you handle, personally, any Hurricane Sandy claims as an engineer hired to do an investigation at the homes of Hurricane Sandy?

**A.  Did I personally inspect homes in New York or in New Jersey?**

Q.  Yes.

**A.  Yes.**

129

Q.  And on the Ramey-Kaible claim that we are here on today, did you go out and personally inspect that home?

**A.  No, I did not.**

Q.  Did you personally inspect the rental home or any part of the property that we are here on today?

**A.  No, I did not.**

Q.  Does you inspect any homes surrounding the Kaible home?

**A.  I am unsure.  I do not know specifically.**

Q.  How many files did you have during Hurricane Sandy for US Forensic that you were doing an investigation based on causation at the time of Hurricane Sandy?

**A.  Specifically as a result of Hurricane Sandy?**

Q.  Yes.

**A.  I don't know.  I'm unsure.**

Q.  Okay.  And we are here to talk about the peer review process.  Is that correct?

**A.  I was asked to appear at this hearing.**

Q.  What is your definition of a peer review process?

**A.  A peer review process is actually a very standardized process across the field of engineering, not just in the line of work we do, where an engineer or an engineer intern produces a set of documents and, at whatever stage of the process that they are developing documents, whether it is a report or construction documents or anything**

130

related to the engineering field where they would produce
something, and at whatever point, whether it was they had
gone as far as they can or it is at the end of their
process, where another peer, an engineer, would review
those documents and provide opinion, make markups, discuss
it with that person, and just generally review to see if
they agree that the content of that document is accurate
in their opinion.

Q.    Now, what was the percentage of your work done for US
Forensic at the time of Hurricane Sandy in doing a peer
review of another engineer's report, as opposed to your
own personal inspection and report?

A.    I don't know.

Q.    Would you say it is 50/50?

A.    I don't know.  I don't know what the percentage would
be.

Q.    Were you in charge of Mr. Hernemar's files to review
every single one of them?  And I believe he testified
there were 50 that he recalled.

      Did you review all 50 of the claims he worked
for US Forensic on?

A.    Not to my knowledge, no.

Q.    How many files did you review on a peer review of
Mr. Hernemar?

A.    I'm not sure.

131

Q.    Do you have that information?  Do you keep that
information at your office?

A.    I don't know.  I don't handle that type of
information.  I'm basically assigned peer reviews by the
office, and then I conduct those peer reviews.

Q.    And are you assigned as a peer reviewer via
electronic email?

A.    Yes.

Q.    And who assigns them to you at the office?

A.    It could be various people at the office.  Admin
staff or just whoever is -- actually, currently they are
automatically assigned.  Or they may be randomly assigned.

      I'm not sure.  I just get assigned by email.

Q.    On this personal claim of Miss Ramey and Mr. Kaible,
do you know who assigned you to review Mr. Hernemar's
original report?

A.    Usually it would come from, if it is coming from the
Louisiana office, it would come from either an admin staff
or someone else in the office.

      It would be probably Gary Bell or Donna
Rumenbaum or somebody down there that would basically
either email me or through our automated system it would
automatically come to me.

Q.    Have you been given any documents to produce in this
litigation, on the Ramey case, pertaining to who at

132

Fidelity Insurance Company spoke with at US Forensic to
obtain an engineering response?

A.    Can you repeat that question?

Q.    Yes.  Did you speak with Mr. -- you spoke to Mr. Gary
Bell about this file.  Is that correct?

A.    I don't know if I spoke to him or not.

Q.    If the file that we have been produced in this
litigation by defendants, the claims activity log shows
Mr. Bell as the person speaking with the insurance company
about sending out a engineer, would that be something that
you would disagree with?

A.    Would I disagree with the request to send out a
engineer?

Q.    Yes.  Would you like to see it?

A.    I'm not involved with that process.

Q.    Before you came here today, did you ask anyone why
you were coming here today?

A.    Yes.

Q.    Okay.  Did you talk to anybody in US Forensic about
your testimony here today?

A.    Yes.

Q.    Who did you speak with?

A.    Larry Demmons.

Q.    Did you speak with Mr. Bell about your testimony or
what was required of you here today?

133

A.    Yes.

Q.    Okay.  You didn't mention him first.  Is there a
reason why you didn't want to tell us it was Mr. Bell?

      MR. MARTINE:  Objection.

      THE COURT:  Sustained.

BY MS. SIGMAN:

Q.    What did you speak with Mr. Bell about?

A.    The contents of the report.  Did I have, you know, do
I recall the specifics of the assignment?  You know, what
do I recall about it?  What do I have --

      MR. MARTINE:  Objection, judge.  This is
violating attorney-client work product.

      The attorney for Mr. Garove is here and just
informed me the conversation that counsel is referencing
was while the attorney was present.

      THE COURT:  Was there an attorney on the line?

      THE WITNESS:  We were physically present.

      I'm sorry.  Yes, our attorney Larry Demmons was
present.

      THE COURT:  Together with an attorney.

      THE WITNESS:  Yes.

      MR. MARTINE:  Judge, Mr. Demmons is in court.
Judge, he is not admitted in New York but he is the
attorney for US Forensic.

      THE COURT:  Well, hold on.  Hold on, everybody.

134

Hold on.

Okay, counsel.  Move to another subject.

BY MS. SIGMAN:

**Q.**  You said you reviewed the report.

Which report did you review or have you reviewed?

**A.**  **When are you talking about?  When did I review what report?**

**Q.**  How many reports did you review during the time of the claim?

**A.**  **What reports are we talking about?  Are we talking about recently or are we talking about when the report was initially?**

**What report are we talking about?**

THE COURT:  The question is to you, okay?  So how many reports did you look at way back when you were handling the file?

THE WITNESS:  Total in my scope of work?  Or specifically in regards to this property?

BY MS. SIGMAN:

**Q.**  Specifically to the Ramey file, how many reports from Mr. Hernemar did you review?

**A.**  **One.**

**Q.**  And what was the date of that report that you reviewed?

135

**A.**  **I don't know.**

**Q.**  In front of you -- may I approach the witness, your Honor?

THE COURT:  Yes.

BY MS. SIGMAN:

**Q.**  -- we have a series of reports.  Exhibit 6 is the report; I will reference you to January 28.  On the second page it says that is the last report, the supplemental report, on this file.

We have Exhibit 3, which is a January 7, 2013 report.

We have an Exhibit 5, which is a December 9, 2012 report.

And then, in Exhibit 7, the document Mr. Hernemar brought here today, we have a December 28, 2012, page with a seal.

Which one of these particular reports did you review at the time of the Ramey-Kaible claim here?

**A.**  **I believe it was, I guess there is a number 5 on here, I guess you are calling it Exhibit 5, so it would probably be this report here.**

**Q.**  And the December 9, 2012 report, is that the one you are referring to?

**A.**  **Yes.**

**Q.**  Did you review the supplemental report; that is,

136

January 28, 2013, Exhibit No. 6?

**A.**  **No, I did not.**

**Q.**  Did you review the January 7, 2013 report, that is Exhibit No. 3?

MR. MARTINE:  Judge, objection only to the classification.

They are in essence a process to get to that one report, and counsel is trying to claim that they are separate reports.  We have gone through this with the engineer.

THE COURT:  Okay.  Let's stop using the word "report."

So this witness said I looked at one document.  Is that correct, sir?

THE WITNESS:  That's correct.

THE COURT:  Find the document for us.  Which one did you look at?

THE WITNESS:  This one right here.  Number 5.

THE COURT:  No. 5.  Okay.

MS. SIGMAN:  Let the record reflect that is the December 9, 2012, Mr. Hernemar report.

THE COURT:  Okay.

BY MS. SIGMAN:

**Q.**  What were you asked to review that report?  What was the basis for your review of that report?

137

**A.**  **The basis for my review?**

**Q.**  Yes.  Why did you choose to review that report?

**A.**  **I did not choose to review it.  I was assigned to review it.**

**Q.**  Who assigned you to review that report?

**A.**  **Our office in Louisiana.**

**Q.**  Do you have an email that would show us who assigned you to review that report?

**A.**  **I don't recall specifically, but at that time it was most likely Gary Bell.**

**Q.**  And would you have received an email from Mr. Bell to review that report?

**A.**  **Yes.**

**Q.**  And do you know, do you still have that email today?

**A.**  **Yes.  Somewhere in, I think it was submitted at some point.**

**So yes.  To my knowledge, yes, I still have that email.**

**Q.**  Okay.  Have you been asked to produce that email to your counsel?

**A.**  **They are not my counsel.  But yes.**

MR. MARTINE:  Objection.  I'm not his lawyer.

BY MS. SIGMAN:

**Q.**  I'm sorry.  Have you been asked to produce the email to the insurance company's counsel?

138

**A.**   No.

**Q.**   What do you recall did the email ask you to do?

**A.**   The email asked me to peer review the report.  I'm assuming.  It said that I was to peer review it.

**Q.**   And when you received an email like that, what was the process that you did to peer review Mr. Hernemar's report?

**A.**   Okay.  The peer review process, when we receive the initial document it is a draft form.  Okay?  Of the report.  Meaning, it is not a final version.  It is a draft version of a report.

And within Microsoft Word, which is a software program that we all should be familiar with, there is a tab in there, a process by which you can initiate a tracking of any type of markups, changes, comments, whatever you would like to do in that report.  And then Microsoft Word tracks it by highlighting your comments, changes, different things in various colors, or whatever, so that it is evident that whatever changes you make are readily, you know, prevalent to whoever is reading that report after you have tracked your changes.

So we get a copy of the report, and the peer review process involves reviewing the contents of the report, both technically, grammatically, you know, the entire content of the report, as well as reviewing any

139

other drawings, photographs, or any other information that the inspecting engineer would produce or provide to us.

From that information, including the original draft copy of the report as well as any photographs or any other information, we basically evaluate as a peer, as an engineer, the validity of what is being stated; you know, whether the engineering science is substantiated based off of your current knowledge of building structures or whatever your experience is as a professional engineer, and then make a final determination about whether or not the conclusions that are included within the report are accurate or in line with, you know, engineering knowledge.

And so what happens is, once that's done, this copy of this report, which has everything that you do as a peer reviewer, is the tracked and documented, so it is not hidden, is submitted back to the office and/or the engineer, inspecting engineer, for their review to determine whether or not they feel as though any changes, comments, markups or anything are correct or in line with their opinion.

And then at that point there is an opportunity, even again within that same software program, to either individually accept or deny any changes that you make or alterations; or in this case a lot of stuff just got moved around, it got restructured, because the grammar was not

140

correct or it wasn't in the proper place in the document.

And all that is done is well documented on purpose so that the inspecting engineer can either accept or deny one, two, three, four, all, if any, changes, address any comments that are made, and then, if appropriate or needed, they have every opportunity to address directly with me any type of changes or comments that I made and determine whether or not he's in agreement, disagreement; why did you come up with this; why did you change that.

And so that it is a process by which, you know, they can either accept or deny or have any type of discussion that they choose about any type of comments or changes that we make as a peer.

**Q.**   Okay.  There is a lot of information there.  I want to break it down with the process.

**A.**   Sure.

**Q.**   On this file with the Ramey case you said that you believed you received an email from Mr. Gary Bell.  Is that correct?

**A.**   That's correct.

**Q.**   And that email would have had, I believe you said, Microsoft Word software.  So you would have been emailed a Microsoft Word document.

**A.**   That's correct.

141

**Q.**   Which would be December - I'm sorry, Exhibit 5, the December 9, 2012, report would have been in a Microsoft format emailed to you.

**A.**   That's correct.

**Q.**   Then you would have clicked in, opened the document in Microsoft Word on your computer.  Right?

**A.**   That's correct.

**Q.**   You said you would be able to track changes.  So whether it is a red line or a comment or a sticky note, something in there where, if you believed something should change, Mr. Hernemar would have been able to see it when he received that back from you-all.  Right?

**A.**   That's right.

**Q.**   *You-all.*  I'm sorry.

So when you opened up the report, you said you would look at photographs?

**A.**   Correct.

**Q.**   Schematics?

**A.**   Schematic drawings.  Yes.

**Q.**   Measurements?

**A.**   Yes.

**Q.**   Any diagrams?

**A.**   Yes.

**Q.**   All that, you would have looked at, and compared and looked at the report and determined if you had any

142

suggestions for his proposed revision of a report.

**A.   Correct.**

Q.   Now, in this particular file, if you look at the December -- I'm sorry, Exhibit 5, December 9, 2012.

Is this the entire report as it was emailed to you from Mr. Bell?  Take your time and look through there, please.

**A.   I honestly would have no basis for comparison between this report and what was actually handed to me.  But this appears to be the document that I originally reviewed.**

Q.   And looking at the photos, because I want to make sure it is accurate, are those the photos that you looked at when analyzing and reviewing Mr. Hernemar's file or report in this case?

**A.   Yes.**

Q.   Did you look or do you remember looking at any more or additional photos outside of what was attached to that report?

**A.   No.**

Q.   Now, I notice there is not a diagram attached to that report.  So did you actually review a diagram in the Ramey case?

**A.   I don't know if I did or didn't on this one.**

Q.   All right.  And if there was a diagram, you, as an engineer being licensed in New York and Louisiana, would

143

expect to have one attached to a report.  Correct?

**A.   Not necessarily.**

Q.   Well, in your reports that you do, do you attach a diagram or a measurement of the house to yours?

**A.   Not to every one of them, no.**

Q.   Okay.  And what about schematics?  Did you review any schematics in regard to the Ramey and Kaible file?

**A.   I'm not sure.**

Q.   Okay.  But if you had, would you expect schematics to be attached to the final report?

**A.   No.**

MR. MARTINE:  Objection.

**A.   Not necessarily.**

MR. MARTINE:  The final report?

MS. SIGMAN:  I'm talking globally now.

THE COURT:  Counsel, don't argue with each other.  I'll allow it.

BY MS. SIGMAN:

Q.   Thank you.

In any of these reports that you have in front of you, whether it is a draft or a final, Exhibit 6, Exhibit 3, Exhibit 5, Exhibit 7, do you see one diagram, measurement, or schematic to Mr. Hernemar's report?

**A.   Attached to it?  Is that what you are asking?**

Q.   Yes.

144

(Witness referring to exhibits.)

**A.   No.**

BY MS. SIGMAN:

Q.   And you reviewed all the documents in front of you, including the file that Mr. Hernemar brought today, which is the Exhibit No. 7, and you didn't find a diagram, a schematic, or a measurement in any of those drafts or last latest reports.  Correct?

**A.   The measurements are included within the body of the report but they weren't necessarily presented in a schematic diagram.**

Q.   Okay.  And you would agree as an engineer in the peer review process it would be important to have as much information as possible related to a home, in particular if you are analyzing it from a peer standpoint and not actually inspecting the house; you would agree that is important.

**A.   I would want as much available information as possible.**

Q.   Do you recall if you ever sent Mr. Hernemar an email asking him to submit more information outside of the original email of a Microsoft Word report from Mr. Bell?

**A.   No.**

MR. MARTINE:  Juge, I'm going to object only because it appears that the examination is now getting

145

into what this gentleman's opinion might be, which is subject to a different type of hearing.

I understand that this was to determine what reports he reviewed and what final copy was submitted to whom.  Whether or not there were schematics or not doesn't seem to go to the issue at hand.

THE COURT:  I'm going to overrule the objection on that basis.

But counsel, move along.  I don't care about these diagrams.  The point is about changed text.

MS. SIGMAN:  Yes, your Honor.

THE WITNESS:  I would say that the actual schematic diagram, the information that I would want on the schematic, was actually presented in Word form in the report.

BY MS. SIGMAN:

Q.   Were you in the courtroom when Mr. Hernemar testified that he was the one that made changes to his report?

**A.   Yes.**

Q.   But in fact when you were able to access Microsoft (sic), you could input your changes in Microsoft so that it could be tracked and then mailed to Mr. Hernemar so that he could see everything you reviewed, redlined, looked at.  Correct?

**A.   That is correct.**

146

Q.   Okay.  And then that email would then -- there should be an email with your redlined revised report that would be sent back to Mr. Hernemar.  Correct?

A.   Yes.  It would either be sent to the office or directly to him, depending upon the situation.

Q.   Do you recall in this case whether you sent it to Mr. Bell first and then sent it to Mr. Hernemar?

A.   I think I sent it to Mr. Hernemar directly on this one.

Q.   Okay.  Did you receive any email back from him in response after you sent it, to your knowledge?

A.   No.

Q.   Exhibit 3, the January 7, 2013.  When you reviewed that, as you sit here today, are you able --

A.   I did not review this.

Q.   Okay.  I'm sorry.

A.   Yes.

Q.   Do you know that to be the final report of Mr. Hernemar, based on your red line revisions to his December 9, 2012 report, which is Exhibit 5?

A.   Yes.

Q.   And those conclusions, which I believe you are looking at, page one, those are your revisions that you made to Mr. Hernemar's December 9, 2012, report?

A.   Yes.

147

Q.   So those -- did he adopt your conclusions completely?

A.   It would appear so.  Yes.

Q.   And so wouldn't you agree that Mr. Hernemar, the field engineer who inspected this house, would be in a better position to determine causation than you, who have never been out to this house before?

A.   Are you asking me to make a judgmental decision about his competence?

Q.   No.

A.   Or whether or not he is in a better position to come up with a conclusion than I would be?

Q.   What I am asking is, Mr. Hernemar went out and inspected on December 4, 2012, and wrote his report, original draft, on December 9, 2012.

     Would he be in a better position to make a determination, a conclusion regarding what happened at my client's house than you, who have never been out there?

     MR. MARTINE:  Objection, judge.

     THE COURT:  I will allow the question.

A.   Not necessarily.  No.

     THE COURT:  Counsel, before you move on.

     Sir, do you still have that redlined file?

     THE WITNESS:  Yes.

     THE COURT:  Counsel, I'm going to direct that that redline file be produced.

148

I assume you don't have it with you today.

     THE WITNESS:  I do not have it with me.

     THE COURT:  Let's have that be produced to plaintiff's counsel whenever it's appropriate.

     MR. MOSTYN:  Your Honor, can we request that it be produced in native format, please?  Because if it is a Microsoft Word document, we are not going to be able to see the track changes unless we can look at it that way.

     THE COURT:  And the interesting part would be the track changes.

     MR. MOSTYN:  The document has a hash tag number.

     THE COURT:  I'm not sure if I understand that.

     MR. MARTINE:  We will work it out.

     THE COURT:  I want to see the changes.

     MR. MARTINE:  We will work it out.

BY MS. SIGMAN:

Q.   After you submitted your proposed changes and revisions to the December 9, 2012, report, were you asked by anyone at US Forensic to peer review any additional reports or supplemental report from Mr. Hernemar?

A.   No.

Q.   Did anyone at US Forensic ever come to you and say: Hey, we have additional photos of the Ramey-Kaible home and we want you to look at this to determine if your proposed revisions should be modified or changed?

149

A.   At that time?

Q.   Yes.

A.   No.

     MR. MARTINE:  Judge, again, objection.

     If counsel wants to obtain the opinion of this witness as to why he reached those conclusions, this is not what this hearing is all about.

     I think we are getting far afield as to what the process was of the peer review, which he described in great detail, and then after the peer review what happens with the filed reports.

     She is now trying to question this witness' credibility as to his opinions and what he based them on, which is not what hearing is about, as I understand, Judge.

     MS. SIGMAN:  Yes, your honor.  What I am trying to ask is to see if he has any additional reports he might have peer reviewed.

     We know we have a January 28 report and know that additional photos were actually obtained on January 15.  So I'm trying to foreclose his knowledge.  If his knowledge is only I changed this one report, that's it.  All I'm trying --

     THE COURT:  With that proffer you can proceed.

BY MS. SIGMAN:

150

**Q.** All I'm asking, simply, is, did you review any other reports from Mr. Hernemar after the December 9, 2012 report?

**A. Not in regards to this property, no.**

**Q.** And in regards to this property, if all the information that we have, that you also have received, is what was emailed from Mr. Bell to you originally in the Microsoft Word format through which you emailed your revisions back to Mr. Hernemar, if is there any other documents out there outside that email, you would not have looked at those. Is that correct?

**A. That's not true. I may have.**

**Basically, everything -- typically in these situations, the inspecting engineer will submit everything and we save it on a company server that I have access to, and basically, based off of what I have read in the report, would make a judgmental decision on whether or not I need to see any more at that time.**

**So I don't know if I did or didn't.**

**Q.** Did you save, when you peer review a file such as the Ramey-Kaible file do you save a folder for yourself of all the information that you look at that would be saved somewhere where we would be able to look at the information you reviewed prior to making the proposed revisions?

151

**A. I think typically the only thing that I would save is the original draft copy of the report that I made changes to. And sometimes I may save things; sometimes I may not.**

**Q.** And if there were additional photos outside of the photos that are attached to that December 9, 2012, report, where would we find those that you reviewed if they are not attached to the email?

**A. They are on our company server.**

**Q.** But do you save them or mark them for your purposes or auditing or reviewing a file?

**A. Like do I mark them up or like make notes on them somehow electronically?**

**Q.** Or save the Ramey photos -- for example: *I looked at photos not attached to this report and they are saved in folder Ramey under the D drive.*

**A. No, I don't do any of that; in other words, if I feel it necessary to save some photos in my hard drive to review them or something like that.**

**But it is not something that we consistently do or I consistently do.**

THE COURT: While counsel is preparing, I will ask you a question.

THE WITNESS: Sure.

THE COURT: Do you know who Joseph Griffith is?

THE WITNESS: No. I have never met him. I

152

assume he works for Fidelity. But other than seeing his name on job reports or assignments, no, I have never met him. Or don't know him, I guess.

THE COURT: Okay. Thank you.

BY MS. SIGMAN:

**Q.** And in reviewing that report, that is, the January 7, 2013, report that you have here today?

**A. I did not review that report.**

**Q.** Okay. I understand that you reviewed Exhibit 5, which is the December 9, 2012, report.

**A. Yes.**

**Q.** And the January 7, 2013, report was Mr. Hernemar's final report at that time submitted. Is that right?

**A. To my -- yes.**

**Q.** You never reviewed his final report to see if he adopted any of your revisions?

**A. No.**

**Q.** So as you sit here -- but you were able to unequivocally say, on page one, the conclusions, he did adopt your revisions.

**A. He adopted my conclusions.**

**Q.** But as far as reviewing the rest of this, were you able to determine if he had adopted any other revisions?

**A. If I could take the time to review it maybe with the redline copy, then maybe. But I mean, there is so much**

153

**words in here that to answer that and say he could accept the worth *the* and used a different word or some other thing.**

**So in general terms, the conclusions seem to be in general line with what I had marked up in my original review of his draft copy.**

**Q.** And in reality if the general, if these conclusions change, the analysis in the original report might have changed as well?

**A. Yes.**

**Q.** And if the conclusions changed 180 from the Exhibit 5, December 9 report, is that report an altered report?

MR. MARTINE: Objection.

The court: Sustain the objection.

BY MS. SIGMAN:

**Q.** Are you familiar with what is considered an altered report?

MR. MARTINE: Objection.

THE COURT: Sustained.

BY MS. SIGMAN:

**Q.** Do you know when the last time you reviewed the redline version was?

**A. When was the last time I reviewed the redline version?**

**Q.** Yes.

154

**A.   Yes.**

**Q.**   When was it?

**A.   Today.**

**Q.**   Then is it here?

**A.   No.**

**Q.**   How were you able to review it today?

**A.   I reviewed an electronic version of it.**

**Q.**   Well, that is what I mean.  Do you have an electronic version with you today?

**A.   No.**

**Q.**   Well, where -- how did you review it today electronically if it is not here?

**A.   It is on my computer.**

**Q.**   Do you have your computer here?

**A.   No.**

          MS. SIGMAN:  Pass the witness, your Honor.

          MR. MARTINE:  Judge, I mean, I think it is something -- I would object.  I believe the federal rules protect the work product of drafts of expert reports of this nature so --

          MR. MOSTYN:  Your Honor --

          THE COURT:  Hold on.

          What are you objecting to?  My request for the redlined version?

          MR. MARTINE:  Yes.  If we have it --

155

          THE COURT:  Given that we have both versions, what harm would there be?  The redlined presumably is the in immediate area.

          MR. MARTINE:  Judge, besides the fact that it is the work product of --

          THE COURT:  How is it work product?

          MR. MARTINE:  Judge, I haven't seen it but I would like to look at it.

          THE COURT:  Hold on.

          I have not heard one word, other than the hearing today, about an attorney --

          MR. MARTINE:  No.  I didn't mean work product, judge.  I mean rough draft of this expert's report.

          I don't necessarily think it is discoverable.  And plus, I would like to see the thing.

          THE COURT:  Given the nature of the allegations here, I'm not sure that is an objection that you want to stand by.  But you can think about that.  And if you have an objection after you review it, if you think there is a basis to protect it, I would love to hear it.

          MR. MARTINE:  Okay, Judge.

          MR. MOSTYN:  Your Honor, this witness is not a designated expert.

          THE COURT:  All right.  I have one question for you.

156

          You said a number of times that you did not review the report that has the January 7, 2013, date on it.  Right?

          THE WITNESS:  Yes.

          THE COURT:  But is it fair to say, based upon what we have seen today, that you wrote that?

          THE WITNESS:  Yes.

          THE COURT:  All right.  Anything else?

          MR. MOSTYN:  No.  No, your Honor.

          MR. MARTINE:  Just briefly, judge.

          THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. MARTINE:

**Q.**   Just so its clear, Mr. Garove.  When you sent the redlined copy of the report back to George, the engineer we heard from this morning, how does he physically go about accepting or rejecting the changes you proposed?

**A.   Within the Word document, there is a section where there's two buttons where you can individually accept or deny any marked changes that are within that document.**

**Q.**   And if he denied every single one of your changes, would that document have been sent back to you for you to attempt to again try to incorporate your changes?

**A.   I don't know for sure, but usually if there was some**

157

**type of discrepancy between the engineers, then I would talk about it.**

**Q.**   And is that part of the peer process, where occasionally, if necessary, you will actually speak with the inspecting engineer and kind of bounce your opinions off each other?

**A.   Correct.**

**Q.**   The changes that you did propose on the December 9, 2012, rough draft report submitted by Mr. Hernemar, did you base those proposed changes on anything other than the sound engineering principles and documents before you that you reviewed?

**A.   No.**

**Q.**   Did anyone associated with USF ask you to make particular changes or make specific content changes to that report?

**A.   No.**

**Q.**   At some point the final report goes to the insurance company that told you (sic) to go out and do the engineering inspection?

**A.   Yes.**

**Q.**   Do they have any process, anyone from the insurance company have any role, in the process of creating that final report?

**A.   No.**

158

Q.   Can you, as you sit here today, support the conclusions that you made that the damage to this house is structural damage; was not due to any Sandy forces?

A.   **Yes.**

Q.   Why don't you tell the court what your opinion is.

A.   **Where to begin.**

**Basically, you know, the forces.  First of all, we are specifically asked to identify structural damage.**

**Just to clarify.  It's not cosmetic, not anything like that.  We are asked to conclude on structural damage, specifically based off of hydrodynamic, hydrostatic, buoyancy forces, and soil scour.**

Q.   And describe each of those forces for us, sir.

A.   **Hydrodynamic forces simply are the force caused by moving water; hence, dynamic.**

**Hydrostatic is exactly what the word implies. You have a still force of water, you know, statically acting on a building or something.**

**Buoyancy forces are the displacement of an object vertically when it is placed, typically in water; some type of liquid.**

**And soil scour is the effect of fast-moving water very quickly displacing soil from a ground surface or beneath a foundation or something similar.**

Q.   Now continue.  What did you rely upon as far as what

159

you observed in reaching or making the suggestion to Mr. Hernemar that the foundational damage to the home that we are talking about was not caused by any hydrodynamic forces, or hydrostatic forces, et cetera?

A.   **A number of things, the first thing primarily being the absence of any evidence of structural damage.**

**I mean, quite simply, you have to have some type of evidence visually typically at the property that would at least initially say that there is a possibility that the structure was damaged by one of these four forces.**

Q.   What type of damage would that be?  What type of evidence would that be?

A.   **You would see any number of things.**

**Localized cracking in walls or ceilings that would be consistent with lateral or vertical forces applied by flood waters.**

**Collapsed foundation walls or piers.**

**Soil voids beneath the foundation structure.**

**Lateral racking of building members, walls, et cetera, that appeared to have occurred recently.**

**And just things common to fast-moving or static water that would have caused structural damage to any portion of the building or the foundation.**

Q.   Did you find any evidence of any of those items?

A.   **No.**

160

Q.   Now, as part of the process of making suggestions to a rough draft report as part of the peer review process, do you comment on what it is you relied upon in reaching perhaps a changed conclusion?

A.   **Sometimes.  Sometimes not.**

Q.   Does this report here, the January 7 report that you can testify to was at least to some degree adopted by Mr. Hernemar, get into what it is you and he relied upon in reaching a decision?

A.   **Does it get into what we --**

Q.   Yes.

A.   **Was it discussed?**

Q.   Yes.

A.   **Yes.**

Q.   And what that decision is based upon is discussed within this report.  Is that correct?

A.   **Yes.**

Q.   As you sit here today, do you stand by the conclusions reached in the report of January 7, 2013, that Mr. Hernemar adopted as his own?

A.   **I believe that the only thing that was slightly different was possibly in regards to what I think I described as maybe a block was moved out from on top of a pier, which can be -- we basically couldn't rule out that moving water moved that block out of position, which would**

161

**constitute structural damage to the building.**

Q.   And that was after a supplemental examination. Correct?

A.   **That's correct.**

Q.   Or inspection.  Excuse me.

(There was a pause in the proceedings.)

MR. MARTINE:  That's all I have, Judge.

MS. SIGMAN:  I have something brief.  Real brief.

THE COURT:  I'm sure you do.


REDIRECT EXAMINATION

BY MS. SIGMAN:

Q.   On the December 9, 2012, report, which you have as Exhibit 5, you looked at the photos.

Were those the only photos that you reviewed prior to submitting your revisions via email to Mr. Hernemar?

A.   **I don't know.**

MR. MARTINE:  Objection, asked and answered, Judge.

THE COURT:  I will allow it.

BY MS. SIGMAN:

Q.   Will you turn to page 5 of Exhibit 5, please.

This last paragraph here says:  "Representative

162

photographs are in the attachments.  These photographs, taken but not included in the report, are available upon request."

Did you request Mr. Hernemar to send you the additional photos?

**A.   I don't request.  I don't make that request.**

Q.   Well, if you needed additional photos or needed to see those, would you have asked someone in your office to obtain those additional photos?

**A.   If I needed to, if I felt the need to review additional photos -- which I may have; was two years ago; I may have reviewed them; I may have not -- I typically have access to them and can readily go see them without asking anybody.**

Q.   How would you -- okay.  How would you have accessed them?

**A.   If they were included.  If he had included those additional photos.**

Q.   Okay.

**A.   If he had -- like when he sends in or -- an inspecting engineer sends in a report, or they may send in just the report, they may send in a host of documents along with that.  Sometimes they are slow at producing them and maybe produce them later.  But at this time, you know, I'm not sure whether or not I reviewed the**

163

**additional photos or not.**

Q.   If in fact you needed additional photos and they were not in the email from Mr. Bell to you attaching this December 9, 2012 report, would you have then requested them to be obtained from your office to Mr. Hernemar?

**A.   If he included them or he submitted them to our office, they should be readily available on the server.**

Q.   Is that something that would be kept on the server today if there are additional photographs not part of this report?

**A.   Yes --**

MR. MARTINE:  Objection, asked and answered.

THE COURT:  I will allow it.

**A.   Yes.**

BY MS. SIGMAN:

Q.   As part of the peer review process, is your name supposed to be affixed to this report in the Ramey file, the report that you reviewed or helped revise or proposed changes, is your name supposed to be also in addition to Mr. Hernemar's on that report?

**A.   Should it be?**

Q.   Yes.

**A.   By what standard?**

Q.   By your peer review engineering standard.

**A.   No.  Not necessarily, no.  Because some of this is**

164

engineering board rules and regulations.

Q.   Okay.  Well, under any regulation that you are aware of, as a engineer are you required to put you name on that report in addition to Mr. Hernemar?

**A.   No.**

Q.   When your counsel asked you in his questions --

**A.   He is not my counsel.**

Q.   I'm sorry.

When the insurance company's counsel asked you, on his questions, about what you went through and your analysis of what you saw from the photos and the report -- is that right? -- you didn't go do the inspection of the home.  Correct?

**A.   That's correct.  The photos are not the only thing I reviewed in making my determination.**

Q.   What else did you review?

**A.   Measurements and observations which were provided within the original report.**

Q.   Okay.

**A.   So in the original report, which is the December 9, 2012 report, looking at just that report, that is where you were able to come up with your analysis and revisions.**

MR. MARTINE:  Objection to form.

**A.   Like I said -- excuse me.**

THE COURT:  You can answer.

165

**A.   To be honest, the answer is I don't know.  It would depend upon whether I felt there was enough information to make a solid determination about whether or not I could make a conclusion or not.**

Q.   Okay.  And did you know that in this report there is not one photograph of the second story floor or any part of the second floor?

**A.   From the interior of the building?**

Q.   Yes.

**A.   It would not appear so, no.**

Q.   When you reviewed this file at the time, do you recall having any conversations with Mr. Hernemar pertaining to no photos of the second floor?

**A.   No, not to my recollection.**

Q.   And if in fact there were photos of the second floor, is that something that you-all would have retained or have on your server today if it was sent to you initially?

**A.   Possibly.  If he took photos of them.**

Q.   Have you had any conversation with Mr. Hernemar since the handling of this claim?

**A.   Other than to answer that we were on a lunch break today?  No.**

Q.   How many conversations did you have with Mr. Hernemar during the claim?

**A.   I don't recall.**

166

**Q.** Is there somewhere in your system, would you have had them via telephone or electronic communication?

**A. It would depend. I mean, if we needed some type of interaction by email, that could be possible. Or we could have spoken by phone. It would just depend on the circumstances.**

**I don't recall whether I talked with him on the phone or by email. I don't think there was any conversation back and forth between me and him by email, from the emails that I have looked at.**

**Q.** Do you recall if you had any telephone conversations?

**A. I don't. I don't recall.**

**Q.** And do you recall, if you had a telephone conversation is that something you would have noted somewhere in a note, or is it your procedure or your office procedure to document when you have had a conversation with an engineer?

**A. Not necessarily, no.**

**Q.** Well, on questioning by the insurance company's attorney, he asked you that once you submit your revised revision report to the engineer, sometimes if they don't agree with your proposals and changes, you-all would be on a conversation and call and talk to each other to talk it out. Is that right?

**A. Could be a phone call or by email.**

167

**Q.** But in this particular case, on the Ramey file, you don't recall having a conversation, whether by telephone or email, to that effect, do you?

**A. Not subsequent to my review. Or excuse me, after my review.**

MS. SIGMAN: No further questions. Thank you, your Honor.

MR. MARTINE: Nothing, judge.

THE COURT: You may step down.

(The witness was excused.)

THE COURT: Any other witnesses?

MR. MOSTYN: We have no other witnesses.

MR. MARTINE: Can we approach, Judge?

THE COURT: Sure.

(Discussion at sidebar ensued as follows.)

MR. MARTINE: Judge, there is a witness from the insurance company who is prepared to offer testimony that he does not receive any report but the final report.

But Mr. Garove testified to that, about the insurance company only getting the final report. And in light of the fact that we have taken up a chunk of your day, I don't think it is necessary.

But I defer to your Honor. If you want to hear from him, I am happy to call him.

THE COURT: I don't need to hear from him.

168

MR. MOSTYN: I will take his deposition, if that is okay.

THE COURT: We will get to that.

What do we do now?

MR. MARTINE: Judge, I defer to you.

THE COURT: Other than that, do both sides rest?

MS. SIGMAN: Yes.

MR. MARTINE: Unless you feel you want to hear from him saying I only received the final report.

THE COURT: I will take this witness word for the fact that he turned over what has been referred to as the final report.

MR. MARTINE: I appreciate that.

(Discussion at sidebar was concluded.)

THE COURT: Counsel, we have closed the evidentiary portion of this and so we can now figure out what we are doing next.

I presume, without knowing, that plaintiffs have some application concerning what they perceive to be discovery violations about the failure to turn over draft reports.

MR. MOSTYN: Correct.

THE COURT: I will take that under advisement and I will take a look at that issue.

The other issue that honestly this all bears on

169

is, perhaps ironically, Mr. Neilson's request, in his response to plaintiff's motion, that we just forget about this expert and get a new expert and that plaintiff should help you get a new expert. I will look that that as well as part of this.

Is that it?

MR. MOSTYN: That's fine. And they are welcome to come out and look at the lot. That is all that is there.

THE COURT: I hear you. Good.

Anything else on this matter?

MR. MOSTYN: I would like to have us take a break to see if we can confer and agree on discovery that we would want.

I will tell you that not only missing from this file is the engineer's report but the independent adjuster's. There is not a single entry here from that independent adjustor. An independent adjuster company file is not here. I have looked at probably 20,000 files and it is missing from this one, all of them that have been produced.

Also, in other litigations we have had this gamesmanship played. I have done a lot of third-party litigation, literally over 20,000 litigations, where they say: Well, you have told the parties just to get the

170

reports, so maybe I wasn't here for the draft of these.

But maybe it needs to be made clear that anybody who worked on their behalf, if they have expert reports, because that is a little gamesmanship.

And I do want to point out that I asked for the engineers phone number so I can get the report. They had them days before this hearing, and they didn't bother to supplement them days before the hearing. So I was left stuck reading them at the table when he first showed up with them. And that certainly could have been done beforehand instead of saying I was intimidating and that I was harassing the witness.

I would like to take a break and see if we can agree to what depositions to go forward, because we would like to move on it pretty quickly.

THE COURT: You mean a break now and you go talk in the back and come back in a little while?

MR. MOSTYN: If I can get an agreement and maybe come back in five minutes. Or we can do it right here on the record.

THE COURT: I would prefer to take a break because I have other matters to call.

MS. SIGMAN: Can I ask one question before Mr. Garove leaves? One thing.

During the testimony you had ordered that he

171

produce the redline version. We had talked about that.

THE COURT: Yes. Counsel wants to object to that. Go ahead.

MS. SIGMAN: My concern also is, if there is email communications, whether from Mr. Bell or anyone else, I would ask him to preserve those. They might have objections or whatever, but preserve those and not alter them.

THE COURT: Mr. Garove, it would be a bad idea to destroy anything that relates to this matter in the near future.

Are we good, Mr. Garove?

MR. GAROVE: Yes, sir.

THE COURT: All right. He has given an affirmative response.

Anything further?

MR. MARTINE: I have no objection to him preserving it.

MR. BROPHY: There is certainly no objection to preserving things.

But, your Honor, you have heard two diametrically opposed versions of how cell phone photographs --

THE COURT: Counsel, I have to tell you that really you are talking about the tail wagging the dog.

172

That really is the least of the concerns here. How that particular piece of evidence got preserved is interesting as the telling of a story, but who cares?

MR. BROPHY: I think it is actually vitally important, your Honor, and actually is very reminiscent of a case that happened in the New York State courts and went to the New York State Court of Appeals in which a litigant personally helped herself to the contents of opposing counsel's litigation bag.

This is an extremely similar series of events as it was related by Mr. Hernemar, that he left his bag on the first floor of the plaintiff's home, then went into the crawl space area to inspect the damage that he was not able to see on his first visit because it was not accessible, and does not give them permission, did not talk to him about it, he has denied and refuted their entire history of how they came into possession of that small handful of cellphone photographs of his papers that he has not shown them, did not give them permission to move them from a stack of photographs.

That was an absolute undermining of how a court can function and dispense justice when you have people doing underhanded things like that.

THE COURT: Counsel, before you say something is underhanded. Remember, I have two sets of sworn

173

testimony. Right? I have a plaintiff who tells me a very different account. If you want to go through the credibility evaluation on each of them, we can do that.

In this circumstance I'm not sure it is a point you really want to push. But if you want to. Have at it.

MR. BROPHY: I'm not, you know, I'm raising the issues. Those were out there.

THE COURT: Bear in mind, counsel, when we started today there was an allegation that something was altered or counterfeited or forged, right? And that clearly is not the situation.

MR. BROPHY: Clearly.

THE COURT: When I first heard this, I thought: *Let's have a hearing. This is probably a mistaken understanding.* But it is not.

We have an engineer who went to the site and said that the house foundation was destroyed by hydrostatic forces.

MR. BROPHY: Yes, and --

THE COURT: Counsel, let me finish.

And then we have a situation in which another engineer, who appears nowhere on the papers, rewrote the report and said: *No, it wasn't hydrostatic forces. There wasn't damage.*

That is a pretty remarkable set of

174

circumstances.  I recognize you are now going to tell me:
Yes, but the original engineer ratified that.

That is a pretty interesting record.  I don't
know what to make of it, sitting here right now, which is
why I'm reserving decision on all of these matters.  But
this is out there, counsel.

Not in a hundred years would I have predicted
the testimony I was going to hear today.

MR. BROPHY:  And in that event what I am
respectfully suggesting is appropriate, because there is a
lot of paperwork flying around, and I think that it would
be most enlightening if the parties had a reasonable
amount of time to make sure that they can marshal the
paperwork, the photographs, the things we have today in
the courtroom and the things that we don't, and actually
have submissions in writing.

THE COURT:  I think that is a great idea.

How long would you like?

MR. BROPHY:  Two weeks.

THE COURT:  I think two weeks is reasonable,
given what happened today.  But let me say something now.

One of the reasons I was interested to see what
would happen today is that Mr. Neilson's response to the
allegation was so very enlightening, right?

In other words, we have had an allegation which

175

he acknowledges was very serious.  I'm really surprised he
was not here today.  He should be here.  And I don't mean
to shoot the messenger.  Right?  But his letter
essentially says:  *Yes, that's a serious allegation but
let's talk about all of the plaintiff's discovery
violations.*

There is an allegation that false evidence was
submitted to this court, and the response I get is:  *Yes,
but they have violated discovery issues.*  That is his
response.

Let's not turn this into yet another screed
about historical discovery complaints that both sides have
about each other.  Please.  If you have something relevant
to submit, I'm eager to see it.

Two weeks from today, both sides can submit a
brief of up to 15 pages in length.  Fair enough?

MR. MARTINE:  Judge, I just, I feel like I have
to respond to the comment of Mr. Neilson not being here.

Had the reply papers, which are a complete
screed, in my opinion, about the history of wind
litigation and other litigation that has no bearing on the
substance of the Ramey case, which is what this hearing
was all about, had we received them sooner than 9 o'clock
or 8 o'clock or 6 o'clock last night, I suspect that he
would have been here.

176

And I did speak to him on the phone last night
and he said, quite frankly, he will be happy to come
before your Honor and address every single allegation made
in those reply papers any time your Honor wants him.

THE COURT:  I understand and I'm happy to hear
Mr. Neilson.

MR. MARTINE:  I want to make it clear that he
would happily do that and answer your Honor any time you
want.

THE COURT:  Two things about the reply papers.

I think they are largely irrelevant or
tangential.  Two things that jumped off the page at me.
One was the nature of his relationship with US Forensic or
the precursor companies and/or the owners.  And he sort of
made a reference, fleeting or passing reference, they are
suggesting something otherwise.

I don't know if there is a problem there or not,
and if that is something he would like to respond to, I
will give him that latitude.

MR. MARTINE:  He would be happy to.

THE COURT:  The second thing, which sort of
affects me in a larger sense as to where we are and why we
are spending as much time as we are on this, is the
reference, and forgive me, I don't remember if it was a
reference to a letter he wrote to this court or to

177

testimony in Congress or someplace else, that he
anticipates that the defense of these cases will be a
nine-digit number.

When I read that, I had to stop and write down
nine digits.  That would be in the hundreds of millions of
dollars.

If that is true, that is of some concern as
well, given that that is all public money.  And
Mr. Neilson is the first one to jump up and down and say
we have to protect the public treasury.  If we are
spending nine digits, hundreds of millions of dollars, to
defend these cases -- which, by the way, I have done the
math, could be settled at full value for far less -- we
have got a problem; a really, really big problem.

MR. MARTINE:  Judge, the federal government has
determined what cases can be settled and what parameters
need to be satisfied before those cases are settled.  That
happens to be the truth, your Honor.

And the court also must remember that 98.5
percent of these cases have not made it to litigation,
have been resolved pre-litigation, so --

THE COURT:  But what is left, what is left we
are going to spend over $100 million defending?

MR. MARTINE:  Judge --

MR. BROPHY:  Your Honor --

178

MR. MOSTYN:  Can I say --

MR. BROPHY:  -- the other thing, if I recollect, if we are talking about the context of something that might have been said at the initial hearing in the ceremonial courtroom in Brooklyn.

THE COURT:  Maybe.  I'm not sure.

MR. BROPHY:  I believe the context was that if we don't get it right in terms of the process, that this is what is going to happen, and this is what everybody should be working to avoid.

He wasn't proclaiming that this is how I'm going to profit.  He was saying if we don't get it right -- and we have had a lot of working experience from Katrina on what works and what doesn't -- that the mistakes are going to drive us in this direction, which is where we shouldn't go.

I'm pretty sure that was the context.

THE COURT:  That is why I waited.  I'm happy to have Mr. Nielson respond to it.

MR. MARTINE:  And he wants to.

MR. MOSTYN:  Can I ask something?

THE COURT:  Sure.

MR. MOSTYN:  I promise you you won't have briefs that have inaccurate statements in it.  This is our case here and we are going to make sure everything is correct.

179

I've been in the business with FEMA, and I've been in the business with the head of FEMA, and the government is not directing these folks not to settle these cases.  In fact they are directing them to settle these cases, by written directive.

And in 20,000 cases I have never seen this type of spending on the defense side.  It is far out of line.  I have never seen it.  So it is miraculous here.  We have sat here all day and spent, which I wrote a large check to the IRS yesterday, a lot of money paying these people over here and denying this man his money.  It is miraculous.

So the other thing is that the allegation that the report was altered was known long before the reply was --

THE COURT:  Counselor, let me stop you there because I called them on a number of things and now I am calling you on one.

You have lots of paragraphs where you say we told them, and you don't give me any backup.  You give me backup about Congressional testimony, which is so far afield, counsel.  I don't care about that.  What am I supposed to do with that?

MR. MOSTYN:  It is not in my brief?  It will be the next time.

THE COURT:  Two weeks from today I want 15

180

pages.  Both sides.

MR. MOSTYN:  It will be well documented.

$100 million in the letters to this court which criticized FEMA, this court, and the Congress for the reason it cost $100 million.  And it will cost more than all the storms in the past, combined together.

And I agree, that is outrageous when we can settle the litigation, which is exactly what the for-profits would do, for a lesser amount.

THE COURT:  So what we are going to do is, we are going to break.  You are going to go and meet in the corridor, and then you can come back.

MR. BROPHY:  I was going to suggest we reserve the entire discovery discussion until after the resolution of the written submissions.

MR. MOSTYN:  Then we need to shorten the written submissions because Mr. Kaible and his wife are in a financial problem.  And we would like an expedited discovery and trial.

And we don't need two weeks.  If we want to do a week and we defer, I will brief that, judge.

MR. BROPHY:  As everyone does, your Honor.  This is not our only case and not Neilson's only case.

THE COURT:  He is right.  Let's make it a week.  A week from today get the submissions in and we can defer

181

discovery items and go home.  It is all right.

Good seeing all of you.

MR. MOSTYN:  Your Honor, can we get a lockdown on when they will produce to us the Microsoft document?

MR. MARTINE:  We will do it in a week, with our submissions.

MR. BROPHY:  Your Honor, whatever we do here we don't want to be dispositive of any other discovery disputes that we have got either in this case or in any other cases.

I say that because they have issued, I have lost count, 20, 30, 40, 50 letters alleging the exact same drafts and related information.

THE COURT:  Let's start with this one.

MR. MOSTYN:  This one.

THE COURT:  All right.

Good seeing you all.

MR. MOSTYN:  Thank you, your Honor.

(Proceedings adjourned at 3 pm.)


CERTIFICATE OF COURT REPORTER


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_____

Dominick M. Tursi, CM, CSR