# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

————————————

№ 14-CV-00461 (JFB)(SIL)(GRB)

————————————

DEBORAH RAIMEY AND LARRY RAISFELD,

Plaintiffs,

VERSUS

WRIGHT NATIONAL FLOOD INSURANCE CO.,

Defendant.

————————————

№ 14-MC-00041 (JFB)

————————————

IN RE HURRICANE SANDY CASES
————————————

**MEMORANDUM AND ORDER**
December 31, 2014
————————————

JOSEPH F. BIANCO, District Judge:

Deborah Raimey [1] and Larry Raisfeld ("plaintiffs") sued Wright National Flood Insurance Company ("Wright" or "defendant")—a "Write Your Own" ("WYO") flood insurance carrier and the issuer of a policy covering a house plaintiffs owned in Long Beach, New York—for breach of contract. Plaintiffs alleged that their house was damaged by flooding during Hurricane Sandy, and that Wright wrongfully denied plaintiffs' claim under

the policy by attributing the damage to long-term deterioration.

Pending before the Court is defendant's appeal of an order issued by Magistrate Judge Gary R. Brown on November 7, 2014, *In re Hurricane Sandy Cases*, -- F.R.D. --, 2014 WL 5801540 (E.D.N.Y. Nov. 7, 2014) (the "November 7 Order"), addressing the disclosure of draft engineering reports on insured properties allegedly affected by Hurricane Sandy, and imposing evidentiary sanctions on defendant Wright and monetary sanctions on its counsel for failing to obey discovery orders and causing undue delay to these proceedings. The sanctions arose from (1) a failure by defendant and its counsel to disclose an initial written report (dated

---

[1] The parties interchangeably spell plaintiff's name "Raimey" and "Ramey." Per the case caption, the Court will use Raimey.

December 9, 2012) by George Hernemar, an engineer from U.S. Forensic ("USF"), who had inspected the home at issue and concluded that it had been damaged beyond repair by Hurricane Sandy, and (2) the conduct by defendant's counsel at a subsequent evidentiary hearing before Magistrate Judge Brown to determine how the undisclosed initial report was modified into a second subsequent report, dated January 7, 2013 (disclosed to plaintiffs), which eliminated certain observations by the engineer and reached the exact opposite conclusions – namely, that the defects in the home had not been caused by the storm, but rather were due to long-term deterioration. In particular, following the evidentiary hearing, Magistrate Judge Brown found, *inter alia*, the following: (1) defendant and its counsel violated their obligations to comply with this Court's discovery orders by failing to produce the initial engineering report; (2) the process, in this particular case, that led to the alterations of Hernemar's observations in the initial report and the reversal of the report's conclusions was "flawed," "unprincipled," "reprehensible," and "highly improper"; (3) the failure to disclose the initial report resulted, in this case, in "unreasonably prolonging this litigation, imposing unnecessary costs upon plaintiffs and further contributing to the unwarranted delays in resolving this claim"; and (4) "given the discovery failures by defendant's counsel, the unreasonable response by defendant to the allegations, and counsel's shocking attempt to curtail inquiry during the hearing, it is reasonable to charge the costs associated with the hearing to defendant's counsel." (November 7 Order, at 13, 15-25.)

For the reasons set forth in detail below, the Court affirms Magistrate Judge Brown's November 7 Order in its entirety. More specifically, there is no basis for this Court to conclude that Magistrate Judge

Brown's findings or his sanctions were clearly erroneous or contrary to law, as would be required for a reversal. Having carefully reviewed the record, it is absolutely clear to this Court that the process that led to the modification of the initial engineering report (including the removal of observations that were inconsistent with the new conclusions) was flawed, and the concealment of that initial report and the process that led to the new report (including conduct at the evidentiary hearing) has prejudiced plaintiffs in terms of delay and costs in this litigation, such that the sanctions were warranted.

First, Magistrate Judge Brown's finding that the Court's discovery orders required the disclosure by the defendant of the initial engineering report is not erroneous. In fact, Case Management Order #1, in plain and unambiguous language, directed the defendants to produce "any documentation relating to an assessment of the claimed loss, including all loss reports and damage assessments, adjuster's reports, engineering reports. . . ." and "all expert reports and/or written communications that contain any description or analysis of the scope of loss or any defenses under the policy." (CMO 1 at 9.) Moreover, the fact that the scope of discovery included draft reports was unequivocally emphasized later in the Order when the Court stated the following: "Documents routinely prepared in the ordinary course of business, including but not limited to adjusters' reports and other expert analyses, *including draft reports*, are not privileged and should be produced." (*Id.* at 10 (emphasis added).) Defendant's primary objection to this finding is that counsel for Wright (as well as other counsel for both sides in the Hurricane Sandy cases) did not interpret CMO 1 (or the subsequent discovery orders) to require the production of documents in the possession of third parties, such as engineers, and Wright did

not have the initial Hernemar report in its possession. However, there is no such limitation in the discovery orders and, as Magistrate Judge Brown correctly noted, counsel has a duty to make reasonable inquiry to ensure discovery responses are complete and correct, including from third parties over whom control exists, and there is no doubt that Wright had the legal and practical ability to obtain this initial report from USF. Moreover, based upon emails produced at the direction of this Court following oral argument on the appeal (which inexplicably were also never produced to plaintiffs, contrary to the plain language of the discovery orders, even though in Wright's possession), it is clear that Wright's Vice President of Claims (Jeff Moore) received a photograph of the initial report by email from plaintiff on January 28, 2013. Thus, any argument that Wright or its counsel had to approach third parties to learn of the existence of the initial report is clearly incorrect.

Second, Magistrate Judge Brown did not err in concluding that the failure to produce the initial report concealed conduct by USF in this case that was, among other things, highly improper. As a threshold matter, contrary to the arguments of Wright and USF, the Court is not suggesting that there is anything problematic about a peer review process in general as it relates to engineering reports, or any other reports generated in connection with an insurance claim. Moreover, the fact that a principled and thorough peer review process may ultimately lead to a conclusion that is contrary to the initial report certainly does not implicate a finding of fraud, or even necessarily suggest that something improper has taken place. Instead, this Court concludes that Magistrate Judge Brown correctly found that USF's peer review conduct *as it relates to the Raimey claim* was improper. In particular, the second peer

review engineer (Michael Garove), without any additional inspection of the property, not only changed the report to reach the exact opposite conclusions but also removed language from the initial report that indicated that Hernemar could not inspect certain portions of the house – such as the foundation (which was obscured by piles of sand) and the crawlspace (which was obstructed and could not be thoroughly inspected) – and replaced that language with language which suggested that observations of those areas supported the contrary conclusions. Regardless of the validity of the ultimate conclusions (which Magistrate Judge Brown questioned), these modifications of the language memorializing the engineer's inability to inspect certain areas are indefensible (even if approved by the first engineer), and certainly place into question the validity of the entire peer review process at USF. In fact, Hernemar apparently accepted all of the changes proposed by Garove after his peer review—including the removal of the language indicating his inability to examine certain areas and his conclusions—without question, as Garove recalled no conversations with Hernemar about the report. Even in other situations where such review is the product of a principled peer review process, such process should not be completely concealed from a plaintiff who is challenging in litigation the ultimate determination of the engineering firm. Fundamental fairness, as embodied in the Court's discovery orders, dictates that plaintiffs suing over a denial of an insurance claim should have knowledge of any such prior reports and be able to test and challenge the process that led to the modifications in the report and its conclusions.[2] Thus, although USF seeks to

_____

[2] In fact, at oral argument, the Federal Emergency Management Agency ("FEMA") withdrew its appeal

defend its new conclusions in the modified report, that does not excuse the conduct as it relates to the Raimey claim – namely, the removal of observations inconsistent with the new conclusions, as well as the concealment of that initial report and the process that led to the second report, from the plaintiffs.

Third, there is no basis to conclude that Magistrate Judge Brown erred in finding that the failure to produce the initial report unreasonably prolonged the litigation, imposed unnecessary costs upon plaintiffs, and further contributed to the unwarranted delays in resolving the claim in this case. Certainly, the initial report, and the process that led to the modifications to that report, are a critical component in the litigation of this case. It was not unreasonable for Magistrate Judge Brown to conclude that had that initial report (which the Court now knows Wright was aware of as early as January 28, 2013) been produced to plaintiffs (along with related documents such as the redline version that led to the modified report and the emails) in a timely fashion, the case would have been able to

move forward more expeditiously and that plaintiff would have avoided unnecessary litigation costs in obtaining those documents, including an evidentiary hearing. Although plaintiffs had a photograph of a portion of the initial report and did not provide that report to defendant's counsel in the discovery process, that failure in no way hindered defendant's ability to comply with its discovery obligations. In fact, as noted above, plaintiffs had already provided that photograph of the report to Wright in an email on January 28, 2013, almost one year before this lawsuit was filed. In any event, because of plaintiffs' counsel failure to produce the photograph of the initial report to the defendant, Magistrate Judge Brown limited the sanction to the costs incurred in the litigation after plaintiff disclosed the photograph of the initial report to defense counsel.

Fourth, Magistrate Judge Brown did not err in finding that counsel for the defendant, among other things, responded unreasonably to the allegations and engaged in a "shocking attempt to curtail inquiry during the hearing." As a threshold matter, Magistrate Judge Brown presided over the hearing and had the benefit of seeing the conduct of defendant's counsel unfold first-hand. Such observations by a judge in the course of hearing, including how the conduct affected the hearing and the motive behind that conduct, are entitled to deference. Moreover, there are more than sufficient grounds, based upon this Court's careful review of the transcript, to support this finding. Hernemar testified, under oath, that he made the changes to his own report after an "open discussion" via telephone with a peer review engineer. Throughout his testimony, Hernemar repeatedly sought to portray the peer review process as it related to his revision of his initial report as one that involved a personal, substantive exchange

---

of the portion of Magistrate Judge Brown's November 7 Order that again reiterated that defendants in all Hurricane Sandy cases were required to produce, among other documents, all draft reports by any engineer relating to properties at issue in the litigation, including such documents in the possession of a third party. FEMA noted that it "is committed to providing transparency to its policyholders," and was in the process of obtaining the relevant documents from third party contractors responsive to the Court's Order and producing such documents. Therefore, although it is unclear the extent to which engineering firms and/or insurance companies have utilized a flawed or fraudulent process in denying the claim, plaintiffs in all Hurricane Sandy will rightfully have transparency into that process as a result of the enforcement of the discovery orders, and will be able to challenge any such practices in a fair and just manner in the context of the litigation.

between him and the "peer review" engineer. Counsel for defendant argues that it was not improper for counsel to suggest after Hernemar testified that additional witnesses were unnecessary. This Court agrees that such an argument, in and of itself, certainly would not be sanctionable. However, defendant's counsel went well beyond that. In an effort to persuade Magistrate Judge Brown to stop the hearing, counsel for the defendant (even though we now know counsel had no pre-hearing substantive discussions with the second engineer regarding his "peer review" of the initial report) represented to the Court, *inter alia*, that the testimony of the peer review engineer (Garove) would be consistent with Hernemar's, in that Garove would testify that he "made suggestions and that the two engineers consult[ed] about the suggestions." When Magistrate Judge Brown decided to hear Garove's testimony notwithstanding that representation, it became clear that the representation was inaccurate. Garove, who had reviewed his redline edits to the initial report prior to his testimony, contradicted Hernemar in a number of important respects, including that he did not recall ever communicating with Hernemar regarding his suggested edits and that, instead, Hernemar just adopted his conclusions completely. Thus, there does not appear to have been an "open discussion" via telephone, or any other back-and-forth exchange, before Hernemar adopted Garove's edits in a wholesale manner. In short, there is a more than sufficient basis, based upon this representation by defendant's counsel, and other conduct by defendant's counsel at the hearing and following the hearing, for Magistrate Judge Brown to find that counsel should not have attempted to curtail the hearing in this manner and that it was "an effort to mislead the Court." That finding was obviously informed by the totality of

the circumstances as it relates to the failure to produce the initial report, as well as the manner in which the evidence unfolded at the hearing.

Given these findings, Magistrate Judge Brown was well within his discretion to impose both the monetary and evidentiary sanctions on defendant Wright and its counsel. The evidentiary sanction cannot be construed as an estoppel in violation of the Appropriations Clause, and both the evidentiary and monetary sanctions were within the scope of Magistrate Judge Brown's authority under Rule 37(b). In sum, as set forth in detail below, the factual findings and particular sanctions imposed are neither clearly erroneous, nor are they contrary to law. Accordingly, the November 7 Order is affirmed in its entirety.

## I. BACKGROUND

### A. Facts

In late October 2012, Hurricane Sandy left a trail of destruction along the East Coast. After the storm, many homeowners seeking to restore damaged or destroyed property sought legal relief against insurers who denied their claims. A panel of three Magistrate Judges in this District, in which more than a thousand such cases have been brought, has worked diligently to facilitate swift but fair resolutions of these claims, via a consolidated management approach to discovery and mediation.[3]

---

[3] *See* Case Management Order ("CMO") 1, ECF Dkt. No. 15 at 1-2 [hereinafter *CMO 1*] (discussing efforts of the Hurricane Sandy Committee (the "Committee"), consisting of three magistrate judges, to "ease the burden and expense upon the litigants and the Court" and streamline case management for the numerous consolidated hurricane-related cases in this District).

In the instant case, plaintiffs allege that their Long Beach property, covered under a flood insurance policy by defendant, was damaged in October 2012 by Hurricane Sandy-related flooding. (Complaint ¶¶ 1, 11-12.) According to plaintiffs, independent experts they hired to evaluate the property "determined and found conclusive evidence that the flood event critically damaged Plaintiffs' covered property." (*Id.* ¶ 15.) Defendant admits that there was damage to the dwelling by flood, for which it partially compensated plaintiff, but denies the allegations with respect to the extent of the damage. (Answer ¶¶ 11-14.)

1. *The Discovery Orders*

The plaintiffs' case, like all Hurricane Sandy-related cases, is subject to the case management orders ("CMOs") issued by the Committee covering discovery practices. The Committee issued CMO 1, ECF Dkt. No. 15, on February 21, 2014.

In CMO 1, the Committee ordered defendants to produce, among other documents:

> b. any documentation relating to an assessment of the claimed loss, including all loss reports and damage assessments, adjuster's reports, engineering reports, contractor's reports, photographs taken of the damage or claimed losses, and any other evaluations of the claim; . . .
>
> f. all expert reports and/or written communications that contain any description or analysis of the scope of loss or any defenses under the policy.

(CMO 1 at 9.) The Committee also stated that, "Counsel for each party is encouraged and expected to provide any information that

would be reasonably be helpful to their adversary in evaluating the case for mediation/arbitration purposes." (*Id.*)

The Committee further stated:

> Documents for which a privilege is properly asserted include communications between counsel and client, documents created in anticipation of litigation, communications between or among plaintiffs' counsel, and communications between or among non-insurer defendants' counsel, insurer defendants' counsel and their respective clients. *Documents routinely prepared in the ordinary course of business, including but not limited to adjusters' reports and other expert analyses, including draft reports, are not privileged and should be produced*.

(*Id.* at 10 (emphasis added).)

Subsequently, on April 7, 2014, the Committee issued CMO 3. (*See* ECF Dkt. No. 28.) In CMO 3, the Committee responded to a question from unspecified defense counsel as to whether expert reports had to be produced under CMO 1. (*Id.* at 9.) The Committee reiterated that its order meant that "to the extent that any such [expert] report was prepared prior to the issuance of this Order, such report must be produced immediately to opposing counsel." (*Id.*)

2. *Plaintiffs' Motion*

On September 26, 2014, well after discovery had concluded, plaintiffs filed a "Motion to Set Discovery Schedule and Set for Trial," ECF Dkt. No. 57, in which they made several allegations against Wright and its third-party engineering firm, USF, which

had performed the inspection and analysis of plaintiffs' Long Beach property for defendant. Plaintiffs allege that Wright and USF failed to produce all of the expert reports on which it had relied in denying their claim, namely those written by the USF engineer who had conducted the on-site examination, George Hernemar. (*Id.* at 2.) Plaintiffs further alleged that Hernemar informed them after defendant denied their claim that he had indeed written an engineering report, but it had come to the opposite conclusions, *i.e.*, that Hurricane Sandy flooding had broken the foundation of the home. (*Id.* at 2-3.) Hernemar allegedly told them that "he did not author a report that disclaimed causation from Sandy." (*Id.* at 2.) Moreover, plaintiffs alleged that he showed them a copy of his report as originally drafted, and allowed them to take cell phone photographs of a couple of the pages, including the cover, though he would not allow them to have a copy. (*Id.* at 3.)[4] The cover reflected a report dated December 9, 2012, but the first report plaintiffs received from defendant was dated January 7, 2013.

One of the potential implications of these allegations was that defendant's third-party engineer had originally drafted its analysis of plaintiffs' claim to conclude that storm flooding had indeed caused the damage, but that USF and/or Wright later modified or altered the report to provide defendant with the more favorable conclusion. In its response to plaintiffs' motion, defendant admitted the existence of this initial report and that it had not been disclosed during discovery, claiming ignorance as to its existence. (Response, ECF Dkt. No. 59 at 4-5.) Moreover, defendant blamed plaintiffs for failing to raise this issue to the Court and to defense counsel during discovery, out of a desire to use the existence of the conflicting report as a "'gotcha' moment" at mediation. (*Id.* at 2.)[5]

### 3. *The Evidentiary Hearing*[6]

Magistrate Judge Brown held a lengthy evidentiary hearing on October 16, 2014 to resolve the allegations about undisclosed draft reports and possible manipulations of the conclusion by defendant or USF. At the

---

[4] In their motion, plaintiffs alleged that the picture was of the report as displayed on a computer screen. (ECF Dkt. No. 57 at 3.) Exhibit 2 to the motion, however, clearly reflected a photograph of the physical report document. (ECF Dkt. No. 57-2.) At the hearing in front of Magistrate Judge Brown, counsel for plaintiffs stated that this statement in the motion was an error, and the picture was actually of the paper report observed during Hernemar's second visit to the property. (Tr. of Evidentiary Hr'g, Oct. 16, 2014 ["Oct. 16 Tr."], at 19.) Magistrate Judge Brown, after evaluating the credibility of the witnesses, credited plaintiffs' account. Defendant presents no basis for this Court to conclude that Magistrate Judge Brown's factual determination on that issue, which was collateral to his other legal rulings, was clearly erroneous.

[5] As discussed *infra*, at the December 17, 2014 oral argument on this motion, plaintiffs' counsel provided the Court with emails received as part of additional discovery disclosures after the November 7 Order. One email to the claims adjuster contained references to plaintiffs emailing and calling Jeff Moore, a Vice-President for Claims at Wright, to discuss the draft report they had seen. (*See* ECF Dkt. No. 115 (electronic filing of emails provided by plaintiffs).) On that basis, the Court ordered defendant to disclose any emails between Moore and plaintiffs, which it did on December 23, 2014. (*See* ECF Dkt. No. 122.) The emails, produced pursuant to the order, reflect that not only did plaintiffs alert Moore about the allegedly conflicting reports on January 28, 2013 via email, including a picture of the draft report, but Moore then quickly forwarded plaintiffs' email to Gary Bell of USF, stating: "We need to talk about this. I have a horrendous day today but maybe we can discuss around 5 or 6 my time? Ramey is the name on this file." (*See id.* at 1-2.)

[6] At the hearing, defendant was represented by McMahon Martine & Gallagher LLP.

hearing, defendant—through testimony by witnesses from USF, namely Hernemar and another engineer, Michael Garove—explained the existence of the conflicting draft report, and how the engineering "peer review" process led to the changes in the report and its conclusion.

In particular, Hernemar testified at the hearing that he inspected the damage at plaintiffs' property on December 4, 2012, and then wrote a "draft" report dated December 9, 2012 which he submitted to USF for peer review. (Oct. 16 Tr. at 65, 74-75.) That report was the same one plaintiffs later obtained, during Hernemar's follow-up inspection conducted at plaintiffs' property on January 25, 2013 after their claim had been denied. (*Id.* at 17-18.) The December 9, 2012 report concluded that the building on the property was structurally damaged by the storm flooding, causing a collapse of the foundation walls around the southwest corner of the building, and that a repair of the building was not economically viable. (*See* December 9, 2012 Report, ECF Dkt. No. 71-6.)

Hernemar testified that he subsequently had "open discussion" via telephone with another engineer at USF (an apparent reference to Michael Garove), who pointed out some flawed assumptions in the draft. (Oct. 16 Tr. at 59, 71.) As a result, Hernemar testified that he "rewrote" his report to arrive at the opposite conclusions—finding that the structural damage was due to "long-term differential movement of the building" and the supporting soils—and it was issued in its final form on January 7, 2013. (*Id.* at 75, 90; *see also* January 7, 2013 Report, ECF Dkt. No. 71-7.) Hernemar said repeatedly that he himself wrote both reports, and that no one else at USF had altered them. (*Id.* at 57-58, 90, 119.) Hernemar admitted that, although various observations of the property and conclusions about the structure had been removed from the report between drafts, he had not conducted another site visit during that interim period between December 9, 2012 and January 7, 2013. [7] (*Id.* at 70-71.) He also testified that he did not exchange emails with anyone at USF about the report on plaintiffs' property. (*Id.* at 90-91.) Instead, he rewrote the report based solely on his "open discussion" via telephone with a "peer reviewing engineer." (*Id.* at 71.)

After Hernemar testified, counsel for defendant stated that he now agreed that discovery should occur and he did not think he needed to call Garove, who was supposed to testify about the peer review process. (*Id.* at 119-20.) Both Magistrate Judge Brown and plaintiffs' counsel disagreed. (*Id.* at 120.) Defendant's counsel continued to assert that Hernemar's testimony had resolved the issues relevant to the hearing, and that "[Hernemar] wasn't required, he wasn't compelled, he wasn't really told to do anything. He adopted the opinions [in the January 7, 2013 Report]." (*Id.* at 121.)

_____

[7] For example, the December 9, 2012 Report stated that, "The crawl space could not be thoroughly inspected due to congestions of lose [sic] floor insulation hanging down, debris and a stark smell of undetermined petroleum products." (December 9, 2012 Report, ECF Dkt. No. 71-6 at 3.) The inaccessibility of the crawlspace was confirmed by Hernemar in his testimony. (Oct. 16 Tr. at 61, 107). The January 7, 2013 Report, however, provided a number of purported observations about the state of the underside of the building from within the crawlspace, such as that "the exposed soil was soft, wet and uneven" and "[d]eposits of waterborne debris were noted on the underside of the floor framing and the floor insulation was matted and fallen." (January 7, 2013 Report, ECF Dkt. No. 71-7 at 3). The USF witnesses were unable to rationally explain at the hearing how these statements could possibly be supported by Hernemar's inspection, when he was unable to enter the crawlspace.

Defense counsel then stated to the Court that:

> Mr. Garove will testify, and this is a representation to the court, is that, yes, he was the peer reviewer for the original report, the rough report of December, that his peer review, basically his peer review, he made suggestions and that the two engineers consult about the suggestions and that Mr. Hernemar could adopt or deny every single suggestion made and then the report is finalized.

(*Id.* at 123-24.)[8] Defense counsel then again argued that Garove's testimony would be duplicative of Hernemar's, stating,

> [Hernemar] testified clearly and unequivocally that those changes were part of the peer review process, that he agreed to those changes, and those changes were his and his opinion alone. So we are now getting far afield of what the reason for this hearing was, in my humble opinion, Judge, if we are putting on a witness to testify about the peer

review process that this witness already testified happened.

(*Id.* at 125.) Nonetheless, Magistrate Judge Brown granted plaintiffs' application to have Garove testify.

In his testimony, Garove confirmed that he was the USF engineer assigned to peer review Hernemar's December 9, 2012 Report. (*Id.* at 137.) He did not visit the property, nor was he certain as to whether he had inspected any of the other damaged homes nearby. (*Id.* at 129.) Further, Garove testified that USF's peer review process normally involves reviewing the initial report and any supplemental photographs, drawings, and so forth, and then evaluating "as a peer, as an engineer, the validity of what is being stated," in order to make "a final determination about whether or not the conclusions that are included within the report are accurate or in line with, you know, engineering knowledge." (*Id.* at 139.) Garove then would edit the draft report using track changes in Microsoft Word—including adding or subtracting individual observations based on the evidence provided, and altering the report's conclusions—and send a "redline" file showing those changes back to the inspecting engineer for finalization. (*Id.* at 139-40.)

Garove testified that this process occurred with respect to Hernemar's draft report on plaintiffs' property, and that he was the one who changed the conclusions as to the cause of the damage. (*Id.* at 145-47.) Indeed, the changes Garove made to the draft report were extensive, based on the track changes or redline file provided to the Court by defendant. (*See* "Letter to Judge Brown in Compliance with Court's Order Entered 10/31/14 Directing Certain Disclosure, and Attaching Same," ECF Dkt. No. 77-1.) Garove also included the

---

[8] The Court notes that, at the oral argument regarding this appeal on December 17, 2014, counsel for defendant averred that he had spoken neither to Hernemar nor to Garove about their testimony before the October evidentiary hearing, other than to discuss Hernemar's compensation for his appearance, in an attempt to avoid any appearance of coaching the witnesses, and stated that the representation was based on a conversation with counsel for U.S. Forensics. Garove also testified at the hearing that he did not prepare with defense counsel prior to the hearing. (Oct. 16 Tr. at 127.) However, when defendant's counsel made this proffer of Mr. Garove's anticipated testimony to Magistrate Judge Brown, he did not mention that it was not based upon his own interview of the witness, but rather a conversation with USF's counsel.

following comment, labeled "MPG1," in that redline:

> George:
>
> Please note the changes/comments within the report. Please noted [sic] that we don't theorize about damages. We observe, inspect and report damages to the building. In this case, we did not observed [sic] any damage from hydrostatic, hydrodynamic, buoyancy forces or scour or erosion of support soils that caused damage to the subject building or foundation.
>
> Please finalize this report and send to Donna for issue.
>
> Michael P. Garove, P.E.
>
> Partner

(*Id.* at 1.) Garove stated that, after emailing the edited report back to Hernemar, it appeared that Hernemar "adopt[ed] his conclusions completely," despite the fact that Garove did not recall ever communicating with Hernemar about his edits. (Oct. 16 Tr. at 146-47.) In fact, in response to Magistrate Judge Brown's question, Garove admitted it was fair to say that he was the author of the January 7, 2013 Report. (*Id.* at 156.) His name, however, does not appear anywhere in the final report, nor does the report reflect that it was peer reviewed or edited by someone other than the listed author.

After Garove's testimony, there was a discussion between the lawyers and Magistrate Judge Brown about a representative from Wright, who was at the hearing and also was prepared to testify. At the beginning of the hearing, defendant's counsel had identified the witness as Jeff

Moore. (*See id.* at 5 ("We also have Jeff Moore here, from Wright Flood, if your Honor deems testimony from the defendant necessary as well.").) Moore was being made available to testify that Wright does not receive any reports except the final report, from U.S. Forensic. During the hearing, after Magistrate Judge Brown suggested that all engineering reports should have been turned over by Wright under the discovery orders, counsel for Wright stated, "Judge, it [CMO 1] says the parties must produce that. The only two reports Fidelity had, and they are the parts in this case, were the two final reports sent them by USF, and those are the two reports exchanged." (*Id.* at 126; *see also id.* at 122 (counsel for defendant stating to the Court that only "finalized reports . . . were then submitted to the carrier. But the rough draft reports are not seen by the carrier, by my client. They see the final report….").) Thus, after Garove's testimony, counsel for defendant made the following representation to the Court regarding the substance of Moore's anticipated testimony:

> Judge, there is a witness from the insurance company who is prepared to offer testimony that he does not receive any report but the final report. But Mr. Garove testified to that, about the insurance company only getting the final report. And, in light of the fact that we have taken up a chunk of your day, I don't think it is necessary. But I defer to your Honor. If you want to hear from him, I am happy to call him.

(*Id.* at 167.; *see also id.* at 168 (defense counsel stating that defendant was resting "unless you [the Court] feel you want to hear from him [Moore] saying I only received the final report").) Based upon that representation, Magistrate Judge Brown

stated that he did not need to hear from Moore.[9]  (*See id.*)

### 4.  *The November 7 Order*

After considering the evidence, Magistrate Judge Brown issued the November 7 Order, finding that Wright's failure to disclose the draft report or the existence and effect of the peer review practices during discovery "unnecessarily complicate[d] and delay[ed] this action." November 7 Order at 23.  Importantly, Magistrate Judge Brown found that CMO 1, subsequently reinforced by CMO 3, ECF Dkt. No. 29 at 9-10, clearly mandated that all parties must disclose and produce any such draft engineering reports during discovery.  November 7 Order at 15-16. Magistrate Judge Brown ordered that: (1) defendants in *all* Hurricane Sandy cases subject to the CMOs must produce to the respective plaintiffs any drafts, redlines, etc. prepared by engineers, claims adjustors, or other agents or contracts "whether such documents are in the possession of defendant or any third party," if they had not done so already; (2) defendant Wright would be sanctioned for its conduct by being prohibited from supporting its case with any expert testimony from an engineer other than the original engineer examiner, George Hernemar; and (3) defense counsel would be sanctioned for its conduct by paying plaintiffs' counsel's reasonable fees and costs associated with the motion and the October 16, 2014 hearing.

### 5.  *The Motion for Reconsideration*

On November 21, 2014, Wright filed a motion for reconsideration of the November 7 Order.  In a Memorandum and Order, dated December 12, 2014, Magistrate Judge Brown denied the motion in its entirety. First, the Court rejected the argument that the evidentiary preclusion remedy constitutes an estoppel of a "fiscal agent of the United States" in violation of the Appropriations Clause.  Second, the Court adhered to its finding that defendant's counsel had unreasonably prolonged the litigation, did not reasonably respond to the allegations, and made a "shocking attempt to curtail inquiry during the hearing."  On that issue, Magistrate Judge Brown outlined the inconsistencies between the testimony of Hernemar and Garove and then explained:

> The dichotomy between the witnesses' accounts highlights one troubling aspect of the conduct by Wright's counsel. After Hernemar had given his misinformative account, but before Garove testified, counsel for Wright tried three times to end the hearing, representing to the Court that Garove would testify that "he made suggestions and that the two engineers consult[ed] about the suggestions."  Tr. 123-24 (arguing that Hernemar had "clearly testified that those were his opinions adopted by him following a peer review process").  Given the record at that point in the proceeding, counsel's argument, some of which was facially false, constituted an effort to mislead the Court.
>
> Other factors supporting the sanctions imposed include the failure of counsel to properly investigate the allegations and

---

[9] As noted *infra*, emails produced after oral argument before this Court on appeal demonstrate that Moore received a photograph of Hernemar's unaltered report in an email from plaintiff Raimey on January 28, 2013.  Thus, Moore was apparently prepared to testify that USF had never given him the initial report (and thus, at a minimum, imply that Wright did not have the initial report in its possession and had no knowledge of it), even though he actually was made aware of the existence of the initial report from plaintiffs prior to the lawsuit being filed, and even took action on it.

its overly aggressive defense of the peer review process in the aftermath of the hearing. On this last point, even after the hearing, counsel attempted to shield the redline version of the Garove Hernemar report under a cloak of work product privilege when the application of such privilege had been rejected by the Committee in February 2014. *Compare* DE [71] at 13-14 *and* Tr. 154-55 *with* CMO 1 at 10 ("expert analyses, including draft reports, are not privileged"); *see also* November 7 Order at 16-18 ("it is difficult to understand how counsel can assert work product in good faith").

December 12, 2014 Memorandum and Order, at 10-11 (footnote omitted).

Finally, as to the peer review process in this case, Magistrate Judge Brown noted that the initial report stated that the crawlspace could not be thoroughly inspected, and the revised report contained observations of the crawlspace to support the conclusions (even though no additional inspection of the crawlspace had been performed).[10] *Id.* at 11-12. In summary, on the "peer review" process in this case, Magistrate Judge Brown reiterated:

> The conclusion of the peer reviewed report flies in the face of all other evidence of record, such as the report of the independent adjustor, the report of the Building Commissioner for the City of Long Beach and the undisputed facts that the dwelling became uninhabitable and was razed. Wright continues to argue that, in theory, the house sustained limited damages, while in reality, it was damaged beyond repair.

*Id.* at 13.

### 6. *Oral Argument on Appeal*

On December 17, 2014, this Court held oral argument on Wright's appeal of Magistrate Judge Brown's decision. During the argument, counsel for Wright emphasized that Wright did not have the initial Hernemar report. (*See* December 17, 2014 Tr. at 14 ("So Wright Flood didn't have it, and it didn't come to my office in the claims file."); *see also id.* at 20 ("Your Honor, plaintiffs' counsel were the only ones who had all three reports. My client didn't. We have the two final reports. They had both those in the CMO process and they had this photograph of the first draft. They had more information than we did.").) Similar arguments were made in the written objections. (*See* Def. Wright's Objections, ECF Dkt. No. 95 at 1 n.5 ("Indeed, neither Wright nor Wright's counsel was aware of the process by which USF peer reviewed its reports until Wright's counsel were informed by Mr. Demmons, counsel for USF, within just days before the hearing."); *see also id.* at 2 (noting that it was undisputed that U.S. Forensics did not provide the initial report to Wright).)

However, during the oral argument, plaintiffs' counsel submitted to the Court emails which had recently been produced to plaintiffs by defense counsel in the wake of the November 7 Order. The submission included emails from Deborah Raimey to the claims adjuster hired by Wright (David Maxime). Plaintiff Raimey's emails from January 26, 2013 to Maxime provided, *inter alia*, photographs of portions of the initial report and the following statement in all capital letters:

---

[10] The Court also referenced plaintiffs' assertion that the "observations" by Garove that were added to Hernemar's report appear nearly verbatim in 28 other reports purportedly authorized by a dozen different engineers. *Id.* at 12.

REPORT WE RECEIVED FOR 24 MICHIGAN – VERY DIFFERENT THAN THE ORIGINAL WHICH LEADS US TO BELIEVE THAT THIS REPORT WAS FALSIFIED, AND WE WILL CONTINUE TO PURSUE THIS WITH THE INSURANCE COMPANY, US FORENSIC. AND OTHERS. SOMEONE NEEDS TO BE HELD ACCOUNTABLE FOR THIS. WE ARE VICTIMS OF A HURRICANE, DISPLACED FROM OUR HOME AND HAVING TO DEAL WITH THIS IN ADDITION.

(ECF Dkt. No. 115-1.) A subsequent email was sent by plaintiff to Maxime on February 5, 2013, stating the following:

Hi David,

Please let me know if you have heard anything about 24 Michigan St. I have called the VP of claims, Jeff Moore, 3 times now and have also emailed him. He was to get back to me within 24 hours after we spoke, which was last Monday. There is something definitely wrong here. We are not going to cash that check for Michigan. It is obvious that something is going on, since no one will get back to us about this engineer's report and our questioning of the changes. Is it time to hire a lawyer? Please let me know if you have heard anything, or can find out anything for us.

(ECF Dkt. No. 115-2.) Plaintiffs' counsel argued that these emails demonstrated that Wright, contrary to representations to the Court, knew about the initial Hernemar report as early as January 26, 2013.

In rebuttal, defendant's counsel noted that the email went to the adjuster, and not Wright: "[T]his email. That went to Colonial Claims, the independent adjusting

company. That didn't go to my client. There is still no evidence before you that this thing ever made its way into the claims file, and made it to my associate, and then to local counsel." (December 16, 2014 Tr. at 76-77.)

Given this additional information at the oral argument, and the reference in plaintiff's email to contact with Jeff Moore, the Court directed that Wright produce to opposing counsel and the Court any emails in its possession between Mr. Moore and plaintiffs. The Court also asked that U.S. Forensic produce any emails between Hernemar and Garove regarding the property at issue in this case.

7. *Post-Argument Documents*

On December 23, 2014, counsel for Wright and counsel for U.S. Forensics produced additional emails pursuant to the Court's direction.[11]

Among the documents produced by Wright was an email, dated January 28, 2013, from plaintiff to Mr. Moore which attached a photograph of the portion of the initial Hernemar report (that plaintiff had obtained) and the following statement: "Mr. Moore, Thank you for speaking with me today, Monday, January 28, 2013. I appreciate that you will look into our concerns about our property at 24 Michigan St. in Long Beach, NY. I will send pictures for you to look over." (ECF Dkt. No. 122-

---

[11] Counsel for Wright also noted the following in his letter: "In searching his email records, Mr. Moore has located other documents that do not constitute correspondence with the plaintiffs, which were not contained in the claim file but which relate to the Raimey claim. All such documents will be produced to counsel for plaintiffs as a supplement to the production previously made pursuant to CMO #1." (ECF Dkt. No. 122.)

1.) Above the photograph of the conclusions of the initial report, plaintiff wrote in the email: "ORIGINAL REPORT SUBMITTED BY GEORGE, THE ENGINEER." (*Id.*) Mr. Moore, the Vice President of Claims at Wright, forwards the email within an hour to Gary Bell at U.S. Forensic stating: "We need to talk about this. I have a horrendous day today but maybe we can discuss around 5 or 6 my time? Ramey is the name on this file." (ECF Dkt. No. 122-1.)

### B. Procedural History

Plaintiffs commenced this action on January 21, 2014. Defendant answered the complaint on March 30, 2014.

The evidentiary hearing in front of Magistrate Judge Brown regarding the draft report at issue occurred on October 16, 2014, and the resultant order was issued on November 7, 2014. Defendant Wright, as well as numerous other defendants in Hurricane Sandy cases, filed motions for reconsideration of the order on November 21, 2014. The Hurricane Sandy Committee issued an opinion denying the motion to reconsider with respect to the broader case management issue on December 8, 2014. Magistrate Judge Brown issued a separate opinion denying the motion to reconsider with respect to the issues specific to this case on December 12, 2014.

Defendant filed the pending objections to Magistrate Judge Brown's November 7 Order also on November 21, 2014. Plaintiffs filed their opposition to both on December 1, 2014. USF filed its *amicus curiae* brief in support of defendant on December 1, 2014, and plaintiffs filed their opposition to that brief on December 15, 2014. The Federal Emergency Management Agency ("FEMA") also filed an appeal of Judge Brown's order with respect to

defendants' duty to disclose draft reports, but withdrew it at the oral argument on December 17, 2014.[12] The Court heard oral argument on December 17, 2014.

On December 19, 2014, plaintiffs filed a motion requesting an order to show cause hearing "as to why [defendant] should not be further sanctioned for its blatant and continued violations of this Court's orders and for material misrepresentations made to the Court." (ECF Dkt. No. 119-1 at 1.) In the memorandum of law in support of that motion, plaintiffs' counsel traces the chronology of events regarding plaintiffs' insurance claim, and various documents related thereto, and argues the following:

On February 11, 2013, Jeff Moore finally emails Ms. Ramey and attaches copies of the January 7th and January 28th reports, purporting to contain the engineers seal and signature. However, a cursory analysis of the reports forwarded by Mr. Moore shows that the original report had been manipulated to fraudulently attach Hernemar's seal and signature from December 28th report to the January 7th report. A simple review of the two signatures on the cover pages of the December 28th and January 7th reports shows that the signatures are identical. In an email change beginning on January 27, 2013 between Hernemar and Gary Bell of U.S. Forensic, it becomes readily apparent that they are

---

[12] FEMA is not a party to this action, but is a defendant in approximately ninety other Hurricane Sandy cases, and has interests at stake in this case because of its responsibility for underwriting the losses of participating WYO carriers such as defendant. FEMA withdrew its appeal because, as discussed *supra*, it no longer wished to challenge the interpretation of the CMOs and the disclosure duties of all defendants, and believed that it was in substantial compliance as of the oral argument date.

14

simply swapping pages between reports to give the false impression that Hernemar had previously signed and sealed the January 7th report. However, Hernemar never signed the January 7th report, it was not contained in his file at the October 16, 2014 hearing, and Hernemar did not produce the January 7th report in response to the Attorney General's subpoena.

(*Id.* at 7-8 (footnotes and citations omitted.).)

On December 23, 2014, counsel for Wright and counsel for USF produced additional emails pursuant to the Court's direction at the oral argument. On December 23, 2014 counsel for plaintiffs submitted a letter to the Court noting, among other things, that "[t]he emails produced by USF today as Exhibits 1 through 4 to its letter have *never* been previously produced to Plaintiffs, and are clearly responsive to the Court's previous orders and directives." (ECF Dkt. No. 121.) On December 23, 2014, counsel for Wright filed a letter containing various arguments in light of the supplemental productions to the Court.

On December 24, 2014, plaintiffs' counsel filed a supplemental memorandum in support of the motion requesting an order to show hearing based upon additional documents provided to the Court on December 23, 2014. On December 26, 2014, counsel for Wright submitted a letter responding to plaintiffs' motion for an order to show cause hearing, and seeking to have the Court direct that plaintiffs' counsel produce documents to defendant pursuant to the discovery orders. On December 30, 2014, plaintiffs' counsel responded to the arguments regarding plaintiffs' production of documents pursuant to the discovery orders.

The appeal of the November 7 Order is fully submitted, and the Court has fully considered the submissions and arguments of the parties, as well as *amicus curiae*.[13]

## II. STANDARD OF REVIEW

This Court may reverse a magistrate judge's order on a nondispositive pre-trial matter only if the order is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); *see Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990) ("A magistrate . . . may issue orders regarding nondispositive pretrial matters. The district court reviews such orders under the 'clearly erroneous or contrary to law' standard."). "An order is 'clearly erroneous' only when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Weiss v. La Suisse*, 161 F. Supp. 2d 305, 321 (S.D.N.Y. 2001) (internal citation and quotation marks omitted). "An order is 'contrary to law' when it fails to apply or misapplies relevant statutes, case law or rules of procedure." *Id.*

Discovery matters are generally considered nondispositive of the litigation. *Thomas E. Hoar*, 900 F.2d at 525; *Zaratzian v. Abadir*, No. 10-CV-9049 (VB), 2012 WL 9512531 at *7 (E.D.N.Y. May 23, 2012) (citing *Caidor v. Onandaga Cnty.*, 517 F.3d 601, 605 (2d Cir. 2008)). Sanctions which are not "case-dispositive," such as striking pleadings such that the cause of action must be dismissed, are also generally considered nondispositive. *Thomas E. Hoar*, 900 F.2d at 525. Accordingly, this Court reviews the

---

[13] The Court does not address in this appeal the post-argument motions to the Court, including the request by plaintiffs for an order to show cause hearing. The Court refers these new motions to Magistrate Judge Brown for his consideration.

November 7, 2014 Order under the "clearly erroneous or contrary to law" standard.

## III. DISCUSSION

Defendant Wright raises five objections to the November 7 Order: (1) the Order wrongly sanctions Wright by estopping it from presenting expert evidence in the future other than Hernemar's, because defendant is a WYO carrier appearing in its capacity as a federal "fiscal agent" under the National Flood Insurance Program ("NFIP") as administered by FEMA; (2) the Order wrongly sanctions defendant for delaying the litigation by not complying with the discovery order, because the Order misinterprets what CMO 1 and CMO 3 required parties to disclose; (3) the Order wrongly finds that defendant's response to the allegations about non-compliance with the CMOs was "unreasonable;" (4) the Order wrongly finds that defense counsel made a "shocking attempt to curtail inquiry during the hearing," leading to Magistrate Judge Brown sanctioning defense counsel with payment of plaintiffs' costs and fees associated with plaintiffs' motion; and (5) the Order fails to identify any professionally impermissible conduct or demonstrably erroneous conclusions with respect to the peer review process.

These objections can be consolidated as concerning two primary issues: whether the November 7 Order properly interpreted the CMOs as requiring the disclosure of draft expert reports subject to the peer review process (the second and fifth objections); and whether the Rule 37 sanctions imposed by Magistrate Judge Brown were appropriate (the first, third, and fourth objections). The Court addresses these issues in turn.

### A. The Interpretation of the CMOs with Respect to Draft Reports

As an initial matter, the Court concludes that the plain language of the CMOs could not be clearer: defendants were ordered to produce "any documentation relating to an assessment of the claimed loss, including all loss reports and damage assessments, adjuster's reports, engineering reports. . . ." and "all expert reports and/or written communications that contain any description or analysis of the scope of loss or any defenses under the policy." (CMO 1 at 9). "Any documentation" included draft reports written by engineers. In fact, the same document later explained, unequivocally, "Documents routinely prepared in the ordinary course of business, including but not limited to adjusters' reports and other expert analyses, *including draft reports*, are not privileged and should be produced." (*Id.* at 10 (emphasis added).) To the extent that defendant suggests that the Committee itself did not interpret the CMOs in that manner, the Court disagrees. The Committee has reiterated that the scope of the CMOs' required disclosures included draft engineering reports. [14] *See In re Hurricane*

---

[14] Defendant argues that the Committee contradicted itself when it issued CMO 8, ECF Dkt. No. 42, and CMO 10, ECF Dkt. No. 58, in that these orders suggested that plaintiffs did not have to disclose documents possessed by third parties on the subject of repair costs, such as receipts, invoices, etc., held by third party contractors. This argument is incorrect. In CMO 8, the Committee stated that to avoid the disclosure requirement, plaintiffs would have to demonstrate in their formal discovery responses why the documents were not "in their possession, custody or control," and defendants were thereby authorized to subpoena the documents themselves from the third party contractors. (CMO 8 at 4, 7.) As discussed *infra*, the draft reports are not outside defendant's control. In CMO 10, the Court further addressed those subpoenas for repair costs and estimates, because defendants in four cases had issued subpoenas to third parties "seeking all

*Sandy Cases*, No. 14 MC 41, 2014 WL 7011069 (E.D.N.Y. Dec. 11, 2014).

Indeed, at the December 17, 2014 oral argument, defendant (as well as FEMA, while withdrawing its appeal of the November 7 Order) appeared to retreat from asserting that draft reports were not subject to disclosure under the CMOs. Instead, defendant argues that it was aware drafts in its own files had to be produced, but not aware that it had to produce files held by third parties, *i.e.*, USF, the engineering firm retained by defendant to evaluate plaintiffs' property. Defendant points to the discussion of draft reports at the February 5, 2014 Hurricane Sandy Committee hearing where the groundwork was laid for the issuance of CMO 1. Defendant argues that the issue of third party possession of draft reports was raised by the parties at the hearing, when defense liaison counsel stated:

> On the drafts of engineers reports, one of the things that we struggled with the plaintiffs' bar in the meetings was you need initial disclosures. Are each side going to just produce the initial disclosures of what the client or counsel possesses, or do they have to go get third-party files like contractors, engineers, estimators, adjusters, and what not? And so, we can do it either way, it just has to be even and clearly spelled out.

---

documents in their files relating to the properties at issue." (CMO 10 at 1-2.) The Committee, adopting Magistrate Judge Pollak's reasoning, stated that such subpoenas had to be tailored to their purposes, *i.e.*, obtaining repair cost-related documents, rather than demanding every document in a third party's file, relevant or not. These orders do not relate to defendant's situation.

(Tr. of Evidentiary Hr'g, Feb. 5, 2014 ["Feb. 5 Tr."], at 64-65.) Plaintiffs' liaison counsel added: "Your Honors, if we're going to go the more expansive route then 90 days is not going to be sufficient." (*Id.* at 65.) Defendant argues that because CMO 1 ordered automatic disclosures to be completed in 60 days, and it did not expressly state that parties must collect the files of engineers, adjusters, and other third parties, the CMO did not require disclosure of draft reports held by third parties.

These arguments are unavailing. The fact that the discovery deadline was shorter than requested does not belie the obvious meaning of the plain language. The CMO required draft reports be disclosed, and—as shown by the discussion at the hearing cited by defendant—all the parties were aware that third party engineers might possess those drafts. Federal Rule of Civil Procedure 34 provides that parties shall "produce" documents "in the responding party's possession, custody, and control." Control for the purposes of discovery is broadly defined, and includes situations where the party "has the practical ability to obtain the documents from another, irrespective of his legal entitlement to the documents." *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 (S.D.N.Y. 1992) (citations omitted); *see also Arkwright Mut. Ins. Co. v. Nat'l Union Fire Inc. Co. of Pittsburg, Pa.*, 90 Civ. 7811 (AGS) 1994 WL 510043 at *3 (S.D.N.Y. Sept. 16, 1994) (control includes the "legal right or practical ability to obtain [documents] from another source on demand."). Here, the draft reports were in the possession of USF, defendant's retained engineering experts. Defendant has offered no proof whatsoever that it did not have the practical ability or, if required, the legal right to obtain the documents from USF. Indeed, defendant was able to "secure" the attendance of USF employees at the October 16, 2014 hearing for the

purposes of testimony on the record without a subpoena – the Court therefore finds it hard to countenance (nor is it alleged by defendant) that, as part of the standard relationship between an insurance company and its engineering consultant, documents are not shared as a matter of course at the company's request. The level of control in this case is no different than, for example, the control one maintains over documents prepared by one's retained accountants or bankers. S*ee, e.g.*, *De Vos v. Lee*, No. 07-CV-804 (JBW), 2008 WL 2946010 at *1 (E.D.N.Y. July 29, 2008) ("documents in the possession of a party's accountant are deemed within that party's control for purposes of Rule 34 discovery"); *Zervos v. S. S. Sam Houston*, 79 F.R.D. 593, 595-96 (S.D.N.Y. 1978) (party subject to disclosure order is considered to be in control of banking records not in his physical possession). Therefore, it was eminently reasonable for the Committee to expect that the parties would comply with its discovery orders in accordance with the Federal Rules of Civil Procedure, and produce any responsive documents within their control.[15] Defendant's arguments do not demonstrate that the November 7 Order's interpretation

of the CMOs is clearly erroneous or contrary to law.

In any event, as discussed *supra*, Wright's argument that the initial Hernemar report was only in the possession of third party USF, and that Wright had no ability to know of its existence, is further undermined by the post-oral argument disclosure of additional emails which make clear that plaintiffs sent an email with a photograph of a portion of the initial report to Wright's Vice President of Claims (Jeff Moore) on January 28, 2013. Thus, any reasonable inquiry into the documents in the possession of Wright would have revealed the existence of the initial report (including emails related to the report), and the report and related documents could have been easily retrieved and produced pursuant to the CMOs.

Defendants and USF as *amicus curiae* seemingly ascribe Magistrate Judge Brown's interpretation of the CMOs to a misunderstanding of the engineering peer review process. Both attempt to argue that, even after Magistrate Judge Brown's inquiry into whether Wright violated the discovery order and disclosure of the draft report/redline on plaintiff's property was made, no professional misconduct on the part of USF or Wright has been identified. The November 7 Order is decried as a misunderstanding of the necessity and validity of the peer review process in engineering and other fields.

This argument misses the point. This Court does not hold that the peer review process as a methodology is unsound, flawed, or fraudulent. To the extent that any aspect of the November 7 Order could be read to imply that, this Court makes clear that the concept of peer review is not being placed into question by this Court. Further, this Court is not holding that an individual peer review resulting in a change of

---

[15] Defendant argues that not a single plaintiff or defendant interpreted the CMOs to require disclosure of drafts held by third parties. The Court doubts this is the case—especially given CMOs 8 and 10, discussed *supra*, where clearly some plaintiffs argued that the required third party documents were outside their control and the Committee allowed defendants to issue subpoenas—but even if it were, wishful "group think" by similarly situated parties is not an excuse for ignoring the CMOs' plain language and the Federal Rules of Civil Procedure. To the extent that defendants in other cases, many of whom filed motions for reconsideration of the November 7 Order that the Committee denied, argue that the November 7 Order should be limited in its applicability to Wright alone, that argument is unavailing because the CMOs themselves are applicable to all Hurricane Sandy defendants.

conclusions from the original draft is inherently wrong or fraudulent. In some cases, it well may be that the initial examiner made mistakes that should be corrected upon review.

What the CMOs, the November 7 Order, and now this Court all demand is transparency into the engineering peer review process via discovery, so that plaintiffs can examine and challenge their claims determinations on a case-by-case basis. In this case, Magistrate Judge Brown found it incontrovertible that Garove removed observations made by Hernemar about plaintiffs' property and substituted contradictory or highly misleading observations in their place.[16] He also found that Garove changed the final conclusions of the report based, at least in part, on those

misleading observations. Garove in fact admitted that he was the one who "rewrote" the report, but his name did not appear anywhere on it as a peer reviewer, let alone as an author. Magistrate Judge Brown's findings regarding the flawed "peer review process" in connection with plaintiffs' property in this case are certainly not erroneous. Obviously, without visibility into the peer review process, plaintiffs would be at a significant disadvantage in pursuing their claims.

This Court concludes that the unprincipled nature of the peer review process in this particular case, as applied to plaintiffs' property, is apparent to even the layperson.[17] This Court is, to be clear, not referring to the peer review process concept in general in the insurance industry, but rather only the manner in which this particular report was reviewed and modified was flawed and unprincipled, and the concealment of that process was in violation of the discovery orders. As discussed below, that violation was further compounded by the conduct of counsel at the evidentiary hearing itself. Again, the need to follow the CMOs and provide transparency into the claims process is crucial to a fair litigation of the plaintiffs' claims in all Hurricane Sandy cases.

Accordingly, defendant's appeal with respect to Magistrate Judge Brown's

---

[16] For example, as Magistrate Judge Brown noted, the December 9, 2012 Report stated that, "The crawl space could not be thoroughly inspected due to congestions of lose [sic] floor insulation hanging down, debris and a stark smell of undetermined petroleum products." (December 9, 2012 Report, ECF Dkt. No. 71-6 at 3.) The inaccessibility of the crawlspace was confirmed by Hernemar in his testimony. (Oct. 16 Tr. at 61, 107.) The January 7, 2013 Report, however, provided a number of purported observations about the state of the underside of the building from within the crawlspace, such as that "the exposed soil was soft, wet and uneven" and "[d]eposits of waterborne debris were noted on the underside of the floor framing and the floor insulation was matted and fallen." (January 7, 2013 Report, ECF Dkt. No. 71-7 at 3.) Similarly, Garove modified the report to remove Hernemar's reference to a "deposit of sand" around the foundation walls of the home and his conclusion that "[f]or the definite determination of the cause of the slope of the floor and the leaning of the walls, the sand along the west and south perimeter of the building had to be removed and maybe also a part of the south west floor has to be opened up." (*See* Redline, ECF Dkt. No. 77-1 at 7.) Instead, Mr. Garove, in support of the new conclusions, stated in the modified report (which Hernemar accepted) that "no evidence" was observed of damage to the foundation components. (*Id*. at 6.)

[17] Magistrate Judge Brown also expressed a concern that this flawed version of peer review may be widespread. Obviously, the precise scope of any such unprincipled or deceptive practices, in the guise of peer review, will be revealed by the discovery of the draft reports required in all the Hurricane Sandy cases.

interpretation of defendant's discovery obligations is denied.[18]

## B. Sanctions

Courts are empowered to issue "just orders" if a party "fails to obey an order to provide or permit discovery," to include such sanctions as "prohibiting the disobedient party from supporting or opposing designated claims or defenses. Fed. R. Civ. P. 37(b)(2)(A), (b)(2)(A)(ii). Rule 37(b)(2)(C) further allows courts to "order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." The district courts have broad discretion to impose sanctions under Rule 37(b)(2), because the Rules are intended to allow discovery to proceed without the delay and costs caused by constant court involvement, and "[w]hen a party seeks to frustrate this design by disobeying discovery orders, thereby preventing disclosure of facts essential to an adjudication on the merits, severe sanctions are appropriate." *Daval Steel Products, a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1365 (2d Cir. 1991) (citations omitted); *see also Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002) (noting that Rule 37(b) provides for sanctions for violations of discovery orders, in addition to courts' inherent power to impose sanctions for misconduct in discovery); *Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 321-22 (S.D.N.Y. 2008) ("Courts in this circuit have often awarded attorneys' fees to sanction a party who disregards her discovery obligations.") (citations omitted).

In this case, Magistrate Judge Brown in the November 7 Order imposed sanctions on both defendant and its counsel for violating the CMO in combination with the conduct that occurred at the hearing. Defendant is barred from supporting its defenses or opposing plaintiffs' claim with any expert testimony other than Hernemar's, or producing, relying on, or creating any new expert reports. Defendant's counsel is responsible for plaintiffs' counsel's reasonable costs associated with the motion for discovery including the hearing and related briefing, because of "discovery failures by defendant's counsel, the unreasonable response by defendant to the allegations, and counsel's shocking attempt to curtail inquiry during the hearing." November 7 Order at 24-25. Defendant now makes several arguments as to why Magistrate Judge Brown's decision to impose sanctions was clearly erroneous and contrary to law. The Court disagrees, and affirms the sanctions.

### 1. *Rule 37(b)(2)(A)(ii) Sanction Against Further Expert Testimony*

Defendant argues that because it appears in this case in its capacity as a "fiscal agent[] of the United States" under 42 U.S.C. § 4071(a)(1), the Court cannot sanction it by estopping the presentation of further expert testimony. Such a sanction, according to defendant, violates the Appropriations Clause of the United States Constitution. Defendant mostly cites as support inapposite cases, such as *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 426 (1990), which

---

[18] To the extent the November 7 Order reiterating the import of the CMOs was directed only at defendants, the Committee's opinion denying the motions for reconsideration cured any defect by noting that the language regarding draft reports in the CMOs was mutual, and plaintiffs too are charged with disclosing any drafts within their control. *See In re Hurricane Sandy Cases*, No. 14 MC 41, 2014 WL 7011069 at *4 (E.D.N.Y. Dec. 11, 2014).

deal with sanctions granting "a money remedy that Congress has not authorized." *See also Jacobson v. Metropolitan Prop. & Cas. Ins. Co.*, 672 F.3d 171, 177 (2d Cir. 2012) (finding it "questionable" whether the doctrine of repudiation applies in the context of NFIP policies); *Gunter v. Farmers Ins. Co., Inc.*, 736 F.3d 768, 774 (8th Cir. 2013) (estoppel cannot be used to compel the government to pay out treasury funds beyond congressional appropriations limits). Although a single case cited by defendant, *Richardson v. American Bankers Ins. Co. of Florida*, 279 Fed.Appx. 295, 299-300 (5th Cir. 2008), stands for the somewhat more relevant proposition that an NFIP insurer cannot be estopped from raising a proof of loss defense, the evidentiary sanction against Wright in this case cannot in any way be construed as estopping defendant from asserting one of its defenses.

To the contrary, defendant's sanction merely limits it under Rule 37(b)(2)(A)(ii) to presenting the ample expert testimony it already possesses in support of its defense. Under Second Circuit precedent, the government and its agents can be subjected to non-monetary evidentiary sanctions under Rule 37(b) such as this one. *See In re Attorney General of United States*, 596 F.2d 58, 65-66 (2d Cir. 1979) (evidentiary or issue-related sanctions should be considered before holding the Attorney General in contempt), *cert. denied*, 444 U.S. 903, 100 S.Ct 217 (1979); *Wahad v. F.B.I.*, 813 F. Supp. 224, 227-28 (S.D.N.Y. 1993) (imposing "issue-related" sanctions under Rule 37(b), specifically the establishment of facts for the purposes of the action, on the government defendants for failing to obey discovery orders); *National Lawyers Guild v. Attorney General*, 94 F.R.D. 600, 615 (S.D.N.Y. 1982) ("Rule 37(b) provides a court with wide discretion in selecting an appropriate sanction. Fines and costs may be imposed, even against the United States, the offending party may be precluded from offering proof on particular issues, and, in an appropriate case, judgment may be entered against the offender.").

The November 7 Order does not assess the most severe sanctions, such as striking a pleading or preventing Wright from asserting a defense; instead, it takes the measured step of preventing Wright from further supplementing its defense with expert testimony beyond what it already possesses. The sanction is narrowly tailored to the purpose of preventing defendant from further delaying the proceedings by engaging in further expert discovery, because of the prejudice caused to plaintiffs by the failure to comply with the CMOs. *See Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979) (Rule 37 issue-related sanctions serve the purpose of "ensur[ing] that a party will not be able to profit from its own failure to comply."). Accordingly, the evidentiary sanction does not constitute an estoppel in violation of the Appropriations Clause.

In sum, defendant has not demonstrated that the evidentiary sanction against it was contrary to law.

## 2. *Monetary Sanctions*

Defense counsel makes several arguments with respect to the monetary sanctions as to why counsel should not be penalized for violating the discovery order and for the subsequent conduct. These arguments are addressed in turn and, as discussed below, this Court finds no error (much less clear error) in Magistrate Judge Brown's findings, or the exercise of his discretion to impose monetary sanctions based upon this findings.

Counsel for defendant first argues that it should not be singled out and sanctioned for discovery violations based on a misunderstanding of the CMOs because, it alleges, all the attorneys for defendants in the other hundreds of Hurricane Sandy cases had the same misunderstanding, and all failed to disclose documents such as drafts created by third party engineers. As discussed *supra*, the allegation that others also ignored the CMOs' obvious plain language does not mitigate the violation, especially given the circumstances surrounding the violation in this particular case (including the conduct at the evidentiary hearing) and the prejudicial impact the violation had on plaintiffs. Furthermore, as evidenced by the discussion at the February 5, 2014 hearing counsel referenced in the briefing, all parties and their attorneys were aware that third party engineers might possess drafts of engineering reports.

Federal Rule of Civil Procedure 26(g)(1) requires attorneys to make a "reasonable inquiry" to ensure a discovery response is complete and correct. The Court agrees with Magistrate Judge Brown that counsel failed this duty, because merely asking Wright for its own file on plaintiffs' claim was an insufficient inquiry given the language in the CMO. As stated above, counsel was aware that USF might have drafts of engineering reports, and there is no evidence to suggest that USF's files could not be easily requested. Moreover, as discussed in *supra* note 3, the emails defendant disclosed on December 23, 2014, well after Magistrate Judge Brown issued his opinion, reflect that defendant was well aware of a possible conflicting draft report in the case at bar because plaintiffs notified Moore, defendant's Vice-President of Claims, directly on January 28, 2013, and attached a photograph of the initial report. The Court is now unsure whether defense counsel even reasonably investigated into their own client's documents (including emails), let alone made reasonable inquiry to third parties under the client's control.

Additionally, separate from the draft report issue, CMO 1 demanded "all . . . photographs taken of the damage or claimed losses." (CMO 1 at 9.) The final USF report, which both Wright and counsel admit to having received, stated that it only contained "representative photographs," and that "photographs taken but not included in the report are available upon request." (January 7, 2013 Report, ECF Dkt. No. 71-7 at 5.) Not obtaining the additional photographs from the preparers of the report was yet another clear violation of the CMO.

Defense counsel similarly argues that it should not be sanctioned for failing to disclose the draft report when plaintiffs had knowledge of its existence since January 25, 2013, whereas Wright and defense counsel allegedly did not know the December 9, 2012 report existed. While this argument is entirely negated by the emails between Moore and plaintiffs, Magistrate Judge Brown did not have the benefit of that information, and limited the timeframe of the monetary sanction to the period after the September 26, 2014 motion because he believed that plaintiffs knew there was a discrepancy with respect to the engineering report and did not raise it with the Court or defense counsel prior to the September 26, 2014 motion. *See* November 7 Order at 24-25. This consideration mitigates the sanction on counsel such that this objection is not warranted.

In any event, defense counsel is not being unfairly targeted in a manner contrary to law or factually erroneous because the sanctions are based on more than just the failure to obey the CMOs' requirements. Counsel aggravated the initial violation by

its unreasonable response to plaintiffs' motion for discovery, including the conduct at the October 16 hearing.

Defense counsel argues in response that there was no attempt to curtail the testimony at the hearing in front of Magistrate Judge Brown, and further argues that, even if there were, such conduct is not sanctionable because any conduct at the hearing was not in violation of any discovery order.

This argument is inconsistent with both the facts and the law.[19] First, it is plain from the record that counsel made a significant misrepresentation to Magistrate Judge Brown with respect to the content of Garove's testimony. In explaining why he believed the hearing should end without Garove testifying, defense counsel stated, "Judge, my feeling is that, based on the testimony this morning and based on the reason for this hearing, the hearing is resolved. The witness clearly testified that those were his opinions adopted by him following a peer review process; that he wasn't required, he wasn't compelled, he wasn't really told to do anything. He adopted the opinions." (Oct. 16 Tr. at 121.) Counsel then made a "representation" to the court that Garove would testify that he made "suggestions" to Hernemar on the report, and then "the two engineers consult [sic] about the suggestions." (*Id.* at 124.)

In fact, Garove's testimony, as summarized in detail *supra* and by Magistrate Judge Brown, presented a starkly contrasting version of the peer review process than Hernemar's, a version that also directly contradicted counsel's representation to Magistrate Judge Brown. It is, frankly, irrelevant whether or not counsel made that misrepresentation out of a knowing attempt to prevent harmful testimony or, as averred at oral argument, out of ignorance because counsel had never directly conferred with Garove about the content of his testimony.[20] Neither reflects an adequate rationale for making evidently false statements to the Court. Moreover, Hernemar never mentioned the existence of a redline document; had Garove not testified, the existence of that additional (and crucial) document and Garove's admonition to "note" the changes and

---

[19] As a threshold matter, the Court disagrees with the argument by Wright that the evidentiary hearing was somehow limited to whether there was an alteration of initial report without the author's consent and, thus, Magistrate Judge Brown's inquiry should have ended once Mr. Hernemar testified that he agreed to the changes. First, the fact that Hernemar gave that testimony is certainly not dispositive of that issue. The Court has every right to hear the testimony of other relevant witnesses, including Mr. Garove, on that issue. Second, the hearing was not limited to the issue of unauthorized alteration of the report (although that allegation was made by plaintiffs' counsel). Instead, Magistrate Judge Brown made clear that the entire circumstances surrounding changes between the undisclosed initial report and the report produced in discovery. (*See* Electronic Order, No. 14-CV-461(JFB)(SIL)(GRB), Oct. 1, 2014 ("Counsel for the parties will ensure that Mr. George Hernemar will be present in person to testify about the preparation and submission of the report and related matters. Counsel for defendants will also produce any other necessary witnesses to explain, as appropriate, any differences between the purported original report and the report ultimately produced in discovery.").)

[20] Counsel argued at oral argument about what was intended by defense counsel's use of the word "consult" at the October 16, 2014 hearing. Defense counsel argued that the word in isolation could encompass Garove's account of the peer review process as well. Given the context of Hernemar's testimony about "open discussion" and telephone conversation(s) immediately preceding these representations, defense counsel, in arguing that Garove's testimony would be repetitive, clearly intended "consult" to convey the same impression. The Court agrees with Magistrate Judge Brown on this point that this is clear even from a reading of the transcript.

comments and "finalize this report and send to Donna for issue" would not have been disclosed. If Magistrate Judge Brown had accepted defense counsel's arguments and ended the hearing before Garove testified, plaintiffs and the Court would have been left with a drastically different impression of the draft reports and the peer review process with respect to plaintiffs' property. Furthermore, the existence of the critical redline document would have for some unknown period remained undisclosed.

Defense counsel's conduct exemplifies what the Second Circuit was describing when it discussed a party's frustrating discovery by "preventing disclosure of facts essential to an adjudication on the merits." *Daval Steel*, 951 F.2d at 1365. In *Daval Steel*, the party was in fact sanctioned not just for its violation of an order from the court to produce a witness for a deposition, but also for the conduct of counsel at the deposition and the party's refusal to continue the deposition after an abortive initial session because that conduct "evince[d] a willful frustration of [] efforts to discover the true facts." *Id.* Magistrate Judge Brown did not err in concluding that counsel's conduct in responding to courts' discovery orders, as well as the conduct at the hearing, evinced a willful effort to frustrate the discovery of the true facts.[21]

In sum, defendant's counsel wishes to parse each statement made to Magistrate Judge Brown and argue that sanctions would not be warranted based on one statement. Defendant's counsel further argues that no other defense counsel, who may have failed to produce such reports pursuant to the CMOs has been similarly sanctioned. However, those arguments overlook that Magistrate Judge Brown's sanctions were based not only on the failure to produce the initial report as required by the clear language of the CMOs, but on a combination of additional factual findings in this particular case, including, *inter alia*, the following: (1) the failure to produce the initial report (and the process used to modify that report) concealed a flawed and unprincipled process in this particular case; (2) the lack of disclosure in this particular case unreasonably prolonged the litigation, imposed unnecessary costs on plaintiffs, and further delayed resolution of the claim; and (3) defense counsel's response to the allegations, and the attempt to curtail the hearing, further exacerbated the prejudice to plaintiffs in terms of delay and costs. Thus, it is the totality of the circumstances upon which the sanctions were based, consistent with the law and Second Circuit precedent.

Accordingly, the Court also affirms the November 7 Order with respect to the sanctions for attorneys' fees.

---

[21] Counsel for defendant argues that a sanction is improper for suggesting, after consultation with FEMA, that an independent engineering review (once an issue was raised regarding the validity of these reports) should be performed. That suggestion itself obviously was not the basis of Magistrate Judge Brown's sanction. When Magistrate Judge Brown refers to defense counsel's response to the allegations, he was referring to, among other things, the failure to investigate the allegations prior to the hearing and the efforts to curtail the hearing to leave the Court "with a distinct misimpression of the practices employed by U.S. Forensic." November 7 Order at 21. Although Magistrate Judge Brown also references attempts to "defend the indefensible practices" revealed at that hearing, he was referencing counsel's failure to recognize the seriousness of the conduct at USF and the prejudicial impact it already had on plaintiffs (and the threat to deny the claim if plaintiffs failed to cooperate in another review), and not simply the suggestion of an independent review in general.

## IV. CONCLUSION

For the reasons set forth herein, the Court affirms Magistrate Judge Brown's November 7 Order in its entirety.

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated: December 31, 2014
       Central Islip, NY

\*      \*      \*

Plaintiffs are represented by John S. Mostyn and Rene M. Sigman of The Mostyn Law Firm, 3810 W. Alabama St., Houston, TX 77027. Defendant is represented by Anthony Martine and Patrick Walsh Brophy of McMahon, Martine & Gallagher, LLP, 55 Washington St., Brooklyn, NY 11201 and Kristina J. Fonte and Gerald J. Nielsen of Nielsen, Carter & Treas, LLC, 3838 N. Causeway Blvd., Suite 2850, Metairie, LA 70002. *Amicus curiae* is represented by Larry Demmons, The Demmons Law Firm, LLC, 7461 Jade Street, Metairie, LA 70002.