UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

| | |
|---|---|
| DEBORAH RAIMEY and LARRY RAISFELD, | **MEMORANDUM & ORDER** |
| Plaintiffs, | 14 CV 461 (JFB)(SIL)(GRB) |
| -against- | |
| WRIGHT NATIONAL FLOOD INSURANCE CO. | |
| Defendant. | |

------------------------------------------------------------X

**GARY R. BROWN, United States Magistrate Judge:**

Plaintiffs have moved for a second evidentiary hearing in this matter, predicated upon purported false representations to the Court by defendant Wright National Flood Insurance Co. ("Wright") and, potentially, further misconduct by its counsel. In a Memorandum and Order dated November 7, 2014 ("November 7 Order"), objections to which have been rejected in a detailed Memorandum and Order of the Honorable Joseph F. Bianco dated December 31, 2014 ("December 31 Order"), the undersigned imposed monetary sanctions in an amount yet to be fixed[1] against Wright's counsel for discovery violations and misrepresentations at the first evidentiary hearing, as well as a limitation on the expert evidence that may be used herein, all emanating from the undisclosed and baseless revision of an expert engineering report. Those sanctions were expressly circumscribed based upon the then-undisputed representation that Wright was unaware of the subject engineering practices and the claim that plaintiff Deborah Ramey[2] failed to disclose the

---

[1] Plaintiffs submitted their Motion for Attorneys' Fees on December 6, 2014 and, following an application by the defendant, the Court extended the time to respond until 14 days after Judge Bianco's resolution of the objections. *See* Electronic Order dated 12/11/14. Because the hearing herein may affect the amount and/or allocation of fees to be awarded, a scheduling order will be set after a decision on the hearing for supplementation of plaintiffs' papers as appropriate and defendant's response thereto; defendant need not respond in the interim.

[2] Plaintiff's name was apparently misspelled as "Deborah Raimey" in court papers. *See generally* Pls.' Mot. to Show Cause, Docket Entry ("DE") [119]; Christine Simmons, *Judge Fears Manipulation of Claims from Sandy*, N.Y. L.J.,

limited evidence she had about the altered engineering report until mediation in this case.

However, as detailed in the December 31 Order, at the direction of Judge Bianco and the undersigned, additional documents have been produced since November 7 which appear to establish that Wright was well aware of the improper conduct. This includes an email from Ramey forwarding the photograph of the earlier, unreleased draft to the Jeff Moore, Wright's Vice President of Claims, who in turn conferred with U.S. Forensic and responded to Ramey's emails and repeated telephone calls. December 31 Order at 12-14. Moore was present as Wright's representative both at the mediation, *see* DE [124] at 5, and at the evidentiary hearing herein, *see generally* Oct. 16, 2014 Hr'g Tr. at 5). In addition, emails have been produced showing that Ramey supplied the photograph of the draft report to David Maxime, a public adjustor retained by Wright,[3] and in those emails Ramey expressed her concern that the report appears to have been "falsified." December 31 Order at 12-13.

Furthermore, the documents appear to demonstrate that Wright may have played some role in the alteration of the engineering reports or the effort to conceal these practices. *See, e.g.*, December 31 Order at 14-15 (discussing potential "swapping" of signature pages on engineering reports by Wright and U.S. Forensic). Without question, representatives of Wright engaged in contemporaneous communications that have not been explored. *Id.* at 7 (emails scheduling telephone conference between Moore and Gary Bell, principal of USF).

This information seemingly stands in stark contrast to the repeated and strident representations made by defendant to the undersigned in filings both before and after the hearing

---

Nov. 13, 2014, http://www.newyorklawjournal.com/id=1202676256938/Judge-Fears-Manipulation-of-Claims-From-Sandy ("A spokesman for the plaintiffs' firm said Ramey's name was misspelled in court papers").

[3] In support of the instant application, plaintiff also submitted documents suggesting that Wright and Colonial Claims, the entity by which Maxime was employed, are owned by the same parent company. DE 128 at 2, Ex. B. Based on the present record, it is unclear whether this purported common ownership is sufficient to attribute knowledge of those communications to Wright, but evidence of communications between Maxime and Wright may be introduced at the hearing that will clarify that question.

that Wright had no knowledge or involvement in the unprincipled practices by U.S. Forensic, and that plaintiff concealed the evidence of the earlier draft report, thereby unfairly "surprising" defendant at mediation. *See* DE [59] at 1 (earlier report "was presented as a surprise during the mediation conference"); *id.* at 5 ("Critically, only Plaintiffs' counsel possessed the three reports"); *id.* at 7 ("Plaintiffs never divulged what they had, to clue in their adversary"); DE [77] ("Defendant was never in possession of this draft, nor any other draft, from US Forensic").[4] At the hearing before the undersigned, *at which Mr. Moore was present*, counsel for Wright represented to the undersigned that Moore was "prepared to offer testimony that he does not receive any report but the final report." Tr. 167; Tr. 168 (counsel representing that Moore would testify that "I only received the final report"); *cf.* DE 95 (objections by Wright stating that Moore "was prepared to testify that Wright had no role whatsoever in the peer review process"). As Judge Bianco found:

> Moore was apparently prepared to testify that USF had never given him the initial report (and thus, at a minimum, imply that Wright did not have the initial report in its possession and had no knowledge of it), even though he actually was made aware of the existence of the initial report from plaintiffs prior to the lawsuit being filed, and even took action on it.

December 31 Order at 11. Based on counsel's representation, the undersigned predicated the November 7 Order, in part, upon "the undisputed fact that U.S. Forensic only provided the two so-called final reports to Wright, which, in turn, disclosed those reports to plaintiffs." November 7 Order at 18.

---

[4] Some of Wright's filings emphasize that defendant's counsel was not in possession of the draft engineering report, and that plaintiffs' counsel had not provided it in discovery, while seemingly avoiding references to whether plaintiff had provided defendant with the draft report during the claims process. *See, e.g.*, DE [59] at 1 ("defense counsel had absolutely no knowledge whatsoever of the existence of a different engineering report"); *id.* at 1-2 ("Plaintiffs' counsel has not presented this Court anything to establish, or even suggest, that defense counsel had any knowledge of that document before its existence was used as a bargaining chip during the mediation"); *id.* at 2 ("At no time did Plaintiffs' counsel ever inform defense counsel that there might have been an even earlier report, (a draft) or provide to defense counsel the supposed cellphone picture of page 1 of an even earlier report or draft"); *id.* at 4 ("never previously divulged to opposing counsel"); *id.* at 5 ("only Plaintiffs' counsel possessed the three reports. Defense counsel did not"); *id.* at 15 ("Had Plaintiffs' counsel divulged the document timely, then both counsel could have worked together to determine the truth.")

3

Having created this misimpression, Wright apparently attempted to capitalize upon it, arguing in its objections that:

> the Order expressly acknowledges the [sic] Wright did nothing wrong (recognizing the "undisputed fact that U.S. Forensic only provided the two so-called final reports to Wright, which, in turn, disclosed those reports to plaintiffs.")

DE [95] at 7; ("Given that the Magistrate Judge acknowledged that Wright itself had committed no wrongdoing whatsoever"). Other defendants followed suit. In the objections to the November 7 Order filed by the WYO carriers, counsel referred to the "engineering reports and drafts which were prepared by a non-party engineering firm and which drafts were not provided to Wright and were not known by Wright until the day of the mediation session in the Raimey case." DE [94].

These representations continued during argument of the objections before Judge Bianco:

> During the argument, counsel for Wright emphasized that Wright did not have the initial Hernemar report. (*See* December 17, 2014 Tr. at 14 ("So Wright Flood didn't have it, and it didn't come to my office in the claims file."); *see also id.* at 20 ("Your Honor, plaintiffs' counsel were the only ones who had all three reports. My client didn't. We have the two final reports. They had both those in the CMO process and they had this photograph of the first draft. They had more information than we did.").)

December 31 Order at 12. Taken together, this material led Judge Bianco to conclude that

> the emails defendant disclosed on December 23, 2014, well after Magistrate Judge Brown issued his opinion, reflect that defendant was well aware of a possible conflicting draft report in the case at bar because plaintiffs notified Moore, defendant's Vice-President of Claims, directly on January 28, 2013, and attached a photograph of the initial report. The Court is now unsure whether defense counsel even reasonably investigated into their own client's documents (including emails), let alone made reasonable inquiry to third parties under the client's control.

December 31 Order at 22.

Predicated upon all of the information that has emerged since the issuance of the November 7 Order, plaintiffs request that the Court "set a hearing and order Defendant to show cause as to

4

why it should not be further sanctioned for its blatant and continued violations of this Court's orders and for material misrepresentations made to the Court." DE [119].

Defendant raises several arguments in response. First, in an argument reminiscent of earlier fallacious arguments of surprise, Wright charges plaintiff Ramey with failing to produce her emails to Moore in discovery. DE [125] at 2 ("we have just produced emails resulting from that specific search, which emails were between plaintiff Debra [sic] Ramey and Wright Vice President of Claims Jeff Moore, *which emails to Moore plaintiff Ramey herself made, and which emails she got back from him she presumably kept, and not one of which plaintiffs' counsel has ever produced to defense counsel!*") (emphasis in the original). Common sense, however, suggests that if plaintiff had access to this email—an effective shield against defendant's repeated allegations of surprise—it would have been submitted at an earlier juncture. And, of course, the emails produced demonstrate that—far from hiding the ball—plaintiff Ramey provided the critical information directly to Wright in January 2013.

Counsel for defendant contend that the application for a hearing should be denied based upon a failure to comply with Local Civil Rule 37.3(c), this district's meet-and-confer rule. However, because the application at issue does not seek discovery, but further sanctions based upon, *inter alia*, misrepresentations and potentially contemptuous conduct by defendant and/or its counsel, requiring a meet-and-confer in these circumstances would be inapposite and unavailing.

Wright also argues that "Jeff Moore was supervising almost 20,000 Sandy flood claims. He cannot be expected to remember every one." DE [125] at 2. The flawed logic of this statement is relatively obvious: this case involved a documented allegation by the insured that the engineering report upon which Wright was relying had seemingly been falsified. Presumably, such allegations are relatively rare. This case, after all, inspired Moore to arrange a conference with Gary Bell at U.S. Forensic with an hour of learning about the allegations, while Bell had

5

previously expressed concern about "the attention" being generated by the plaintiff. *See* December 31 Order at 13-14; DE [123]-1. No matter how many cases Moore was handling, a matter involving allegations of forgery and falsification tend to remain in the forefront of one's recollection.[5] In sum, none of these arguments defeat plaintiffs' request for a hearing.

As suggested by counsel for plaintiff, additional sanctions may be warranted under statutory authority, the federal rules or under the Court's inherent authority. *See, e.g.*, 18 U.S.C. §1927 (providing for the imposition of costs and fees against an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously"); *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45, 111 S. Ct. 2123, 2133, 115 L. Ed. 2d 27 (1991) ("federal courts have inherent power to assess attorney's fees against counsel"); *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991)(sanctions imposed under the Court's inherent power may be imposed "against either the client or his attorney"); *Wood v. Brosse U.S.A., Inc*., 149 F.R.D. 44, 49 (S.D.N.Y. 1993)("An aspect of this inherent power is the court's ability to assess costs and attorneys' fees against either the client or his attorney . . . when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons'"). This is particularly true because the sanctions imposed were expressly limited based on the apparent misimpression—created by counsel for defendant—that Wright was unknowing and blameless in this matter, and it appears that Wright may have attempted to leverage that misimpression to escape the consequences of its actions. *See Int'l Bhd*., 948 F.2d at 1345 (discussing continuing obligation to correct factual misstatements under 28 U.S.C. §1927). Another issue that may be considered at the hearing is the proper allocation of the monetary sanctions imposed in the November 7 Order. While the undersigned imposed sanctions solely

---

[5] The undersigned is among the three magistrate judges managing more than 1,300 Hurricane Sandy cases filed in this district. The facts of this case render it different and, therefore, memorable.

upon counsel (and has not, as yet, allocated those fees among the national and local attorneys representing Wright), the facts may dictate that those sanctions should be borne, in some measure, by defendant. *See, e.g.*, *Grenion v. Farmers Ins. Exch.*, No. CV 12-3219 (JS) (GRB), 2014 WL 1284635, at *7 (E.D.N.Y. Mar. 14, 2014) (imposing sanctions on insurance company, a "sophisticated litigant with internal counsel and significant resources" rather than on its counsel).[6]

Thus, the Court will conduct a hearing on January 22, 2015, beginning at 9:30 a.m., to permit Wright, and its counsel, to show cause why additional sanctions should not be imposed. At that hearing, counsel for the parties should produce all appropriate documents and witnesses, including but not limited to: Jeff Moore, David Maxime, Deborah Ramey and Gary Bell.[7] The hearing will continue day-to-day until complete.

**SO ORDERED**.

Dated: Central Islip, New York
       January 12, 2015

                                        /s/    GARY R. BROWN
                                        Gary R. Brown
                                        United States Magistrate Judge

---

[6] In CMO 1, the Committee ruled that counsel should withdraw extra-contractual claims, including bad faith claims, in all of these matters, or file a statement "explaining the legal basis for continuing to pursue such claims in any particular action." CMO 1 at 5-6 (citing *Funk v. Allstate Ins. Co.*, No. 13 CV 5933 (JS) (GRB) (E.D.N.Y. Dec. 13, 2013); *Dufficy v. Nationwide Mut. Fire Ins. Co*., No. 13 CV 6010 (SJF) (AKT) (E.D.N.Y. Dec. 2, 2013)). The New York Court of Appeals has held that "implicit in contracts of insurance is a covenant of good faith and fair dealing, such that a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims." *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York,* 10 N.Y.3d 187, 194, 886 N.E.2d 127, 131 (2008). Given the extraordinary facts alleged here, it is conceivable that such claims may be warranted *in this particular case,* depending upon the evidence adduced at the hearing. This provides additional justification for holding the hearing.

[7] The information that Moore provided to counsel, and the timing of such provision, may well be relevant, and Moore will be available to testify to such information if appropriate. I will neither require nor forbid counsel from testifying at the hearing. The considerations that may arise relating to issues of attorney-client or work product privilege—and possible exceptions thereto—are too complex to anticipate. Wright should consider in advance whether it is willing to waive such privilege for these purposes, and to be prepared to advise the Court of its position at the time of the hearing. Defendant has already substituted its national counsel in this case; it may wish to consider, given the significant possibility of an apparent or actual conflict, whether to substitute local counsel as well. Otherwise, defendant should be prepared to state its position on waiving any such conflict that may arise, assuming such a conflict is waivable. *Lee v. Charles*, No. 12 Civ. 7374 (JFK), 2013 WL 5637658, at *1 (S.D.N.Y. Oct. 16, 2013) ("For guidance on the issue of a New York attorney's potential conflict of interest, the court may look to the New York Rules of Professional Conduct," and citing N.Y. Rule of Professional Conduct 1.7); *see also* N.Y. Rule of Professional Conduct 1.7 (conflict of interest); N.Y. Rule of Professional Conduct 3.7 (advocate-witness rule).