UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

DEBORAH RAMEY and LARRY RAISFELD,

                      Plaintiffs,                **MEMORANDUM & ORDER**
                                                  No. 14-CV-461 (JFB)(SIL)(GRB)

       -against-

WRIGHT NATIONAL FLOOD INSURANCE
CO.

                      Defendant.
-----------------------------------------------------------X

**GARY R. BROWN, United States Magistrate Judge:**

       Before the Court is a motion by plaintiffs Deborah Ramey and Larry Raisfeld for the

imposition of additional non-monetary sanctions upon former counsel of defendant Wright

National Flood Insurance ("Wright"), specifically, Gerald J. Nielsen ("Nielsen") of Nielsen, Carter

& Tres ("NCT"), and Anthony D. Martine ("Martine") of McMahon, Martine & Gallagher, LLP

("MMG").[1]   Letter by Shpelfogel, Docket Entry ("DE") 187; Pls.' Mem. for Non-Monetary

Sanctions, DE 191.   This application follows the payment of $1.1 million in sanctions by

defendant Wright, representing all of the costs and attorneys' fees sustained by plaintiffs in this

matter (which costs and attorneys' fees were, beyond question, incurred because of improper acts

by defendant and its counsel), as well as the settlement of the plaintiffs' substantive claims for

$250,000 (less amounts previously paid), representing the policy limits of the subject flood

insurance policy.   Stipulation, DE 190.   Although plaintiffs' motion is persuasive, and has been

met with an anemic response by defendant's counsel, the need for finality in this highly over-

litigated matter counsels denial of the motion.

---

[1] While the papers cover individuals other than Nielsen and Martine, as well as their respective firms, I find that only
the conduct by these two lawyers warrants further consideration.

**FACTUAL BACKGROUND**

The background of this matter, including detailed discussion of significant conduct by prior counsel for defendant, is well-documented in a series of court orders including, *inter alia*, orders by the undersigned dated November 7, 2014, December 12, 2014, January 12, 2015 and February 24, 2015, as well as an order by the Committee of Magistrate Judges dated December 11, 2014, and Judge Bianco's Memorandum and Order dated December 31, 2014 (collectively, the "Orders"). *See In re Hurricane Sandy Cases,* 303 F.R.D. 17 (E.D.N.Y. Nov. 7, 2014), *reconsideration denied*, No. 14-MC-41, 2014 WL 7011069 (E.D.N.Y. Dec. 11, 2014), No. 14-CV-461, DE 111, and *aff'd sub nom. Raimey v. Wright Nat. Flood Ins. Co.,* 76 F. Supp. 3d 452 (E.D.N.Y. 2014); No. 14-CV-461, DE 132, 164.   Familiarity with the factual matters discussed in the Orders is assumed, and the Orders are incorporated herein by reference.

## 1.  Misconduct by Counsel

On February 21, 2014 and April 7, 2014, the Committee issued CMOs 1 and 3, which plainly required the production of the draft reports and related emails.   *Raimey*, 76 F. Supp. 3d at 469 ("the Court concludes that the plain language of the CMOs could not be clearer"); *Hurricane Sandy Cases,* 2014 WL 7011069, at *4 ("the obligation to provide draft reports from engineers and adjustors arose from CMO 1"); *Hurricane Sandy Cases*, 303 F.R.D. at 26.   Nevertheless, Nielsen failed to obtain or produce the draft reports or related emails.   Instead, he persisted in relying on arguments which, after the exercise of reasonable diligence by successor counsel, proved to be wholly false.   *See* Resp. to Mot. to Set for Trial 1, DE 59 (earlier report "was presented as a surprise during the mediation conference"); *id*. at 5 ("Critically, only Plaintiffs' counsel possessed the three reports"); *id.* at 7 ("Plaintiffs never divulged what they had, to clue in their adversary");

DE [77] ("Defendant was never in possession of this draft, nor any other draft, from US Forensic").

Court-ordered mediation was held on September 25, 2014.   At the mediation, which failed to resolve the case, plaintiffs' counsel raised the issue of the original engineering report.   As of that proceeding, Nielsen undeniably had knowledge of these very serious allegations. Nonetheless, Nielsen persisted in his failure or refusal to exercise reasonable diligence.   As the undersigned has previously observed:

> after receiving evidence that the engineer's report apparently had been altered, counsel for Wright initially did little to investigate the matter. *See* Deft.'s Mem. in Opp., DE [59] at 2 (observing that the fragment "*seems* to be a draft report" and suggesting "it *might* be that this was a document that had not yet gone through the normal internal peer review process").

*Hurricane Sandy Cases,* 303 F.R.D. at 29 (quoting 9/30/14 memorandum by Nielsen).

Following the mediation, on September 26, 2014, plaintiffs filed a "Motion to Set Discovery Schedule and Set for Trial."   Mot. to Set for Trial, DE 57.   The undersigned issued the following order:

> ORDER setting evidentiary hearing and deferring ruling on Motion to Set Discovery Schedule and Set for Trial.   In light of the nature of the allegations set forth in plaintiffs' submission and defendant's response thereto, a hearing shall be conducted before the undersigned [on] October 16.   At that hearing, plaintiffs shall be prepared to present testimony and documentary evidence concerning the allegations relating to U.S. Forensic Report No. 12.22.1304 and the various incarnations of that report referenced in the parties' submissions.   Counsel for the parties will ensure that Mr. George Hernemar will be present in person to testify about the preparation and submission of the report and related matters. Counsel for defendants will also produce any other necessary witnesses to explain, as appropriate, any differences between the purported original report and the report ultimately produced in discovery.

Order dated Oct. 1, 2014.   The hearing was conducted on October 16, 2014 to resolve the discovery misconduct allegations relating to undisclosed draft reports.   *Id.*   During the preparatory briefing, numerous allegations were raised concerning the potential involvement of

3

Nielsen in improper activities.   *See generally* Mot. to Set for Trial; Resp. to Mot. to Set for Trial;

Reply to Mot. to Set for Trial, DE 66.   Surprisingly, however, Nielsen did not appear at the

hearing; instead, counsel from MMG exclusively represented Wright at the hearing.   Minute Order

dated Oct. 16, 2014, DE 68.

At the hearing, Martine made several misrepresentations to the Court in a seeming effort to

curtail the inquiry.   These issues have already been well documented elsewhere, and need not be

rehashed here.   *See, e.g.*, *Hurricane Sandy Cases*, 303 F.R.D. at 22 (discussing Martine's repeated

false representations about expected testimony from Michael Garove, the "peer review" engineer);

*Raimey*, 76 F. Supp. 3d at 458 ("there is a more than sufficient basis, based upon this

representation by defendant's counsel, and other conduct by defendant's counsel at the hearing and

following the hearing, for Magistrate Judge Brown to find that counsel should not have attempted

to curtail the hearing in this manner and that it was 'an effort to mislead the Court'"); *id.* at 476 ("it

is plain from the record that counsel made a significant misrepresentation to Magistrate Judge

Brown with respect to the content of Garove's testimony").   Subsequent revelations in this matter

have revealed that Martine may well have succeeded in thwarting the undersigned's effort to

develop a complete record here, as he effectively used false representations to keep Jeffrey Moore,

Wright's Vice President of Claims, from testifying at the October hearing.   *Id.* at 463 (discussing

Martine's "representation to the Court regarding the substance of Moore's anticipated testimony").

### 2.   *Plaintiffs' Arguments Regarding Additional Sanctions Upon Counsel*

On this motion, plaintiffs submit an expert report by Michael S. Ross, Esq., an individual

with substantial experience and qualifications in the area of legal ethics.   *See* Ross Report 4-6, DE

187-1.   After an extensive review of certain assumed facts (the accuracy of which shall be

discussed presently), Ross opines that conduct by counsel warrants the imposition of sanctions.[2] *Id.* at 17.   Ross outlines potential remedial sanctions that may be imposed with respect to Nielsen and Martine, including (a) referring counsel to the Attorney Disciplinary Committee of the Eastern District of New York for further review; (b) submitting this matter to several state disciplinary authorities; and (c) referring counsel to the United States Attorney's Office for criminal prosecution.   *Id.* at 26.   Ross further suggests that the revocation of *pro hac vice* status for Nielsen and NCT in the instant case as well as other pending Hurricane Sandy cases would well serve as another sanction for the misconduct that occurred before this Court, but notes that Nielsen's withdrawal from all such cases obviously renders this a moot issue.   *Id.* at 22-23 n.7.

In a thoughtful submission by the Mostyn firm on behalf of plaintiffs, counsel adds several other suggestions for non-monetary sanctions.   Pls.' Mem. for Non-Monetary Sanctions.   These supplemental suggestions include (1) requiring counsel to attend CLE classes, (2) mandatory *pro bono* representation of a client; and (3) issuance of a published or unpublished reprimand.   *Id.* at 3.

### 3.   *Responses by Nielsen and Martine*

A review of the responses by Nielsen and Martine, which are individually examined below, reveal several common elements.   First, in fairness, counsel have necessarily been limited by the refusal of Wright to waive the attorney-client privilege, a fact which, in some, but not all relevant respects, impairs counsels' abilities to respond to the matter before the Court.   *See* Feb. 18, 2015 Tr. 141:10, 142:3-7.   Similarly, the invocation of the Fifth Amendment by Moore restricts both the ability of the attorneys, as well as this Court, to fully develop the factual record.   *Id.* at 12-16.   In reviewing these matters, I have remained cognizant of these limitations and have not drawn any negative inferences against counsel based upon the resulting evidentiary gaps.   *Nabisco, Inc. v. PF*

---

[2] Ross conflates the actions of Nielsen and Martine in conducting his review.

*Brands, Inc.,* 191 F.3d 208, 226 (2d Cir. 1999) (adverse inference may generally not be drawn based on invocation of attorney-client privilege); *United States v. Dist. Council of New York City & Vicinity of United Bhd. of Carpenters & Joiners of Am.,* 832 F. Supp. 644, 652 (S.D.N.Y. 1993) ("the fairness of taxing a party with [another's invocation of the Fifth Amendment] depends upon the relationships between them").   Rather, the determinations made herein are based solely upon indisputable evidence of counsel's conduct before this Court.

Next, the tone of both responses reflects a level of litigiousness that, sadly, has been characteristic of counsel's approach throughout this case.   *See* Nielsen's Mot. to Strike, DE 199; Nielsen's Mem. in Opp., DE 200; Martine's Mem. in Opp., DE 201.   Counsel are quick to blame each other, attack plaintiffs' counsel, elevate form over substance, recycle arguments that have been roundly rejected by the Court and, in one bewildering sequence in Martine's response, falsely accuse plaintiffs of committing fraud.

Finally, both responses are also remarkable for a common deficiency.   In neither response has counsel assumed a morsel of responsibility for their own misconduct, or uttered a syllable of apology.   Despite lengthy submissions by both firms, the volume of paper submitted is devoid of a single sentence suggesting that their conduct was anything other than professional.   In fact, notwithstanding specific findings by Judge Bianco, the Hurricane Sandy Committee or the undersigned, both counsel seem to believe that everyone's conduct was lacking, except for their own.   They are mistaken.

### 4.  *Response by Martine*

The most telling aspect of Martine's otherwise lackluster defense appears on the very first page of his memorandum.   *See* Martine's Mem. in Opp. 1 n.2.   Martine engages in a long and entirely irrelevant calculation, estimating the value of the home destroyed in the storm and the

ultimate sale price of the land.  *Id.*   Martine inexplicably charges, among other things, that "the court embraced the plaintiffs' fraudulent claim of $250,000."  *Id.*   This diatribe ends with the unfathomable charge that plaintiffs "have now *fraudulently* collected the entire $250,000.00 policy limits.  *The American taxpayer weeps*."  *Id.* (emphasis added).

While the factual underpinnings of Martine's analysis are undefined (and in many places simply wrong), the facts asserted are far less important than the message contained therein. Martine, whose fees were being paid by FEMA, made unsupported, false representations in open court, wasted countless hours with obstructive conduct, and attempted to thwart a fair inquiry into the truth.   That he begins his opposition to a motion for sanctions with a baseless attack upon the plaintiffs—who were the victims not only of the storm but also of misconduct by counsel and their client—remains incomprehensible.

In terms of his misrepresentations as to the expected testimony of Garove, Martine again argues that he "did not interview or advise Mr. Garove, or make any request of him, directly or indirectly, to testify, or not testify."[3]   Martine's Mem. in Opp. 8.   This argument has already been rejected by the Court:

> "It is, frankly, irrelevant whether or not counsel made that misrepresentation out of a knowing attempt to prevent harmful testimony or, as averred at oral argument, out of ignorance because counsel had never directly conferred with Garove about the content of his testimony.   Neither reflects an adequate rationale for making evidently false statements to the Court."

*Raimey*, 76 F. Supp. 3d at 476.

Martine's response is also notable for another reversal of a factual assertion made during

---

[3] Paradoxically, MMG also argues that "We say confidently, categorically and absolutely that any and every representation made by a lawyer of this firm concerning the anticipated testimony of the persons whose attendance we secured for the October 16, 2014 hearing, was based on diligent preparation and was made in absolute good faith and believed by MMG's lawyers with good reason to be true. . . Unconditionally, every representation made by a lawyer of this firm concerning what we, MMG, knew, was and is absolutely true."   Martine's Mem. in Opp. 10.   It is unclear how these statements can logically be resolved with the assertion that no one from MMG spoke to Garove, and the misrepresentations made to the Court about the content of his testimony.

the October 2014 hearing.   At the hearing, Nielsen's conspicuous absence was the first issue raised

by the Court, leading Mr. Martine to state that Nielsen was "currently on a plane, and will be on

one all day heading out West."   Oct. 16, 2014 Tr. 2:7-8.   The Court expressed surprise given that

"many of the allegations in those papers . . . relate to Mr. Nielsen's conduct and statements he has

made."   *Id.* at 2:9-15.   On two separate occasions during the hearing, Martine attributed Nielsen's

absence to the late filing of papers by plaintiff, and Nielsen's resultant ignorance of the allegations.

*Id.* at 2:18-21 ("Judge, I would imagine that had those papers not been filed at 6 o'clock last night,

Mr. Nielsen or a representative from his firm would have been here."), 175 ("had we received [the

reply papers] sooner than 9 o'clock or 8 o'clock or 6 o'clock last night, I suspect that he would

have been here.")   Notwithstanding the above representations made at the hearing concerning

Nielsen's travel plans and the purported late notice of allegations against him, Martine now

acknowledges exactly the opposite.   Martine asserts that "MMG was asked by NCT to take the

lead in representing Wright at the hearing ordered by Your Honor [ ] [d]ue at least in part to the

plaintiffs' motion papers' extensive and vituperative personal allegations against Mr. Nielsen."

Martine's Mem. in Opp. 7.   In other words, Martine now represents that Nielsen asked MMG to

appear in his stead not because he was unaware of the allegations made against him, but precisely

to avoid facing those allegations.

       5.   *Response by Nielsen*

      As a threshold matter, Nielsen responds to the request for sanctions by moving to strike

Ross's expert report.   Nielsen's Mot. to Strike.   Indeed, the firm's primary challenge to the

motion for nonmonetary sanctions is to attack the expert report based upon (1) the timeliness of its

submission; (2) the fact that counsel other than Mostyn filed the report with the Court; and (3) the

accuracy of its assumptions.   *Id.*   As to the timeliness of the submission, paradoxically, there was

some question about the timeliness of Nielsen's response to this Court's order to show cause why sanctions should not be imposed, a failure that this Court excused in its February 24 Order. Moreover, Nielsen can demonstrate no prejudice from any such delay.   Thus, I am unmoved by Nielsen's complaint of untimeliness.   As to the fact that counsel other than Mostyn filed the report with the Court (which report was fully embraced by Mostyn, *see* Pls.' Mem. for Non-Monetary Sanctions 1), this syllogistic argument similarly rings hollow.

It is surprising that Nielsen expends great effort in his attempt to strike Ross's report while failing to supply a meaningful defense of his own misconduct.   While Mr. Ross's report is sufficiently well done, if at times resting on flawed assumptions, his suggestions of potential remedies, while certainly well-considered, are not exactly revolutionary.   In other words, even assuming, *arguendo*, that the undersigned were to strike the report, this Court would remain well aware of its authority to refer counsel to state disciplinary authorities, to this District's disciplinary committee or to the U.S. Attorney.   Similarly, Mr. Ross's opinion that Nielsen's conduct warrants the imposition of disciplinary sanctions, even if predicated in some part on mistaken assumptions, could be characterized, at best, as interesting to the undersigned, who presided over the litigative morass that led to this application.   Thus, the motion to strike is denied, though, to be clear, I have not relied upon Ross's conclusions in any material respect.

As to the principal misconduct issue—the failure to produce the altered report and related documents—Nielsen primarily relies upon the fact that other counsel in the case did not construe the order to require such production.   Nielsen's Mem. in Opp. 20-22.   This argument has been repeatedly rejected in this case.   *See, e.g.*, *Raimey*, 76 F. Supp. 3d at 475 ("the allegation that others also ignored the CMOs' obvious plain language does not mitigate the violation").

Equally important, though, the argument that counsel involved in cases other than this one—which was highly unusual in many ways—similarly interpreted the CMOs, misses a larger

9

point.   Once Nielsen learned of the potential that the engineering reports had been improperly altered, which, by his own admission, was no later than the mediation hearing in September 2014, *see, e.g.,* Dec. 17, 2014 Tr. 14-15, his duty to update the deficient discovery responses filed on behalf of his client gained greater urgency.   *See Markey v. Lapolla Indus., Inc.,* 2015 WL 5027522, at *20 (E.D.N.Y. Aug. 25, 2015) (upholding imposition of a monetary sanction based upon, in part, "counsel's failure to sufficiently oversee the document retention and collection"). Notwithstanding (1) the undisputed notice to Nielsen of altered engineering reports during the September mediation, (2) the subsequent discovery disputes, motion papers and evidentiary hearing in October 2014, (3) this Court's November 7, 2014 decision, in which counsel, for avoidance of doubt, was again ordered to turn over draft reports and related communications, (4) the motions to reconsider that ruling made to the undersigned and to the Committee, and (5) the appeal of the November ruling to Judge Bianco, Nielsen never took steps to conduct the degree of diligence *with his own client* to uncover documents that would have ensured that his arguments were sufficiently based in fact.   On December 17, 2014, nearly three months after the mediation, Nielsen once again made the following representation to Judge Bianco at oral argument:

> plaintiffs' counsel were the only ones that had all three reports. My client didn't. We have the two final reports. They had both of those in the CMO process and they had this photograph of the first draft. They had more information than we did.

Dec. 17, 2014 Tr. 20:9-13.   Of course, as is now indisputable, Wright, Nielsen's client, had possession of the reports since January 2013, when plaintiff Ramey repeatedly emailed the original document to Moore, among others.   *See* Feb. 18, 2015 Hearing Pls.' Exs. 1, 8-11, 14, 15.   That three months was more than enough time to determine this fact is demonstrated by the conduct of Wright's successor counsel, who assumed representation on this case on December 19, 2014, *see* DE 118, and produced the emails to Moore along with the photographs of the original and altered reports by February 12, 2015, less than two month after taking control of the case.   DE 156.   This

course of events suggests that the task of finding and producing these documents should have been accomplished by Nielsen well within the many months following CMO 1, and certainly within the three months he was aware of the most serious allegations of fraud and tampering with evidence.

Lastly, Nielsen, limited by Wright's refusal to waive attorney-client privilege, invites the Court to draw certain inferences based on non-privileged communications.   Specifically, Nielsen asserts that his baseless, and ultimately fallacious arguments represented "the ***adamantly*** held positions of Wright's highest corporate executives."   Nielsen's Mem. in Opp. 7; *id.* (arguing that "newly produced emails conclusively establish that the highest ranking corporate officers of Nielsen's client, a very large insurance company, were *adamant* that they did not have the email concerning the 'first' Hernemar Report from Ms. Raimey during the representation of Wright Flood by NCT and Nielsen")(emphasis in original)).   In support of this assertion, Nielsen cites to two December 2014 emails, one from Wright's President Connolly to a reporter at National Public Radio ("NPR email"), and the other from Moore to Connolly ("Moore email").   *Id.* at 6-7.   The NPR email states that "Wright had no knowledge of the original opinion."   *Id.* at 6.   The Moore email details the events at the hearing before Judge Bianco, as to which Moore states:

> The other side also produced two emails from Ms. Raimey to the Colonial adjuster supposedly emailing him the photos from the first draft report. She also references speaking to me and emailing me.   I remember speaking to her but have no recollection of any email and did not find anything in my email search for anything related to Raimey at the time of suit nor when I did a more diligent search a few weeks ago. They did not produce any emails from Raimey to me.

*Id.* at 7.

While Nielsen would have the Court infer that these emails support the notion that Wright's executives held the position, as he represented to the Court, that Wright had no notice or knowledge of the altered reports, there are two significant problems with this assertion.   First, Moore acknowledges speaking to Ms. Ramey in his email to Connolly, and the substance of that

11

call must have involved the changed report.   Second, Nielsen's argument ignores another email produced by successor counsel.   At the February 18, 2015 hearing, the first exhibit introduced was an email from Moore to Russell Tinsley, representative of FEMA, dated September 18, 2014, just less than a week before the mediation.   Feb. 18, 2015 Hearing Ex. 1.   In that document, Moore attached a number of documents relevant to the Ramey claim and stated:

> I will call you in the morning.   After reviewing, I remembered these folks and may have an idea about the "fraud" engineer report.

*Id.*   Thus, a week before the mediation, it would seem that Moore sufficiently recalled the details of the allegations of fraud to be able to share them with a Government representative.   It is difficult to imagine, absent some extraordinary event, that he suddenly forgot this information in the week leading up to the mediation.

As a result, I decline to accept counsel's suggestion that the two emails he cites establishes that his representations were based upon firmly held views of these corporate officers.   Given the state of the record on this point, including the contradictory information contained in these emails, and the difficulties presented by Moore's invocation of the Fifth Amendment and Wright's maintenance of the attorney-client privilege, though troubled by Nielsen's selective presentation of evidence on this application, I draw no conclusions as to the position taken by his clients.   Rather, I find that Nielsen failed to exercise appropriate diligence in the face of repeated court orders.

## DISCUSSION

The question facing the Court, then, is whether, after the imposition of $1.1 million in costs and attorneys' fees, as well as evidentiary sanctions against their client, some additional non-monetary sanction should be imposed against counsel.   As the Second Circuit has observed:

> We are cognizant of the unique dilemma that sanctions present. On the one hand, a court should discipline those who harass their opponents and waste judicial resources by abusing the legal process. On the other hand, in our adversarial system,

12

> we expect a litigant and his or her attorney to pursue a claim zealously within the
> boundaries of the law and ethical rules. Given these interests, determining whether a
> case or conduct falls beyond the pale is perhaps one of the most difficult and
> unenviable tasks for a court.

*Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 341 (2d Cir.1999).

Notwithstanding these difficulties, I find—and reiterate this Court's earlier findings—that Nielsen

and Martine unquestionably engaged in sanctionable conduct, and that conduct was not harmless.

The complication, of course, is that Wright has paid for all costs and attorneys' fees sustained by

plaintiffs.   The shifting of costs and attorneys' fees provides a proportional, nuanced response to

attorney misconduct: such sanctions represent a nearly precise measure of the harm cause.   *Kara*

*Holding Corp. v. Getty Petroleum Mktg., Inc.,* No. 99 Civ. 0275 (RWS), 2004 WL 1811427, at \*29

(S.D.N.Y. Aug. 12, 2004) ("payment of attorneys' fees and expenses . . . is both a measurable and

a proportionate sanction").   Indeed, this Court has thoroughly considered the imposition, *sua*

*sponte*, of additional monetary sanctions upon counsel, but such an effort would almost invariably

lead to further litigation in a matter that, above all, cries out for resolution.   *Satcorp Int'l Grp. v.*

*China Nat. Silk Imp. & Exp. Corp.*, 101 F.3d 3, 7 (2d Cir. 1996) (discussing the complexities of

imposing monetary fines on attorneys under Rule 37); *Apex Oil Co. v. Belcher Co. of New York,*

855 F.2d 1009, 1011-12 (2d Cir. 1988)(same).

Under the circumstances, the remedies suggested by plaintiff, including disciplinary and/or

criminal referrals, are inefficient and, potentially, draconian.   Initially, the tangled and lengthy

record of the case renders review difficult and time-consuming, particularly to a fact finder that has

not lived through this legal odyssey.   These inefficiencies weigh heavily against a referral.   The

sanctions available, including suspension, disbarment and/or prosecution would be far beyond the

pale for the conduct discussed herein, particularly in light of the loss of business and other

consequences already endured by counsel.   *See, e.g.*, Nielsen's Mem. in Opp. 27 ("a previously

unblemished and exemplary career spanning three decades has already been significantly tarnished

13

and diminished").   Furthermore, given the history of this matter, some of counsel's more creative

suggestions, such as CLE classes or mandatory *pro bono* representation, offer little promise.

Thus, the primary non-monetary vehicle available—whether to this Court or a disciplinary

authority—would be some form of formal or informal reprimand.   The Orders in this case,

particularly when viewed in the aggregate, provide a level of admonishment rarely seen in federal

litigation.   The remorselessness demonstrated in the responses by counsel on the instant

application seems to suggest that these cautions, representing the work of four federal judicial

officers, have not had their intended effect.   One can only hope that in reviewing this decision, and

reflecting upon the history of this matter, Nielsen and Martine will realize just how perilously close

they came to facing far more serious consequences for their misconduct.

### 1.   Other Applications

Plaintiffs also seek further inquiry into this matter, including consideration of whether

Nielsen should be ordered to provide this Court and/or a disciplinary board with all

communications relating to its knowledge of the engineering report alterations.   *See* DE 205.

This application is buttressed by the suggestion that communications with Wright on this subject

would not be privileged under the crime-fraud exception.   *Id.*; Ross report 26 n.10.   Though

sorely tempted to consider this application further, I decline to do so.   I believe this matter has

been sufficiently vetted, and it is time to bring this to a close.

### CONCLUSION

Based on the foregoing, plaintiffs' well-reasoned application for the imposition of

additional non-monetary sanctions is hereby DENIED.   The Clerk of the Court is directed to close

the case.


**SO ORDERED**.

Dated: Central Islip, New York
         January 12, 2016


                                        /s/    GARY R. BROWN
                                        Gary R. Brown
                                        United States Magistrate Judge

15